JAMES W. PUZEY (NV SBN 05745)
Email: jpuzey@nvlawfirm.com
**KEARNEY PUZEY DAMONTE LTD.**
800 South Meadows Parkway, Suite 800
Reno, Nevada 89521
Telephone: (775) 851-8700

SHERI FLYNN (*Pro Hac Vice Forthcoming*)
Email: SFlynn@ch-law.com
COLEMAN & HOROWITT, LLP
499 West Shaw Avenue, Suite 116
Fresno, California 93714
Telephone: (559) 248-4820

*Attorneys for Plaintiffs Utherverse, Inc. and*
*Brian Shuster*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA – RENO DIVISION

| | |
|---|---|
| UTHERVERSE, INC., a Nevada corporation, BRIAN SHUSTER, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>BRIAN QUINN, an individual; JOSHUA DENNE, and individual; BLOCKCHAIN FUNDING, INC. a Delaware corporation; BLOCKCHAIN ALLIANCE LLC, a Wyoming Limited Liability Company; MASTERNODE PARTNERS, LLC, a Wyoming Limited Liability Company; LYNNE MARTIN, an individual; NIYA HOLDINGS, LLC, a Nevada limited liability company; NIMA MOMAYEZ, an individual; and JEREMY ROMA, an individual,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1961 ET SEQ.); FRAUD IN THE INDUCEMENT; INTENTIONAL MISREPRESENTATION (FRAUD); CONVERSION; BREACH OF FIDUCIARY DUTY; AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; AND TORTIOUS INTERFERENCE WITH CONTRACT**<br><br>**(DEMAND FOR JURY TRIAL)** |

Plaintiffs, UTHERVERSE, INC. ("UI") and BRIAN SHUSTER ("Shuster"; collectively "Plaintiffs") allege as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is proper under 28 U.S.C. §1331 as Plaintiff's claim is rooted in a federal statute, namely, the Racketeer Influenced and Corrupt Organizations Act ("RICO"; 18 U.S.C. §§ 1961 et seq.).  The Court has supplemental jurisdiction over the state law

claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case and controversy.

2.      Venue of this Court is proper pursuant to 18 U.S.C. § 1965(a) and (b) in that defendant NIYA HOLDINGS, LLC ("NIYA") is a Nevada limited liability company, UI is a resident of the state of Nevada, and a significant part of the events that form the case and controversy at issue occurred in the state of Nevada.

**PARTIES**

3.      UI is and at all relevant times hereto was, a corporation, doing business and having its principal place of business in Carson City, Nevada.

4.      Shuster is, and at all times relevant hereto was, an individual residing in Vancouver, British Columbia, Canada.

5.      On information and belief, BRIAN QUINN ("Quinn") is an individual residing in Orange County, California.

6.      On information and belief, JOSHUA DENNE ("Denne") is an individual residing in Paradise Valley, Arizona.

7.      On information and belief, BLOCKCHAIN FUNDING, INC. ("Blockchain Funding") is a Delaware Corporation, with its principal place of business at 1020 Wendy Lane, Cheyenne, Wyoming. On information and belief, Blockchain Funding is owned by Denne.

8.      On information and belief, BLOCKCHAIN ALLIANCE, LLC ("Blockchain Alliance") is an administratively dissolved Wyoming Limited Liability Company with its principal place of business at 6933 E. Fanfol Dr., Paradise Valley, Arizona. On information and belief, Blockchain Alliance's controlling member is Denne.

9.      On information and belief, MASTERNODE PARTNERS ("Masternode") is an administratively dissolved Wyoming limited liability company, with its principal place of business at 30 N. Gould Street, Suite R, Sheridan, Wyoming.

10.      On information and belief, LYNNE C. MARTIN ("Martin") is an individual residing in Orange County, California, and is the mother of Denne.  On information and belief, Martin is a member of Masternode.

11.    On information and belief, NIYA is a Nevada limited liability company, with its principal place of business at 187 Warm Springs Road, Suite B206, Las Vegas, Nevada.

12.    On information and belief, defendant, NIMA MOMAYEZ ("Momayez") is an individual residing in Irvine, California, and is NIYA's sole member.

13.    On information and belief, defendant, JEREMY ROMA ("Roma") is an individual who resides and does business in California, and has a residence in Dubai, United Arab Emirates.

14.    Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, each of the defendants were the agents and/or the employees of their co-defendants and in doing the things hereafter alleged were acting with the permission and consent of their co-defendants. Plaintiffs further allege that at all times herein mentioned, each of the defendants authorized, directed, or participated in the commission thereof, or subsequently ratified the acts of each of the remaining defendants with full knowledge of all relevant facts.

## INTRODUCTION

15.    This case is about an elaborate and premeditated scheme by Defendants acting in concert to defraud Plaintiffs, embezzle and extort money from them and others, and eventually bankrupt UI and Utherverse Digital, Inc. ("UDI") to cover up their scheme. The scheme was organized and directed by Quinn and Denne with the full knowledge and participation of the other Defendants and targeted Shuster, UI and UDI because of their involvement in virtual world environments capable of utilizing cryptocurrency within a metaverse, and their vulnerability resulting from the need for cash for development of the virtual world environments.

16.    Quinn and Denne convinced Shuster they were trustworthy, could infuse millions of dollars of investments into UI and UDI for virtual world development, and could assist in the launching of a cryptocurrency for trading and use in those virtual worlds.  Through numerous documented electronic communications and various agreements, Quinn and Denne promised to pay up to $5 million US dollars to cover all the costs of to prepare, market and rapidly launch a top cryptocurrency that would fund all the expansion and development costs of UDI's virtual world software; and to identify and bring to UI investors interested in purchasing UI stock and promised to market and presell cryptocurrency tokens, to be known as "UTHER" tokens, to infuse much

needed cash into the companies.  Although Quinn and Denne repeatedly told Shuster they were working deals with a stream of big money investors, the big money investors never materialized.

17.    In furtherance of the scheme, Quinn and Denne sold stock in UI that they had no right to sell, presold UTHER tokens under falsified Simple Agreements for Future Tokens ("SAFTs") and pocketed the money due to UI from the sales.  They also convinced Shuster to enter into a variety of loans and agreements that were ultimately determinantal to UI and UDI, based on false and misleading statements, among numerous other misdeeds and violations of the law.

18.    A portion of the scheme involved convincing Shuster to add staff to UDI, including a new CEO handpicked by Quinn and Denne, with Quinn and Denne promising to provide the funds needed to cover the additional cost while keeping UI/UDI on the verge of bankruptcy, infusing only enough cash into the companies to keep them afloat until Quinn and Denne pocketed sufficient funds to make the scheme profitable to them.

19.    Such schemes are not new to Quinn or Denne. In an Order issued in *Securities and Exchange Commission v. Tobin, et. al.*, No. 18-CV-12451 (Dist. Mass. July 13, 2022) (judgment as to defendant Brain Quinn), and a Final Judgment as to Defendant Brian Quinn in the same case, dated October 17, 2024, collectively attached hereto as **Exhibit A**, Quinn was found in violation of federal securities laws and permanently restrained and enjoined from, among other things, (i) engaging in any act, practice or course of business which operates or would operate as a fraud, (ii) offering or selling any security in interstate commerce or by use of the mails that employs any device, scheme, or artifice to defraud, (iii) obtaining money by means of any untrue statement or omission of a material fact, and (iv) participating in an offering of any penny stock (defined as stock trading under $5.00/share).  At the relevant times herein when Quinn was selling UI stock, UI's shares were trading for between $1.00 and $2.50 per share.

20.    From all accounts, Denne is a twice convicted felon, having pled guilty to felony drug and gun charges in 1998 and convicted of insurance fraud in 2011.  See Los Angeles Times, *Offer of masks for California drew a cast of characters, from a lobbyist to an ex-con* (May 29, 2020), available at https://www.latimes.com/california/story/2020-05-29/coronavirus-masks-deal-characters, attached hereto as **Exhibit B**.  Quinn and Denne have also reportedly been involved in a

myriad of Ponzi and other fraudulent schemes, both separately and together.

21.    Quinn and Denne are skilled at the art of deception, using a variety of methods to maintain Shuster's trust, including presenting themselves as honest family men by texting photos of activities and time spent with their children.

22.    They also attempted to entrap Shuster to violate the law to maintain control over him and his companies. When Shuster began to question their motives, Quinn and Denne became defensive and threatened to bring bogus legal action against Shuster and his companies in a further attempt to extort money from them.

23.    In an abuse of process, Denne and some of the Defendants named herein did file such a frivolous lawsuit against Shuster, his companies, and others (see *Denne v. Shuster*, Cal. Sup. Ct., Co. of Orange, Case No. 30-2024-01438251-CU-FR-NJC, filed Nov. 8, 2024; the "Orange County Case"). However, the action, has multiple deficiencies including that the court lacks jurisdiction over Shuster, his companies and the other defendants, and therefore, rather than counter-complain in the Orange County case, Shuster and UI chose to bring their action here, in an appropriate forum.

**FACTS**

**A.    Background and Initial Contact by Quinn and Denne**

24.    Shuster has been in the business of developing virtual world environments for over twenty (20) years. In June 2005, after years of frustration caused by an inability to directly manage the development of virtual worlds and metaverses, Shuster formed UI and brought the development of virtual worlds/metaverses in house with his own development team.

25.    UDI was formed in November 2006 for the purpose of employing software developers and others tasked to develop and maintain virtual world environments and metaverses. UDI invoices UI for such development and maintenance, and UI provides accounting support by invoicing and receiving payments from customers, and reimbursing UDI for its work.

26.    As a major part of the development of virtual environments/metaverses, UDI undertook to create new software with the goal of the new software becoming widely adopted for virtual world environments. Because UDI was carefully managing cash flow, the development of the new software was slow.

27. At or near the beginning of 2022, when the software was still under development, Shuster was approached by Quinn. Quinn told Shuster that he was operating a billion-dollar investment fund and was interested in investing in UI. Quinn brought in his partner, Denne, who Quinn said was similarly situated with a consortium of investors sitting on a large amount of money earned via cryptocurrency.

28. As a result of the discussions Quinn had with Shuster, Quinn convinced Shuster he would: (a) raise money UI needed to reach profitability; (b) take UI public on the NASDAQ; (c) spend $5 million to prepare, market, and presell UDI's UTHER (cryptocurrency) tokens (funds from the presale were to be used for completing and launching the software platform), (d) mint the UTHER tokens that would be used as in-world currency in UDI's virtual world environment; and (e) bring investors to UI to purchase shares prior to the initial public offering ("IPO"). Based on these promises and others, Shuster began working with Quinn and Denne.

29. Contrary to his express representations, Plaintiffs later learned that Quinn did not run a billion-dollar hedge fund. Quinn also did not take UI public, spend the $5 million promised, nor bring in the promised investors to UI to purchase shares, among other failed promises.

**B.    Defendants' Fraudulent Scheme**

30. After gaining the confidence of Shuster and UI, Quinn, Denne, and the other Defendants proceeded with a complex scheme to defraud Shuster, UI, UDI, and investors. The scheme included defrauding two sets of victims: (1) Shuster, UDI and UI (by diverting money intended for investment in UI to Defendants own accounts); and (2) individuals and entities that thought they were investing in UI (whether by purchasing stock or by purchasing UTHER tokens), but who received no valid stock or tokens and instead had their "investment" diverted for use by Defendants, while Defendants concealed the "investment" from UI.

31. To make the plan work, Defendants needed UI to stay solvent, but also to be close enough to insolvency that UI would not make any public announcements about ceasing investment rounds.

/ / /

/ / /

32.   In addition, Defendants needed UI to be in strong need of funds, so that it would continue to assist Defendants – who repeatedly represented that they were trying to bring in investors – in getting investors to pay money that Defendants would divert for their own use.

33.   As part of the scheme, Quinn and Denne sold shares in UI and "rights" to purchase cryptocurrency that they did not own or have the right to sell.  Quinn and Denne, acting in concert, collected millions of dollars, and diverted the funds from UI to their personal bank accounts and/or cryptocurrency wallets. The defrauded investors were left believing that they had purchased and now owned stock in UI, rights to future tokens, or both, and UI and UDI were left without investment dollars, believing the tales of Quinn, Denne, and the other defendants that for one reason or another, the investors chose not to invest.

34.   Specifically, Quinn and Denne falsified a SAFT that had been prepared by UI/UDI for accredited investors to purchase UTHER cryptographically secured digital tokens that would issue on behalf of UI/UDI.  Quinn and Denne did so by inserting Blockchain Funding, Inc. as the "Company" in the SAFT in place of Utherverse International, Ltd. ("UI LTD").  UI LTD is an administratively dissolved entity, with its rights and obligations under the legitimate SAFTs having been undertaken by a new company UTHX DAO, LLC, which Shuster subsequently formed for this purpose.

35.   Thus, investor funds, transferred electronically, were paid to Blockchain Funding, Denne and/or Quinn's bank account(s) and/or cryptocurrency wallets, instead of being paid to UI.

36.   Another aspect of the fraud were representations made to Shuster by Quinn and Denne that one or more potential investors were interested in buying UI or UDI stock. Quinn and Denne would then pump up the investor as having large amounts of money and being very interested in investing in UI.  Shuster would then conduct meetings with one or both of Quinn and Denne and the potential "investors".  It was not uncommon for the potential investors to say that they very much wanted to invest after attending one or more meetings. However, with very few exceptions, the potential investors would just evaporate, with Quinn and Denne telling Shuster they had lost interest.

37.   One particular investor was Disruptive Technologies OÜ ("Disruptive Technologies"), an Estonian Private Limited Company who, on or about August 8, 2022, signed a

Binding Letter of Intent ("Binding Letter") with UDI, Shuster, and Shuster's brother Gary (collectively, "Sellers"). On information and belief, Defendant Roma has an ownership interest in Disruptive Technologies. At minimum, Roma was involved in facilitating communications between Quinn and Denne on the one hand, and Disruptive Technologies on the other hand.

38.    In exchange for fifteen percent (15%) of the outstanding shares of UDI, 300 million UTHER tokens, and other consideration, Disruptive Technology agreed to distribute $30 million to Sellers, $2.5 million of which was to be paid in September 2022, $2 million in October 2022, $2.5 million in November 2022, and the balance of $23 million in April 2023. However, the money was never distributed.

39.    Right before the first payment was to be made, Quinn, Denne and Roma met, and shortly thereafter, Quinn told Shuster that a disgruntled former associate of UDI contacted Disruptive Technologies, telling Disruptive Technologies that Shuster was a fraud, among other lies. Quinn also said that the former associate indicated he would soon be suing Shuster, which caused Disruptive Technologies to pull out of the deal. On information and belief, the story that the former associate contacted Disruptive Technologies was fabricated by Quinn, Denne, and Roma to keep UDI in a weak position financially while continuing to divert funds to themselves.

40.    On information and belief, the communication from the former associate never occurred and instead the deal between Disruptive Technologies and Sellers was a sham and part of the scheme to defraud UI, UDI and Shuster.

41.    On information and belief, Disruptive Technologies and other investors transferred funds (either cash or cryptocurrency) to Quinn, Denne, or one of the other Defendants (e.g., Blockchain Funding, Masternode, etc.), who in turn provided the investors with forged documents and false promises that they were now investors.

42.    In addition to allowing them to steal investor funds, this mechanism allowed Quinn and Denne to keep Utherverse in a weak position financially. Having caused UI to substantially increase its operating costs based on false promises that they would deliver funds to cover the costs,

///

///

Quinn and Denne carefully titrated the flow of funds to UI/UDI so that UI/UDI did not fail while the fraud was ongoing. However, UI and UDI were heavily compromised because of the ongoing theft.

43.    Quinn, Denne and other Defendants consistently reassured Shuster that funding was imminent, that huge investment opportunities were around the corner, and they would personally fund UI should the opportunities fall through. These misrepresentations were repeated as part of nearly every communication Defendants had with Shuster.

44.    Just a few examples of the multitude of electronic communications reassuring Shuster that funding was imminent (even though it was not) are as follows:

- On or about April 14, 2022, Quinn represented that he had created a "massive opportunity to bring together the blockchain entertainment consortium BEC" and "Worst case, you have 8 – 10 metaverse clients who will license your IP/use your token" and "Best case we find a way to combine forces and go big for more like 150 mil [$150 million dollar] raise..."

- On or about April 16, 2022, Quinn advised that he could connect UI to a portal service with 300 million members. He also advised that he would bring in Tong Soo Chung who "can grab all the Asia money".

- On June 17, 2022, Quinn told Shuster that Quinn was at a dinner with investors capable of investing $50 billion.

- On July 7, 2022, Quinn told Shuster that he was with people at dinner who were worth "Maybe 18b[illion dollars]". On information and belief, Quinn knew at the time that they were not going to transfer any funds to UI.

- On July 12, 2022, Quinn stated that "Josh [Denne] and I just off ! Got the whole advisor, partnership, exchanges, new deck etc deal inked", and that Denne, Quinn and UI would get cryptographic tokens in another company. Such tokens were never delivered to Shuster or UI.

- On or about July 17, 2022, Quinn falsely promised that "Koreans" would take UI public.

- On or about July 25, 2022, Quinn promised that "I have a lot of money and I have a fund we will never go short of money just stick to the plan I promise you if we ever get in a tight spa [SIC, should be spot] I will bail us out". This statement was false.

- On or about August 10, 2022, Quinn falsely promised he would wire to UI $0.50 million in two tranches of $250K each. The amounts were never wired.

- On or about August 23, 2022, Quinn falsely represented that an investor (Disruptive Technologies) "Agreed to the 2.5m[illion] then 2m[illion] then 2.5m[illion]." The payments were part of what was to be a $30 million deal.

- On August 25, 2022, Quinn told Shuster that the Binding Letter had been signed, locking in the $30 million deal. However, other than a $66 "test" payment, none of the $30 million was ever received by UI. Instead, Shuster was told by Quinn and Denne that a third party had caused the investor to withdraw from the deal.

45. The myriad of false representations by both Quinn and Denne about having investment deals continued into late 2022, throughout 2023 and into early 2024.

46. Defendants also falsely represented to Shuster that to prepare UI for an IPO, it was necessary to install a new CEO, Robert Hackett ("Hackett") – who was handpicked by Quinn and Denne. Defendants used Hackett to further their scheme by instructing Hackett to compartmentalize and/or withhold information from Shuster, alter UI's capitalization table ("Cap Table"), and otherwise manipulate UI to Defendants' benefit.

47. On information and belief, Defendants intended to mask their scheme and avoid detection by bankrupting UI, and making the defrauded third-party putative investors believe that the stock that Defendants "sold" to them was valueless so that the investors would never discover that they had been defrauded and did not hold stock. An analogous plan was used by Defendants related to future tokens, with the goal of causing UI to bankrupt without ever minting the tokens. When Defendants realized that bankruptcy might not happen in time to prevent minting of tokens, they resorted to extorting Shuster to not mint the tokens that Defendants pretended to have sold to the third-party victims.

48. Having extracted the maximum amount of fraudulent stock investments, Defendants switched to utility tokens as a method to defraud potential investors. On or about May 2, 2024, Quinn expressly said to Shuster "we don't care about any of the stock… The point is that as you know, between Josh [Denne] and I, we have all those tokens… It's really none of your business of who we gave tokens to."

49. At the time Quinn made these statements, no tokens had been minted, and Defendants refused to provide information about the putative transferees. Moreover, Defendants had failed to meet contractual requirements and thus, had no right to obtain any tokens. Regardless, Shuster repeatedly asked for documentation of stock and token transactions, but Quinn and Denne refused to provide it.

**C.    Agreements Induced by Fraud**

**NIYA Note**

50.    Instead of obtaining investors to purchase UI stock to infuse funds into UI/UDI, Quinn and Denne conspired with Defendants, Momayez, NIYA and Blockchain Funding, to arrange for loans that were ultimately detrimental to UI and UDI, and convinced Shuster to enter into these loan agreements on behalf of UI and UDI based on false promises.

51.    On or about February 22, 2022, Quinn promised that Momayez would invest $4 million in Utherverse and said Momayez "will provide total investment tonight." Yet, more than six weeks later the investment was still not realized.

52.    Finally, on or about April 11, 2022, NIYA transferred to UDI $1.35 million. However, the $1.35 million was not a purchase of stock or other investment into UI or UDI, but was instead, a loan via a Senior Secured Convertible Promissory Note (the "NIYA Note"). The NIYA Note was convertible to UTHER tokens and Shuster was assured by Quinn and Denne prior to Shuster executing the Note on behalf of UDI, that the loan would be converted so that UDI would not have to come out-of-pocket to repay the loan. However, these were false assurances, as Quinn, Denne, Momayez, and NIYA knew that they would use the NIYA Note to demand repayment if their other acts of malfeasance were not enough to force UI into bankruptcy. Interest on the Note accrued at a rate of 6% simple interest per annum on the unpaid principal balance, and payments for interest were due quarterly. UDI made all interest payments as they became due.

53.    On information and belief, the purpose of this loan, while providing initial funding to continue the development of the software, was part of the scheme to create a large liability for UI/UDI and provide an avenue by which Quinn, Denne, and Momayez could cause UI/UDI to go bankrupt when the loan was called in or otherwise became due. Additionally, in keeping with the conspirators' insistence that there was an urgency to speed development, to accelerate development of the software, UDI also expanded staff, thereby increasing costs, on reliance of conspirators' promises that additional funding was forthcoming.

54.    Following the expiration of the term of the NIYA Note (August 1, 2024), Momayez, on behalf of NIYA, began demanding that NIYA be repaid immediately and in full.

55.    Defendants knew the fraud would soon be discovered, so they attempted to bankrupt UI/UDI by doing what they had promised they would not do – demanding immediate repayment of the NIYA Note instead of converting part or all of the Note.

56.    Quinn and Denne's false promises to bring investors to UI to make UI profitable, intentional failure to spend up to $5 million to market and presell UTHER tokens, and intentional failure to take UI public, interfered with UI's ability to repay the NIYA Note when UI had entered into the Note in good faith and with every intention, based on Quinn and Denne's representations, to timely pay back the Note.

**Blockchain Funding Consulting Agreement**

57.    On or about April 16, 2022, UDI and Blockchain Funding entered into a Consulting Agreement (the "Consulting Agreement") pursuant to which Blockchain Funding was to provide certain services in connection with the launch and release of UTHER tokens, including paying up to $5 million toward all expenses relating to the token launch and ongoing token maintenance in exchange for 12% (360 million) of the 3 billion tokens to be minted.

58.    Pursuant to the Consulting Agreement, most of the tokens Blockchain Funding was to receive were to be used for the benefit of UDI for the promotion of, and to add value to the token. Consequently, Denne insisted that Blockchain Funding's 360 million tokens have no vesting schedule and be immediately unlocked, allowing Blockchain Funding to immediately transfer its tokens.  This term was atypical for the presale of tokens in the cryptocurrency market.

59.    Some of the tokens were (at least initially) used to the benefit of UDI.  For example, Denne and/or Blockchain Funding contracted with a software development company skilled in the cryptocurrency space, Nexus Venture LLC ("Nexus"). Nexus was to (and did) develop the software and build an online platform for presale of tokens to investors. The software and platform were complex in that to launch tokens on the platform, smart contracts were needed that would automatically generate when an investor purchased tokens. Such platform development was an expensive endeavor, initially estimated to be $100,000. However, instead of being paid cash for the development, Nexus opted to be paid by Denne/Blockchain Funding in UTHER tokens and/or UI stock.  The platform was to be operational in or about December 2022 or January 2023.

60.    At the time the Consulting Agreement was executed, Quinn promised that if UI/UDI needed money, all Shuster had to do was pick up the phone and call him and the money would be available the next day.  However, when UI/UDI needed money for token development and/or launch, the money was not forthcoming.

61.    Blockchain Funding failed to provide the agreed to funding for the launch and release of UTHER tokens. Although initial payments were made, in 2023, Blockchain Funding, at Quinn and Denne's instruction, ceased making payments for legal, public relations, and management fees related to the launch of tokens.  Instead, to keep the launch of tokens moving forward, Shuster was forced to pay out of pocket for these legal, public relations, and management fees.

62.    Further, Nexus put in more time than originally estimated and needed additional compensation beyond the original number of tokens/shares of stock in UI that it was allocated. Instead of paying Nexus directly for the additional development work, Nexus was instructed by Quinn to sell the UI stock it was previously fraudulently allocated by Quinn and Denne to generate cash to continue the development. Nexus did so, selling to buyers that are part of the Nexus community.

63.    In addition to instructing Nexus to sell its stock, which stock sale was not authorized by UI, on information and belief, Blockchain Funding sold a portion of the tokens it was allocated under the Consulting Agreement.  Such tokens were restricted and not permitted to be offered, sold or otherwise transferred, pledged or hypothecated, especially because they carried no vesting or release schedule. Further, instead of the proceeds from Blockchain's unauthorized token sales being used for the benefit of UI and UDI, the funds from the token sales were diverted to Denne, Quinn, or Blockchain Funding's bank accounts and/or crypto wallets and used for Defendants' personal benefit.

**Blockchain Funding Promissory Note**

64.    On or about July 17, 2022, the initial presale of UTHER tokens by UDI went live. The presale was set up to presell tokens to accredited investors.  However as of July 25, 2022, UI had not received any funds and Shuster questioned the delay in receiving funds, but Denne falsely assured Shuster that nothing was wrong, the accreditation process takes time, and investments would

be forthcoming. Shuster later learned that Denne had instructed the developer of the presale software to change the digital wallet that was to receive funds such that the funds would be wrongfully diverted to Quinn and/or Denne, who then received and pocketed the funds from the IDO instead of UI.

65.    As UI was still not receiving significant investment funds even though the presale was live, and because Quinn and Denne still had not brought significant investors to purchase stock of UI or UDI, UDI continued to be short on funds to continue development of virtual world software.

66.    Consequently, on or about August 12, 2022, UDI executed a Promissory Note with Blockchain Funding ("Blockchain Note") for $350,000 to use as working capital. The Blockchain note carried an interest rate of 5% per annum, with principal and interest coming due on August 12, 2025.

67.    Prior to Shuster executing the Blockchain Note on behalf of UDI, and on or about July 25, 2022, via email, Quinn told Shuster "As I always told you I have a lot of money and I have a fund we will never go short of money just stick to the plan I promise you if we ever get in a tight spa (sic) I will bail us out it's all happening…" and "I'm working on big big sh__ for us that is all going to come to fruition in a big money wat (sic) this isn't my first rodeo…"

68.    Based on Quinn assurances, Shuster, on behalf of UDI, executed the Blockchain Note, expecting that large investments would soon be forthcoming that would more than pay off the Blockchain Note and provide cash needed for the software development and the minting/release of the UTHER cryptocurrency.

**Blockchain Alliance Agreement**

69.    The deception by Denne and Quinn continued when, in a further attempt to control UI, Denne convinced Shuster that UI should purchase stock in Blockchain Alliance.

70.    On or about April 10, 2023, Denne, on behalf of Blockchain Alliance, a Wyoming limited liability company, and Shuster on behalf of UI, executed a Membership Interest Purchase Agreement ("Membership Agreement") whereby UI purchased a twenty-five percent (25%) membership interest in Blockchain Alliance in exchange for 3,685,000 shares of UI Class A Common Stock with a par value of $0.001 per share. The Membership Agreement indicated that the

units represented by membership interest were not registered under the U.S. Securities Act of 1933 and were "restricted securities." The Membership Agreement also gave Denne the option to purchase up to 3 million shares of UI Class A Common Stock at a purchase price of $1.00 per share.

71.    In exchange, the Membership Agreement gave UI the option to purchase up to 100% interest in Blockchain Alliance, in 25% increments.

72.    The Membership Agreement was set up to be an additional channel of income for UI and gave UI the ability to purchase the remaining 75% interest in Blockchain Alliance when UI became profitable.  Blockchain Alliance was pitched to Shuster as a massive network marketing company that would sell UI's digital assets, including but not limited to cryptocurrency, nonfungible tokens (NFTs) and membership packages to its network members with a substantial portion of the revenue going to UI as earned income, to increase the earnings of UI and make the IPO more successful.  However, UI never received any income from Blockchain Alliance, and on information and belief, Blockchain Alliance did not have a massive network of members, and either never completed setting up for the sale of UI's digital assets or sold a portion of UI's digital assets and pocketed the money. Additionally, on information and belief, and in breach of its fiduciary duty, Blockchain Alliance sold UI stock that it was not authorized to sell to "investors" who then appeared on UI's Cap Table. UI never received money from the investors to whom Blockchain Alliance sold stock.

73.    Although Denne, on behalf of Blockchain Alliance, represented in writing in the Membership Agreement that Blockchain Alliance was validly existing and in good standing under the Laws of the State of Wyoming, on information and belief, this statement was false and was made with intent to deceive because at the time of execution of the Membership Agreement, Blockchain Alliance was not in good standing and was or was soon to be an administratively dissolved company.

74.    The statement that Blockchain Alliance was a validity existing company in good standing was relied on by Shuster and UI when executing the Membership Agreement.

75.    Additionally, and although UI shares were restricted and indicated so on the shares issued, on information and belief, Denne and/or Blockchain Alliance resold the UI shares it received under the Membership Agreement to other investors and pocketed the funds received.

**Blockchain Funding SAFT**

76.    To presell UTHER tokens, UI's securities attorney prepared a SAFT (Simple Agreement for Future Tokens), which required investors who wished to buy tokens during the presale period to be accredited (i.e., have an income of at least $200,000, or if married, have an income of at least $300,000, in each of the prior two years and a reasonable expectation for the same income for the current year, or have a net worth of at least $1 million, not including the value of a primary residence).

77.    On or about May 10, 2022, Blockchain Funding and Utherverse International Ltd ("UI LTD") entered into such SAFT ("Blockchain SAFT"), pre-purchasing 360 million UTHER tokens at a price of $0.000033334 per token or $12,000.24.  There was no vesting schedule or release schedule requirements in the Blockchain SAFT, which was not typical for the presale cryptocurrency.

78.    Under the Blockchain SAFT, if the UTHER tokens were not generated by December 31, 2022, the SAFT would terminate and UI LTD would owe Blockchain Funding its original purchase price of $12,000.24.

79.    On information and belief, Quinn, Denne, and Blockchain Funding knew that UTHER tokens would not be minted by December 31, 2022, and knew that UI LTD would owe Blockchain Funding its original purchase price.  On information and belief, the Blockchain SAFT was just another way for Defendants to put UI into further debt, thereby aiding in driving them to bankruptcy.

**Masternode SAFT**

80.    Similarly, on or about May 10, 2022, Masternode and Utherverse International Ltd ("UI LTD") entered into a SAFT ("Mastenode SAFT"), pre-purchasing 150 million UTHER tokens at a price of $0.000033334 per token or $5,000.01.  Like the Blockchain SAFT, there was no vesting schedule or release schedule requirements for the tokens in the Masternode SAFT.

81.    On or about March 18, 2022, Denne confirmed that he was exchanging information about his work with Shuster and UI with his mother, Lynne Martin.

82.    Martin, working in concert with Denne and Quinn in furtherance of the scheme, and

on behalf of Masternode, represented in writing that Masternode had the full legal capacity and authority to execute the Masternode SAFT and perform its obligations thereunder. On information and belief, this statement was false and was made with intent to deceive because at the time of execution of the Membership Agreement, Masternode was not in good standing with the State of Wyoming and was or was soon to be an administratively dissolved company.

83. The statement that Masternode had the full legal capacity and authority to execute the Masternode SAFT was relied on by Shuster and UI when executing the SAFT.

84. Additionally, on information and belief, Quinn, Denne, and Martin knew that UTHER tokens would not be minted by December 31, 2022, and knew that UI LTD would owe Masternode its original purchase price. On information and belief, the Masternode SAFT was just another way for Defendants to put UI into further debt, thereby aiding in driving them to bankruptcy in furtherance of the scheme.

85. Additionally, on information and belief, Masternode sold tokens to investors that it was not authorized to sell and Martin and/or Masternode pocketed the funds received from such token sales.

**D.    Falsified SAFTs and Cap Table Manipulation**

86. In furtherance of their scheme to defraud, Denne with the full knowledge of Quinn, falsified the SAFT prepared by UI's securities attorney, replacing UI LTD with either Blockchain Funding or Masternode, and the investor's payment under the SAFT was diverted to Denne, Blockchain Funding, Blockchain Alliance, or other entities affiliated with Quinn and/or Denne.

87. To date, Quinn and/or Denne have misappropriated at least $1,410,500.00, from no less than sixteen (16) investors, the investors signing doctored SAFTs, expecting to receive tokens when such tokens were minted. Plaintiffs expect to discover that the number of defrauded investors and the total amount of funds misappropriated by Quinn and Denne are much larger than they currently realize.

88. In addition, on information and belief, Quinn and Denne sold stock in UI to third parties, whose names then appeared on UI's Cap Table, but from whom UI received no investment

/ / /

1  funds.  On information and belief, Quinn, Denne, and the other Defendants pocketed in excess of $1

2  million from the sale of these stock certificates.

3  **E.    Defendants' Attempts to Entrap Shuster**

4       89.    Defendants attempted to compromise Brian Shuster directly, and thereby cause him

5  to be unable to manage UI.  One way they did so was by presenting unaccredited investors to UI

6  with actual funds to invest and lying to Shuster that they were in fact accredited investors. One such

7  investor is non-party Jennifer Chen ("Chen").

8       90.    Quinn represented to Shuster that Chen was a wealthy real-estate broker for the rich

9  and famous and was an accredited investor. Mr. Quinn further indicated that Chen was so wealthy

10  and was so liquid that for her to write a check for $100,000 USD was an inconsequential matter.

11       91.    Quinn was provided a proper UI Subscription Agreement that was to be filled out and

12  signed by Chen and that would, among other things, confirm that Chen was an accredited investor.

13  Chen sent a check along with a Subscription Agreement that was not the Subscription Agreement

14  that UI had provided to Quinn. On information and belief, Quinn modified the Subscription

15  Agreement, including specifically eliminating the representation that Chen was accredited, and

16  attempted to pass the falsified document off as UI's Subscription Agreement.

17       92.    In January 2023, when Chen's check for $100,000 and the falsified Subscription

18  Agreement arrived, Shuster noticed that the correct Agreement had been swapped out for an

19  alternative Agreement and he refused to accept the payment.  Even under pressure from Mr. Quinn

20  just to deposit the check first and then have the proper Agreement signed at a later time, Mr. Shuster

21  refused.

22       93.    On April 4, 2023, Chen signed the correct Subscription Agreement, in which Chen

23  affirmed she is an accredited investor.

24       94.    Additionally, and in conjunction with the $1.35 million loan from NIYA, Quinn

25  attempted to get UI to pay commissions for arranging the loan to unlicensed brokers. While no

26  commission had been discussed or agreed to, on April 13, 2022, Quinn sent an invoice to Shuster

27  asking that UI "send mark and Frankie commission $67,500" and included wiring instructions to

28  Luxury Asset Lending LLC.  However, Luxury Asset Lending LLC was not owned by "mark" or

"Frankie", but instead listed Quinn as "Chief Executive Officer", "Owner", "Member", and "Managing Member".

95.    On information and belief, this was an attempt to defraud Utherverse out of $67,500 and entrap Shuster and UI into making payments to brokers not licensed in accordance with the law. Shuster did make a payment to Quinn for $67,500 but the payment was for expenses related to social media marketing.

**F.    Defendants' Attempts to Prevent Discovery of the Scheme**

96.    After more than a year and a half of Quinn and Denne stringing Shuster along, promising that they could arrange for investors with substantial amounts of cash to invest in UI/UDI, in or about May 2023, Shuster notified Quinn that the failure of Quinn and Denne to obtain investments was creating the risk of UDI layoffs as UDI was caught overextended by hiring personnel at the insistence of Quinn and Denne.

97.    Shuster then speculated that by minting the cryptographic tokens, the layoffs could be avoided.  It was Shuster's belief that if the tokens were minted, the tokens could generate tens of millions of dollars.

98.    However, the minting of tokens would mean that all the rights to tokens that Quinn, Denne, and other Defendants had "sold" to investors and whose money they had pocketed would cause the investors to ask UI when they would get their tokens, revealing the fraudulent conspiracy. This the Defendants could not allow.

99.    Instead, Quinn insisted that a hasty decision to mint the tokens too early would not be successful in bringing in revenue. Consequently, UI delayed minting the tokens and, in the process, delayed discovery Defendants' fraudulent enterprise.

100.    Subsequently, Denne and Quinn attempted to negotiate an exit that would leave them with substantial, unearned compensation. However, because their demands were so high and involved cash of which UI was short of because of Defendants' fraud, the negotiations failed.

101.    Quinn then became combative, telling Shuster that he "had close friends at the SEC" and would ensure that Shuster was bankrupted and imprisoned if he minted the token. Quinn also made numerous statements to Peter Gantner of Nexus saying he would destroy UI, take UI shares to

1    zero and have Shuster prosecuted. This extortion failed, however, as Shuster was not guilty of

2    wrongdoing and not dissuaded from minting the tokens by Quinn's threats of law enforcement

3    intervention.  The tokens were minted on or about September 28, 2024.

4        102.    Shortly after minting the tokens, "investors" began contacting Plaintiffs asking when

5    they would receive their tokens.  At that point, it became clear that Quinn, Denne, and the other

6    Defendants had diverted money from SAFTs and UI stock to their own bank accounts and/or

7    cryptocurrency wallets, and all the promises of huge investments, minting of tokens, and promises

8    of taking UI public was nothing more than an elaborate scheme by Defendants to defraud Plaintiffs

9    so that Defendants could line their own pockets at the expense of Plaintiffs.

10                              **FIRST COUNT**
11    **For Violation of Racketeer Influenced and Corrupt Organizations Act of 18 U.S.C. § 1964**
      **(Against All Defendants)**

12        103.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs

13    1 through 102 above.

14        104.    Defendants, and each of them, engaged in a conspiracy to violate the Racketeer

15    Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1692, 1694.  As set forth above, each of

16    the Defendants intentionally engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of

17    racketeering activity by acting and conspiring in concert in furtherance of a scheme to defraud

18    Plaintiffs.

19        105.    As alleged herein, for the purpose of executing or attempting to execute said scheme,

20    Defendants delivered literally hundreds, if not thousands of interstate and foreign wire

21    communications in furtherance of their scheme in violation of 18 U.S.C. § 1343 (wire fraud).

22        106.    As alleged herein, for the purpose of executing or attempting to execute said scheme,

23    Defendants diverted money from Plaintiffs utilizing interstate wire transfers to Defendants' bank

24    accounts and cryptocurrency wallets also in violation of 18 U.S.C. § 1343.

25        107.    As alleged herein, on numerous occasions, forged documents were used by

26    Defendants and sent via means of interstate and foreign communications to defraud Shuster, UI,

27    UDI, and third parties. These included, without limitation, subscription agreements that had been

28

1    modified by Defendants to remove language requiring investors be qualified and stating falsely that

2    the SAFT agreements provided a means of purchasing tokens from Defendants.

3    108.    Each violation by Defendants of the wire fraud statute, 18 U.S.C. § 1343 constitutes

4    an instance of "racketeering activity" as defined in 18 U.S.C. § 1961(1).

5    109.    The instances of racketeering activity all took place within a ten-year period.

6    110.    The multiple acts of racketeering activity by Defendants were interrelated and part of

7    a common, fraudulent scheme, all perpetrated for the same or similar purposes, thus constituting a

8    pattern of racketeering activity.

9    111.    Defendants, and each of them, unlawfully, willingly, and knowingly engaged in the

10    scheme.

11    112.    18 U.S.C. § 1964(c) provides for the recovery of treble damages for each instance of

12    "racketeering activity" as well as cost of suit including reasonable attorney's fees.

13    113.    The millions of investment dollars diverted away from UI, UDI, and Shuster as a

14    result of this conspiracy, together with the other acts described herein, caused injury to UI, UDI and

15    Shuster's businesses and property, in an amount to be proven at trial.

16    **SECOND COUNT**
    **(For Fraud in the Inducement against Quinn, Denne, Blockchain Funding,**

17    **Masternode, Martin, and Blockchain Alliance)**

18    114.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs

19    1 through 113 above.

20    115.    As detailed above, Quinn, Denne, Blockchain Funding, Masternode, Martin, and

21    Blockchain Alliance, and each of them, made false statements and engaged in deceptive conduct to

22    coerce Shuster and his companies to enter into the various agreements described above that were

23    part of their deceptive scheme and ultimately detrimental to Shuster and his companies.

24    116.    The false statements included, among others, that:

25    Defendants Quinn, Denne, and Blockchain Funding represented they would:

26    •    Raise the money UI needed to reach profitability;

27    •    Take UI public on the NASDAQ;

28    •    Spend $5 million to prepare, market, and presell UDI's UTHER tokens;

- Mint the UTHER tokens that would be used as in-world currency in UDI's virtual world environment; and

- Bring investors to UI to purchase shares prior to the initial public offering.

Defendants Martin and Masternode represented that:

- Masternode had the full legal capacity and authority to execute the Masternode SAFT.

Defendants Quinn, Denne and Blockchain Alliance represented that:

- Blockchain Alliance had the full legal capacity and authority to execute the Membership Agreement; and

- Blockchain Alliance has a massive network of members and would market and sell UI's digital assets to its members.

117. Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance knew the representations to be false when they made them.

118. Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance made the representations with the intent to deceive Plaintiffs so that Plaintiffs would enter into the Agreements in furtherance of their scheme to defraud Shuster and his companies.

119. Plaintiffs justifiably relied on the representations made by Defendants and entered into the various agreements detailed above.

120. Defendants' conduct as alleged above, was a substantial factor in causing harm to Plaintiffs.

121. Plaintiffs are informed and believe that Defendants' conduct was intentional, to deprive Plaintiffs of profits or otherwise cause injury to Plaintiffs, and was fraudulent, malicious conduct in willful disregard of Plaintiffs' rights so as to justify an award of exemplary and punitive damages against Defendants pursuant to NRS 42.005 and other applicable laws.

122. As a proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

/ / /

/ / /

**THIRD COUNT**
**(For Fraud Against Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance)**

123.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 122 above.

124.    Throughout the course Plaintiffs' relationship with Defendants, beginning in or about January 2022 through July 2024, Defendants made numerous intentional misrepresentations of facts to Shuster, UI and UDI, in furtherance of their scheme to defraud.  Such misrepresentations are detailed above and include, but are not limited to:

- Defendant Quinn operated a billion-dollar investment fund and was interested in investing in UI;

- Defendants Quinn and Denne would raise the money UI needed to reach profitability, and would front $5 million to prepare, market, and presell UDI token;

- Defendant Quinn would take UI Public on the NASDAQ;

- Defendants Quinn and Denne had investors with large amounts of money that were interested in investing in UI;

- That Masternode had full legal capacity and authority to execute the SAFT;

- That Momayez would not call in the NIYA NOTE and instead, would convert the Note into UTHER tokens; and

- That Blockchain Alliance was validly existing and in good standing with the State of Wyoming and had the capacity to sell a 25% Membership interest to UI.

125.    Acting in reliance on Defendants' misrepresentations, Plaintiffs, among other things, entered into the agreements described above, performed under such agreements, increased staff in an effort to timely develop metaverse and virtual world software, prepared and paid money necessary to develop, launch and maintain cryptocurrency tokens.

126.    Defendants' representations as set forth above were false, as investors, money for the development of metaverse and virtual world software, money for the development and launch of

cryptocurrency for use in such metaverse and virtual world software, and money for repayment of loans was withheld by Defendants. Additionally, the NIYA Note was not converted, as promised, as instead, was called in, in an effort to bankrupt UI and UDI.

127.    Defendants' conduct as alleged above, was a substantial factor in causing harm to Plaintiffs.

128.    Plaintiffs are informed and believe that Defendants' conduct was intentional, to deprive Plaintiffs of profits or otherwise cause injury to Plaintiffs, and was fraudulent, malicious conduct in willful disregard of Plaintiffs' rights so as to justify an award of exemplary and punitive damages against Defendants pursuant to NRS 42.005 and other applicable laws.

129.    As a proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial.

## FOURTH COUNT
**(For Conversion Against Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance)**

130.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 129 above.

131.    Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance possessed stock and/or cryptocurrency to be held and used for the benefit of Plaintiffs.

132.    Plaintiffs are informed and believe and thereon allege that Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance, without the authorization to do so, sold UI stock and/or UTHER tokens to investors and took the money from the sales and used it for their personal benefit.

133.    Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance's conduct as alleged above, was a substantial factor in causing harm to Plaintiffs.

134.    As a proximate result of Quinn, Denne, Blockchain Funding, Masternode and Martin's conduct, Plaintiffs have been damaged in an amount to be determined at trial.

///

///

///

**FIFTH COUNT**
**(For Breach of Fiduciary Duty Against Blockchain Funding)**

135.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 134 above.

136.    As a result of the Consulting Agreement, Blockchain Funding's relationship with Plaintiffs involved a special trust, such that Blockchain Funding knowingly agreed it would act for the benefit of UI and UDI in the distribution of tokens to marketing groups, influencers, tokens exchanges, etc.

137.    Because of the agreement to knowingly act with special trust on behalf of UI and UDI, Blockchain Funding had a duty to act with the utmost care and loyalty with regard to UI and UDI.

138.    Blockchain Funding breached its fiduciary duty when, instead of distributing such tokens as provided for in the Consulting Agreement, Blockchain Funding sold such tokens without Plaintiffs' authorization and received money for the sale in its bank account and/or cryptocurrency wallet.

139.    Blockchain Funding's conduct as alleged above, was a substantial factor in causing harm to Plaintiffs.

140.    Plaintiffs are informed and believe that Defendant's conduct was intentional, to deprive Plaintiffs of profits or otherwise cause injury to Plaintiffs, and was fraudulent, malicious conduct in willful disregard of Plaintiffs' rights so as to justify an award of exemplary and punitive damages against Defendant pursuant to NRS 42.005 and other applicable laws.

141.    As a proximate result of Blockchain Funding's conduct, Plaintiffs have been damaged in an amount to be determined at trial.

**SIXTH COUNT**
**(For Aiding & Abetting Breach of Fiduciary Duty Against Quinn and Denne)**

142.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 141 above.

/ / /

143.    At all times herein, Denne was actually and fully aware of Blockchain Funding's breaches of fiduciary duty as set forth above because, at the time of such breaches, Denne was the sole Owner of Blockchain Funding and directing its activities.  Quinn was also actually and fully aware of Blockchain Funding's breaches of fiduciary duty because Quinn and Denne were partners in the scheme to defraud Plaintiffs and Quinn was made aware by Denne of the actions of Denne and Blockchain Funding.

144.    Plaintiffs are informed and believe that Denne and Quinn provided substantial assistance in furthering Blockchain Funding's breaches of fiduciary duty because, at the time of such breaches, Denne and Quinn were the principal, if not sole beneficiaries of Blockchain Funding's breaches of fiduciary duty, Denne directed all actions and activities of Blockchain Funding with Quinn's actual knowledge and endorsement.

145.    Quinn and Denne's conduct, as alleged above, was a substantial factor in causing harm to Plaintiffs.

146.    Plaintiffs are informed and believe that Quinn and Denne's conduct was intentional, to deprive Plaintiffs of profits or otherwise cause injury to Plaintiffs, and was fraudulent, malicious conduct in willful disregard of Plaintiffs' rights so as to justify an award of exemplary and punitive damages against Defendants pursuant to NRS 42.005 and other applicable laws.

147.    As a direct and proximate result of Quinn and Denne's aiding and abetting in Blockchain Funding's breaches of fiduciary duty owed to Plaintiffs, Plaintiffs have been damaged in an amount to be proven at trial.

## SEVENTH COUNT
### (For Tortious Interference with Contract Against Quinn and Denne)

148.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 147 above.

149.    A valid contract existed between UI and NIYA (i.e., the NIYA Note).

150.    Quinn and Denne had actual knowledge of the NIYA Note because both Quinn and Denne assisted in negotiating the terms of the NIYA Note and facilitated its execution.

151. As alleged above, both Quinn and Denne diverted investments in UI/UDI to their own accounts, thereby intentionally keeping UI/UDI in weak positions financially so that UI/UDI would be unable to meet their financial obligations, including the obligation to repay the NIYA Note.

152. As a direct result of Quinn and Denne's intentional conduct, UI was unable to meet its obligations under the NIYA Note.

153. Plaintiffs are informed and believe that Defendants' conduct was intentional, to deprive Plaintiffs of profits or otherwise cause injury to Plaintiffs, and was fraudulent, malicious conduct in willful disregard of Plaintiffs' rights so as to justify an award of exemplary and punitive damages against Defendants pursuant to NRS 42.005 and other applicable laws.

154. As a direct and proximate result of Quinn and Denne's conduct, Plaintiffs have been damaged in an amount to be proven at trial.

### EIGHTH COUNT
**(For Tortious Interference with Contract Against Quinn, Denne, and Roma)**

155. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 154 above.

156. A valid contract existed between Disruptive Technologies and Sellers (i.e., the Binding Letter).

157. Quinn, Denne, and Roma had actual knowledge of the Binding Letter because they assisted in negotiating the terms of the Binding Letter and facilitated its execution.

158. As alleged above, Quinn, Denne, and Roma intentionally fabricated a story that disrupted the deal between UDI, Shuster, and Shuster's brother Gary, on the one hand, and Disruptive Technologies on the other hand.

159. As a direct result of Quinn, Denne, and Roma's intentional conduct, the monies to be paid to UDI under the Binding Letter were never transferred to UDI.

160. Plaintiffs are informed and believe that Defendants' conduct was intentional, to deprive Plaintiffs of profits or otherwise cause injury to Plaintiffs, and was fraudulent, malicious conduct in willful disregard of Plaintiffs' rights so as to justify an award of exemplary and punitive damages against Defendants pursuant to NRS 42.005 and other applicable laws.

161.    As a direct and proximate result of Quinn, Denne, and Roma's conduct, Plaintiffs have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

### ON THE FIRST COUNT

1.    For treble damages in a sum according to proof;

2.    An order enjoining Defendants from engaging in any additional unlawful acts including but not limited to wire fraud; and

3.    For attorneys' fees and cost of suit.

### ON THE SECOND COUNT

1.    For an order voiding and/or rescinding the agreements at issue;

2.    Or alternatively:

- For out-of-pocket damages in an amount according to proof.
- For consequential damages according to proof; and;
- For punitive damages.

### ON THE THIRD COUNT

1.    For compensatory damages according to proof.

2.    For attorneys' fees and cost of suit; and

3.    For punitive damages.

### ON THE FOURTH COUNT

1.    For the market value of the converted property in the sum according to proof.

2.    For damages resulting from loss of use of the property in an amount according to proof at the time of trial;

3.    For interest on the value of the converted property according to proof from the date of conversion; and

4.    For damages for the time and money properly expended in pursuit of the converted property in a sum according to proof.

**ON THE FIFTH COUNT**

1.    For compensatory damages in a sum according to proof.

2.    For punitive damages; and

3.    For restitution.

**ON THE SIXTH COUNT**

1.    For compensatory damages in a sum according to proof.

2.    For punitive damages; and

3.    For restitution.

**ON THE SEVENTH COUNT**

1.    For consequential damages in a sum of according to proof.

2.    For lost profits in an amount according to proof; and

3.    For punitive damages.

**ON THE EIGHTH COUNT**

1.    For consequential damages in a sum of according to proof.

2.    For lost profits in an amount according to proof; and

3.    For punitive damages.

**ON ALL COUNTS**

1.    For costs of suit herein incurred, including attorney fees ; and

2.    For such other and further relief as the court deems just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2        Pursuant to the Seventh Amendment to the United States Constitution, and Fed. R. Civ. P.

3   38(b) and LR II 38-1, Plaintiffs hereby demand a trial by jury in this action for all issues and matters

4   so triable.

5        Dated: January 10, 2025.

6                                              **KEARNEY PUZEY DAMONTE LTD.**

7

8                             By:   /s/ James W. Puzey
                                    JAMES W. PUZEY (NV SBN 05745)
                                    800 South Meadows Parkway, Suite 800
9                                   Reno, Nevada 89521
                                    Telephone: (775) 851-8700
10
                                    COLEMAN & HOROWITT, LLP
11
                                    SHERI FLYNN *(Pro Hac Vice Forthcoming)*
12                                  499 West Shaw Avenue, Suite 116
                                    Fresno, California 93714
13                                  Telephone: (559) 248-4820

14                                  *Attorneys for Plaintiffs Utherverse, Inc. and*
                                    *Brian Shuster*

15

16

17

18

19

20

21

22

23

24

25

26

27

28