JAMES PUZEY (NV SBN 05745)
jpuzey@nvlawfirm.com
KEARNEY PUZEY DAMONTE
800 South Meadows Parkway, Suite 800
Reno, Nevada 89521
Telephone: (775) 851-8700

SHERRIE M. FLYNN (*Pro Hac Vice*)
sflynn@ch-law.com
ROBERT K. ASHLEY (*Pro Hac Vice*)
rashley@ch-law.com
COLEMAN & HOROWITT, LLP
Attorneys at Law
499 W. Shaw Avenue, Suite 116
Fresno, California 93704
Telephone: (559) 248-4820
Facsimile: (559) 248-4830

Attorneys for Plaintiffs and Counter-Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA – RENO DIVISION

| | |
|---|---|
| UTHERVERSE, INC., a Nevada corporation, BRIAN SHUSTER, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>BRIAN QUINN, an individual; JOSHUA DENNE, an individual; BLOCKCHAIN FUNDING, INC., a Delaware corporation; BLOCKCHAIN ALLIANCE LLC, a Wyoming Limited Liability Company; MASTERNODE PARTNERS, LLC, a Wyoming Limited Liability Company; LYNNE MARTIN, an individual; NIYA HOLDINGS, LLC, a Nevada limited liability company; NIMA MOMAYEZ, an individual; and JEREMY ROMA, an individual,<br><br>Defendants.<br><br>AND RELATED COUNTERCOMPLAINT. | Case No. 3:25-cv-00020-MMD-CSD<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**<br><br>[Filed Concurrently with Notice of Motion and Proposed Order]<br><br>**Complaint Filed:** January 10, 2025<br><br>**Counterclaim Filed:** February 28, 2025 |

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION AND RELIEF REQUESTED

On June 24, 2026, the Court dismissed Count I of the Complaint — the RICO claim — as to Defendants Roma, Martin, Masternode, Momayez, and Niya Holdings, and to the extent it includes a RICO conspiracy claim, without prejudice and with leave to amend, allowing Plaintiffs 15 days, through July 9, 2026, "to cure the deficiencies of this claim." (ECF No. 76 at 14, 16.) Plaintiffs timely submit the [Proposed] First Amended Complaint (the "FAC," Exhibit 1) and move for leave to file it. To the extent the FAC implements the leave the Court has already granted, this Motion is protective; to the extent the FAC goes beyond that grant, Plaintiffs seek leave under Rule 15(a)(2).

The FAC does four things. First, it cures the deficiencies the Court identified: it pleads the predicate acts defendant by defendant, with the date, sender, recipient, medium, content, and interstate or foreign character of each wire (FAC, FACTS Section G), and it pleads each remaining Defendant's knowledge of the essential nature and scope of the enterprise and agreement to further it (*id*. Section H), as ECF No. 76 requires (at 13, 17-18; citing *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993)). Second, it names Nazanin Namazi — the individual who, as alleged, electronically executed and transmitted the fabricated lien filings already described in the original Complaint — as an additional defendant. Third, it omits settled Defendants Nima Momayez and Niya Holdings, LLC (the "Momayez Parties"), as addressed below and in Plaintiffs' concurrently filed motion for voluntary dismissal without prejudice. Fourth, it conforms the factual allegations to the evidence developed since the original Complaint was filed.

## II.     BACKGROUND

Plaintiffs filed the Complaint on January 10, 2025, asserting Count I (RICO) against all Defendants and Counts II through VIII (state-law claims) against certain Defendants other than the Momayez Parties. (ECF No. 1.) On June 24, 2026, ruling on Defendants' Motion for Judgment on the Pleadings, the Court sustained Count I as pleaded against Defendants Quinn, Denne, Blockchain Funding, and Blockchain Alliance; dismissed Count I without prejudice and with leave to amend as to Defendants Roma, Martin, Masternode, Momayez, and Niya Holdings, and as to RICO conspiracy; and deferred judgment as to Count VIII against Defendant Roma and as to personal

jurisdiction over Defendants Martin and Masternode. (ECF No. 76.) The Court allowed 15 days — through July 9, 2026 — to amend and provided that "[f]ailure to file an amended complaint within 15 days will result in dismissal of this claim with prejudice against Defendants Roma, Martin, Masternode, Momayez, and Niya and as to RICO conspiracy." (*Id*. at 16.)On

July 9, 2026, Magistrate Judge Denney entered the parties' Revised Discovery Plan and Scheduling Order, which sets August 24, 2026 as the deadline for amending pleadings and adding parties, October 26, 2026 as the fact-discovery cut-off, and February 25, 2027 as the dispositive-motion cut-off. (ECF No. 78.) No trial date has been set.

Effective June 30, 2026, Plaintiffs and related parties, on the one hand, and the Momayez Parties, on the other, entered into a written settlement agreement resolving the disputes between them, a term of which provides for dismissal of the claims asserted against the Momayez Parties in this action without prejudice. Plaintiffs' motion for voluntary dismissal of the Momayez Parties without prejudice under Rule 41(a)(2) is filed concurrently with this Motion.

## III.   DISCUSSION

### A.   Leave to Amend Should Be Granted

Leave to amend should be freely given, and every relevant factor favors it here. Rule 15(a)(2) directs that "[t]he court should freely give leave when justice so requires," and the Ninth Circuit applies that policy "with extreme liberality." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Absent undue delay, bad faith, repeated failure to cure, undue prejudice, or futility, leave should be granted, *Foman v. Davis*, 371 U.S. 178, 182 (1962), and "[a]bsent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend," *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original).

There is no undue delay: this is Plaintiffs' first amendment, filed on the fifteenth day allowed by ECF No. 76 and well within the August 24, 2026 deadline for amending pleadings and adding parties in the scheduling order entered this same day (ECF No. 78), so no scheduling-order obstacle exists. *Cf. Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–09 (9th Cir. 1992). There is no bad faith: the FAC responds directly to the Court's order. There is no prejudice: fact discovery is

open until October 26, 2026, no trial date is set, and the amendments concern the same transactions pleaded in the original Complaint. In addition, the amendment is not futile: the Court has already held that amendment would not be futile, ECF No. 76 at 14 (citing *Sanchez v. Los Angeles Dep't of Transp.*, 39 F.4th 548, 562 (9th Cir. 2022)), and the FAC supplies precisely what the Court found wanting — at least two particularized wire predicates for each remaining Count I Defendant, and per-defendant allegations of knowing agreement and awareness of the enterprise's scope.

**B.    Joining Namazi is Proper**.

Rule 15 governs the addition of parties by amendment, read with Rules 20 and 21. *See* Fed. R. Civ. P. 20(a)(2), 21. The claims against Namazi arise out of the same series of transactions or occurrences already pleaded — the fabricated UCC-1 and USPTO lien filings alleged in the original Complaint — and share common questions of law and fact with the claims against the existing Defendants: the FAC alleges that Namazi personally executed and electronically transmitted those filings at Quinn's direction. Joinder within the scheduling order's deadline for adding parties promotes efficiency and avoids a duplicative second action, and no Defendant is prejudiced: discovery has months to run and the underlying documents are already at issue.

**C.    Dismissal of the Momayez Parties Implements a Settlement**

The omission of the Momayez Parties implements a settlement and is not a failure to cure. The FAC does not reassert Count I against the Momayez Parties, and asserts no other claim against them. That omission implements the parties' resolution, which provides for dismissal of the claims against the Momayez Parties without prejudice, and it is addressed by Plaintiffs' concurrently filed motion for voluntary dismissal without prejudice under Rule 41(a)(2). Plaintiffs respectfully request that the order granting leave confirm that neither the omission of the Momayez Parties from the FAC nor the fifteen-day provision of ECF No. 76 shall operate as, or result in, a dismissal with prejudice of any claim against them.

**D.    The Motion Complies with LR 15-1**.

The proposed FAC is attached as Exhibit 1 and is complete in itself without reference to the superseded pleading. LR 15-1(a). Upon entry of an order granting leave, Plaintiffs will promptly file the FAC, and will promptly serve Defendant Namazi in accordance with Rule 4.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court grant this Motion, deem the FAC timely under ECF No. 76 as lodged July 9, 2026, and enter the proposed order submitted herewith.

DATED: July 9, 2026                    COLEMAN & HOROWITT, LLP


By: _____
    Sherrie M. Flynn. Esq.
    Robert K. Ashley, Esq.
    499 West Shaw Avenue, Suite 116
    Fresno, California 93704
    Telephone: (559) 248- 4820
    Email: sflynn@ch-law.com


KEARNEY PUZEY DAMONTE LTD.

    James W. Puzey, Esq
    800 South Meadows Parkway, Suite 800
    Reno, Nevada 89521
    Telephone: (775) 851- 8700
    Email: jpuzey@nvlawfirm.com

    Attorneys for Plaintiffs Utherverse, Inc. and Brian Shuster and Counter-Defendants Utherverse, Inc., Brian Shuster, Utherverse Digital Inc., Peter Gantner, Nexus Venture LLC, Ari Good and Gary Shuster

# EXHIBIT 1

JAMES PUZEY (NV SBN 05745)
jpuzey@nvlawfirm.com
KEARNEY PUZEY DAMONTE
800 South Meadows Parkway, Suite 800
Reno, Nevada 89521
Telephone: (775) 851-8700

SHERRIE M. FLYNN (*Pro Hac Vice*)
sflynn@ch-law.com
ROBERT K. ASHLEY (*Pro Hac Vice*)
rashley@ch-law.com
COLEMAN & HOROWITT, LLP
Attorneys at Law
499 W. Shaw Avenue, Suite 116
Fresno, California 93704
Telephone: (559) 248-4820
Facsimile: (559) 248-4830

Attorneys for Plaintiffs and Counter-Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA – RENO DIVISION

| | |
|---|---|
| UTHERVERSE, INC., a Nevada corporation, BRIAN SHUSTER, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>BRIAN QUINN, an individual; JOSHUA DENNE, an individual; BLOCKCHAIN FUNDING, INC., a Delaware corporation; BLOCKCHAIN ALLIANCE LLC, a Wyoming limited liability company; MASTERNODE PARTNERS, LLC, a Wyoming limited liability company; LYNNE MARTIN, an individual; JEREMY ROMA, an individual; and NAZANIN NAMAZI a/k/a "NAZ NAMAZI," an individual,<br><br>Defendants. | Case No. 3:25-cv-00020-MMD-CSD<br><br>**FIRST AMENDED COMPLAINT**<br><br>**(1) RICO, 18 U.S.C. § 1962(c);**<br>**(2) RICO Conspiracy, § 1962(d);**<br>**(3) Fraud in the Inducement;**<br>**(4) Fraud;**<br>**(5) Conversion;**<br>**(6) Breach of Fiduciary Duty;**<br>**(7) Aiding and Abetting Breach of Fiduciary Duty;**<br>**(8) Tortious Interference with Contract;**<br>**(9) Tortious Interference with Contract**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**Complaint Filed:** January 10, 2025<br><br>**Counterclaim Filed:** February 28, 2025 |

Plaintiffs, UTHERVERSE, INC. ("UI") and BRIAN SHUSTER ("Shuster"; collectively "Plaintiffs") allege as follows:

**JURISDICTION AND VENUE**

1.    This Court has original jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because Counts I and II arise under federal law, and supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a).

2.    This Court has personal jurisdiction over each Defendant under 18 U.S.C. § 1965(a)–(b), including because a substantial part of the events occurred in this District, the fabricated UCC-1 financing statement was filed with the Nevada Secretary of State, and the ends of justice require that the members of the single conspiracy alleged herein be brought before one court. Venue is proper under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

**PARTIES**

3.    UI is and at all relevant times hereto was, a corporation, doing business and having its principal place of business in Carson City, Nevada.

4.    Shuster is, and at all times relevant hereto was, an individual residing in Vancouver, British Columbia, Canada.

5.    On information and belief, BRIAN QUINN ("Quinn") is an individual residing in Orange County, California.

6.    On information and belief, JOSHUA DENNE ("Denne") is an individual residing in Paradise Valley, Arizona.

7.    On information and belief, BLOCKCHAIN FUNDING, INC. ("Blockchain Funding") is a Delaware Corporation, with its principal place of business at 1020 Wendy Lane, Cheyenne, Wyoming. On information and belief, Blockchain Funding is owned by Denne

8.    On information and belief Defendant BLOCKCHAIN ALLIANCE, LLC ("Blockchain Alliance") is a Wyoming limited liability company with its principal place of business at 6933 E. Fanfol Drive, Paradise Valley, Arizona; per the Wyoming Secretary of State record, it was administratively dissolved on December 9, 2023, reinstated on April 24, 2025, and again administratively dissolved on December 9, 2025.

9.    On information and belief, Defendant MASTERNODE PARTNERS, LLC ("Masternode") is a Wyoming limited liability company whose principal office of record is 1020 Wendy Lane, Cheyenne, Wyoming. Per the Wyoming Secretary of State record, it was administratively dissolved on April 14, 2024, was never reinstated, and was archived on April 15, 2026.

10.    On information and belief, Defendant LYNNE C. MARTIN ("Martin") is an individual residing in Orange County, California, is the mother of Denne, and is a member of Masternode exercising signatory authority.

11.    On information and belief, Defendant JEREMY ROMA ("Roma") is an individual who resides and does business in California and maintains a residence in Dubai, United Arab Emirates.

12.    On information and belief, Defendant NAZANIN NAMAZI a/k/a "Naz Namazi" ("Namazi") is an individual who resides in Laguna Niguel, California, and at all relevant times was employed by or acted as an agent and at the direction of Quinn.

13.    Nima Momayez ("Momayez") and Niya Holdings, LLC ("Niya Holdings" or "NIYA") — defendants in the original Complaint — are not named as defendants herein. As alleged below, litigation filings (including their counterclaim in this litigation) and lien recordings were made in their names without their knowledge or authorization. This information enabled the parties to negotiate a settlement that includes dismissal of claims against them without prejudice. Appropriate filings to effectuate the dismissal provided for in the settlement agreement are forthcoming.

14.    Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, each of the defendants were the agents and/or the employees of their co-defendants and in doing the things hereafter alleged were acting with the permission and consent of their co-defendants. Plaintiffs further allege that at all times herein mentioned, each of the defendants authorized, directed, or participated in the commission thereof, or subsequently ratified the acts of each of the remaining defendants with full knowledge of all relevant facts. These agency and concert allegations supplement, and do not substitute for, the specific defendant-by-defendant predicate-act

allegations set forth in Section G and the awareness allegations set forth in Section H.

## INTRODUCTION

15.     This is a civil action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), 1962(d), and 1964(c), and Nevada law. From no later than early 2022 through at least August 2025, Defendants Brian Quinn and Joshua Denne, with the entities they controlled and the persons they directed, operated a scheme with a single modus operandi — acting in other people's names without authority: they substituted their own entities as counterparties on forged investment agreements; diverted investor funds intended for Plaintiffs; caused litigation to be filed in the names of purported plaintiffs and counterclaimants who never retained or authorized the lawyers who filed it; and caused fabricated liens to be recorded with the USPTO and with the Nevada and California Secretaries of State in the name of a lienholder that never authorized them, clouding title to forty-four United States patents.

## FACTS

### A.     Background and Initial Contact by Quinn and Denne

16.     Plaintiff Shuster has developed virtual-world environments for more than twenty years. In June 2005, he formed UI to bring virtual-world and metaverse development in house with his own development team. Utherverse Digital, Inc. ("UDI") was formed in November 2006 to employ the software developers who build and maintain those environments. UDI invoices UI for development and maintenance; UI invoices and collects payments from customers and reimburses UDI for its work.

17.     As a major part of that development, UDI undertook to create new software with the goal that it would become widely adopted for virtual-world environments. Because UDI was carefully managing cash flow, development proceeded slowly, and the companies' need for development capital made them vulnerable to the scheme described below.

18.     At or near the beginning of 2022, while the software was still under development, Quinn approached Shuster. Quinn told Shuster that he was operating a billion-dollar investment fund and was interested in investing in UI. Quinn brought in his partner, Denne, whom Quinn described as similarly situated with a consortium of investors holding a large amount of money earned via

cryptocurrency.

19.     Through those discussions, Quinn convinced Shuster that Quinn and Denne would: (a) raise the money UI needed to reach profitability; (b) take UI public on the NASDAQ; (c) spend $5 million to prepare, market, and presell UDI's UTHER cryptocurrency tokens, with presale proceeds funding completion and launch of the software platform; (d) mint the UTHER tokens for use as in-world currency in UDI's virtual-world environment; and (e) bring investors to UI to purchase shares before an initial public offering ("IPO"). Based on these promises and others, Shuster began working with Quinn and Denne.

20.     Plaintiffs later learned that these representations were false. Quinn did not run a billion-dollar fund, did not take UI public, did not spend the promised $5 million, and did not bring the promised investors to UI.

21.     Such conduct was not new to Quinn or Denne. In *Securities and Exchange Commission v. Tobin*, No. 18-cv-12451 (D. Mass.), by order dated July 13, 2022 and final judgment dated October 17, 2024, Quinn was found in violation of federal securities laws and permanently enjoined from, among other things, fraudulent conduct in the offer or sale of securities and from participating in any offering of penny stock (stock trading under $5.00 per share). At the relevant times when Quinn was selling UI stock, UI shares traded between $1.00 and $2.50 per share. Denne pled guilty to felony drug and gun charges in 1998 and was convicted of insurance fraud in 2011. On information and belief, Quinn and Denne have also been involved in a myriad of Ponzi and other fraudulent schemes, both separately and together.

**B.     Defendants' Fraudulent Scheme**

22.     After gaining Shuster's and UI's confidence, Quinn, Denne, and the other Defendants executed a scheme that defrauded two sets of victims: (1) Shuster, UI, and UDI, by diverting money intended for investment in UI to Defendants' own accounts; and (2) individuals and entities who believed they were investing in UI — by purchasing stock or UTHER token rights — but who received no valid stock or tokens, their funds diverted for Defendants' use and their investments concealed from UI.

23.     The scheme required UI to remain solvent but close enough to insolvency that it

would not publicly announce the end of investment rounds, and needy enough to keep assisting Defendants — who repeatedly claimed to be bringing in investors — in soliciting money that Defendants would divert. Having induced UI to substantially increase its operating costs on false promises to deliver funds covering those costs, Quinn and Denne carefully titrated the flow of funds to UI and UDI so the companies would not fail while the fraud was ongoing, leaving them heavily compromised by the ongoing theft.

24.    As part of the scheme, Quinn and Denne sold UI shares and rights to purchase cryptocurrency that they did not own and had no right to sell, collected millions of dollars, and diverted the funds to their personal bank accounts and/or cryptocurrency wallets. Defrauded investors were left believing they owned UI stock, future-token rights, or both, while UI and UDI were left without the investment dollars, told that the investors had simply chosen not to invest. Quinn and Denne maintained Shuster's trust through methods that included presenting themselves as honest family men by texting photographs of time spent with their children.

**False Assurances of Imminent Funding**

25.    In nearly every communication with Shuster, Defendants falsely reassured him that funding was imminent, that huge investment opportunities were around the corner, and that they would personally fund UI if the opportunities fell through. These misrepresentations continued from early 2022 into early 2024. Examples include:

- On or about April 14, 2022, Quinn claimed a "massive opportunity" to assemble a blockchain entertainment consortium: "Worst case, you have 8–10 metaverse clients who will license your IP/use your token"; "Best case we find a way to combine forces and go big for more like 150 mil" ($150 million) raise;

- On or about April 16, 2022, Quinn said he could connect UI to a portal service with 300 million members and would bring in Tong Soo Chung, who "can grab all the Asia money";

- On June 17, 2022, Quinn said he was at dinner with investors capable of investing $50 billion;

- On July 7, 2022, Quinn said he was at dinner with people worth "[m]aybe 18b" (billion dollars); on information and belief, Quinn knew they would not transfer any funds to UI;

- On July 12, 2022, Quinn stated "Josh [Denne] and I just off ! Got the whole advisor, partnership, exchanges, new deck etc deal inked," and that Quinn, Denne, and UI would receive tokens in another company; no such tokens were ever delivered;

6
FIRST AMENDED COMPLAINT

- On July 16, 2022, at 8:52 p.m., Quinn texted that he had "knocked it down it [sic] with Koreans for public company"; no such transaction existed;

- On or about July 25, 2022, Quinn promised: "I have a lot of money and I have a fund we will never go short of money just stick to the plan I promise you if we ever get in a tight spa [sic] I will bail us out." The statement was false;

- On or about August 10, 2022, Quinn promised to wire UI $500,000 in two $250,000 tranches ("Probably gonna send 2 tranches 250"); the promise was never fulfilled as made — $250,000.00 was received by August 15, 2022, a further $100,000 wire was announced on August 17–18, 2022, and what arrived was then recharacterized not as the promised support but as repayable, interest-bearing debt of UDI under the $350,000 Blockchain Note;

- On or about August 23, 2022, Quinn, on information and belief with the consent of and at the direction of Roma, falsely represented that investor Disruptive Technology OÜ ("Disruptive Technology") "[a]greed to the 2.5m then 2m then 2.5m," part of what was to be a $30 million deal; and

- On August 25, 2022, Quinn told Shuster the Binding Letter (defined below) had been signed, locking in the $30 million deal. Other than a $66 test payment, UI received none of the $30 million.

**The NIYA Note**

26.    Instead of bringing investors to purchase UI stock, Quinn and Denne arranged loans — using NIYA and Blockchain Funding as the lenders — that were ultimately detrimental to UI and UDI, and convinced Shuster to enter into them on the companies' behalf based on false promises. On or about February 22, 2022, Quinn stated that he had a "4m potential investor", but then instructed Brian Shuster "On the 4m keep between us". Immediately after the statement "On the 4m keep between us", Quinn sent Shuster a screenshot of a message timestamped February 22, 2022. The screenshot states "Nima asked when the agreement can be ready? ***He will provide total investment tonight." More than six weeks later, no investment had been made – and no investment was ever made other than a contingent investment via a far smaller convertible note: A loan.

27.    On or about April 11, 2022, NIYA transferred $1,350,000 to UDI — not as an investment, but as a loan under a Senior Secured Convertible Promissory Note (the "NIYA Note"), bearing 6% simple interest per annum on unpaid principal, with interest payable quarterly, and convertible into UTHER tokens. Before Shuster executed the Note on UDI's behalf, Quinn and Denne assured him the loan would be converted so UDI would not have to repay out of pocket. Those assurances were false: on information and belief, Quinn and Denne intended that the Note

7<br>FIRST AMENDED COMPLAINT

would be used to demand repayment if their other malfeasances did not force UI into bankruptcy. UDI made every interest payment as it came due prior to NIYA *apparently* filing litigation against it, although as described herein, NIYA never even knew it had filed litigation until well over a year after the litigation had been filed.

28.     On or about April 1, 2023, the parties executed a First Amendment to the NIYA Note, converting $675,000 of the Note's principal into 270,000 shares of UI stock. On or about April 22, 2024, the parties executed a Second Amendment under which the 270,000 shares were returned, the Note's term was set to expire August 1, 2024, and interest remained payable quarterly.

29.     On information and belief, the loan — while providing initial development funding — was designed to create a large liability and an avenue for Quinn and Denne to force UI and UDI into bankruptcy when the loan came due. Meanwhile, at the conspirators' insistence on urgency, as communicated by at least Quinn, Denne and Blockchain Funding, Inc., UDI expanded staff and costs in reliance on their promises of forthcoming funding. Denne presented a new COO candidate who was totally unqualified but about whom the conspirators were very insistent (Shuster declined). They demanded PR spending that they said they would pay for but left Utherverse with many of the bills. They demanded that Shuster cause UI to hire Robb Hacket as CEO; they required UI and UDI to have financial statements reviewed and tried to get them to do a full-blown audited financial statement. They demanded that Shuster hire the "Former CFO of Tinder" whom Shuster refused after interviewing and finding out he was not ever the CFO of Tinder.  Following expiration of the Note's term on August 1, 2024, a demand for immediate repayment in full was made in NIYA's name — precisely what Defendants had promised would never occur. (As alleged below, communications in NIYA's name ran through Quinn.) Quinn and Denne negotiated the NIYA Note's terms and facilitated its execution, and their false promises and diversion of funds destroyed UDI's (and, following the 2023 and 2024 amendments to which UI became a party, UI's) ability to repay a Note entered in good faith with every intention of timely repayment.

**The Blockchain Funding Consulting Agreement**

30.     On or about April 16, 2022, UDI and Blockchain Funding entered into a Consulting Agreement under which Blockchain Funding was to provide services for the launch and release of

the UTHER tokens — including paying up to $5 million toward all token-launch and ongoing maintenance expenses — in exchange for 12% (360 million) of the 3 billion tokens to be minted. Blockchain Funding knowingly agreed that it would act for the benefit of UI and UDI in distributing those tokens to marketing groups, influencers, token exchanges, and similar market participants — a relationship of special trust. The "substantial majority" of those tokens were required to be used for UDI's benefit to promote and add value to the token.

31.     Denne and/or Blockchain Funding engaged Nexus Venture LLC ("Nexus"), a software developer skilled in cryptocurrency, to build an online token-presale platform with smart contracts generating automatically upon purchase — work initially estimated at $100,000, for which Nexus opted to be paid in UTHER tokens and/or UI stock rather than cash. The platform was to be operational in or about December 2022 or January 2023.

32.     When the Consulting Agreement was executed, Quinn promised that if UI or UDI needed money, Shuster needed only to call and money would be available the next day. It never was. Although initial payments were made, in 2023 Blockchain Funding — at Quinn's and Denne's instruction — ceased paying the legal, public-relations, and management fees for the token launch, forcing Shuster to pay those fees out of pocket to keep the launch moving.

33.     When Nexus required additional compensation for work beyond the original estimate, Quinn instructed Nexus to sell UI stock that Quinn and Denne had fraudulently allocated to it — a sale UI never authorized — to buyers within the Nexus community. On information and belief, Blockchain Funding likewise purported to sell a portion of its Consulting Agreement tokens and diverted the proceeds to Denne's, Quinn's, or Blockchain Funding's bank accounts and/or crypto wallets for Defendants' personal benefit rather than UI's and UDI's. On information and belief, no more than a nominal amount of Consulting Agreement tokens (believed to be zero) were spent for the benefit of Utherverse, despite the contract's requirement that it use the "substantial majority" of the tokens for the benefit of UDI. This is consistent with the other breaches of the contract, such as paying "up to $5 Million dollars towards" token launch and maintenance. On information and belief, Denne and Blockchain Funding Inc. never intended to be bound by the Consulting Agreement, but instead used it as a pretext to further loot the company.

**The July 2022 Presale and the Diverted Wallet**

34.     On or about July 17, 2022, UDI's initial presale of UTHER tokens to accredited investors went live. As of July 25, 2022, UI had received no funds. When Shuster questioned the delay, Denne falsely assured him nothing was wrong and that the accreditation process takes time. Shuster later learned that Denne had instructed the presale-software developer to change the digital wallet designated to receive presale funds, wrongfully diverting them to Quinn and/or Denne, who received and pocketed the presale proceeds instead of UI.

**The Blockchain Funding Promissory Notes**

35.     With the presale producing nothing for UI and no significant investors materializing, UDI remained short of funds for development. On or about July 25, 2022, Quinn texted Shuster by iMessage — replying to Shuster's warning that "we will need some funds here in pretty short order or I will need to change the business" — "As I always told you I have a lot of money and I have a fund we will never go short of money just stick to the plan I promise you if we ever get in a tight spa [sic: spot] I will bail us out it's all happening," adding moments later, "I'm working on big big sh__ for us that is all going to come to fruition in a big money way this isn't my first rodeo." In reliance on those assurances, on or about August 12, 2022, UDI executed a promissory note in favor of Blockchain Funding (the "Blockchain Note," in parts of the record also styled the "2022 Promissory Note") evidencing a $350,000 working-capital loan, bearing 5% interest per annum with principal and interest due August 12, 2025. Shuster executed it expecting that promised large investments would more than repay it and fund software development and the minting and release of the UTHER cryptocurrency.

36.     The $350,000 loan came to be evidenced by two instruments. In May 2023, the parties negotiated an adjusted note on the same loan terms substituting and/or adding UI as obligor in place of or alongside UDI ("We are going to use the original docs, execute those, and then execute an adjusted version . . ."). That adjusted note (the "2023 Promissory Note"), together with a June 5, 2023 Amendment, was executed via DocHub with all-party finalization on June 7, 2023; signers included brian99@ideaflood.com (June 6, 2023) and joshua@blockchainfunding.com.

///

**The May 10, 2022 SAFTs**

37.     To presell UTHER tokens, UI's securities attorney prepared a Simple Agreement for Future Tokens ("SAFT") requiring presale purchasers to be accredited investors (income of at least $200,000 — or $300,000 if married — in each of the prior two years with a reasonable expectation of the same, or a net worth of at least $1 million excluding a primary residence).

38.     On or about May 10, 2022, Blockchain Funding and Utherverse International Ltd. ("UI LTD") entered into such a SAFT (the "Blockchain SAFT"), pre-purchasing 360 million UTHER tokens at $0.000033334 per token, or $12,000.24, with no vesting or release schedule — atypical for a token presale. If the tokens were not generated by December 31, 2022, the SAFT would terminate and UI LTD would owe Blockchain Funding its $12,000.24 purchase price. On information and belief, Quinn, Denne, and Blockchain Funding knew the tokens would not be minted by that date and intended the SAFT as another debt to help drive UI toward bankruptcy. UI LTD has since been administratively dissolved; its rights and obligations under the legitimate SAFTs were undertaken by UTHX DAO, LLC, which Shuster formed for that purpose.

39.     Also on or about May 10, 2022, Masternode and UI LTD entered into a like SAFT (the "Masternode SAFT"), pre-purchasing 150 million UTHER tokens at approximately $0.000033334 per token, or $5,000.01, again with no vesting or release schedule. Martin — Denne's mother, to whom, as Denne told Shuster in writing on March 18, 2022, Denne had described his new alignment with Shuster ("it's awesome that we can see 'eye to eye' . . . I told my mom the same thing") — acted for Masternode in concert with Denne and Quinn, representing in writing that Masternode had full legal capacity and authority to execute the Masternode SAFT and perform its obligations. Shuster and UI relied on that representation in executing the SAFT.

40.     Masternode is a Wyoming limited liability company with a repeated pattern of tax dissolutions: it was administratively dissolved from April 10, 2020 until reinstated on April 28, 2021; it filed its 2022 annual report on February 25, 2022; and it was dissolved again on April 14, 2024 and has never been reinstated. On information and belief, Quinn, Denne, and Martin knew the UTHER tokens would not be minted by December 31, 2022 and that UI LTD would owe Masternode its purchase price; the Masternode SAFT was another means of loading UI with debt in furtherance

of the scheme. On information and belief, Masternode also sold tokens it was not authorized to sell, and Martin and/or Masternode pocketed the proceeds.

### Falsified SAFTs and Cap Table Manipulation

41.     At all relevant times, the Defendants utilized the DocuSign platform to transmit, execute, and store at least some of the agreements at issue, thereby engaging in the continuous transmission of wires across state lines. According to DocuSign's published technical specifications, the platform operates on a "multi-active architecture" that is powered by "real-time data synchronization across three geographically disparate active sites". Furthermore, DocuSign enforces a "9x3 data storage" model, wherein "[a]ll customer data is stored up to nine times across three geographically disparate locations". Consequently, the moment the Defendants uploaded and executed the subject documents, the digital files and associated transaction data were instantaneously and automatically replicated, transmitted, and stored across multiple out-of-state servers to fulfill this redundancy requirement, establishing a clear and undeniable nexus to interstate commerce.

42.     In furtherance of the scheme, Denne, with Quinn's full knowledge, falsified the SAFT prepared by UI's securities attorney by substituting Blockchain Funding or Masternode as the "Company" in place of UI LTD, so that investors' electronically transferred payments went to Blockchain Funding, Denne, and/or Quinn's bank accounts and/or cryptocurrency wallets — or to Blockchain Alliance or other entities affiliated with Quinn and/or Denne — instead of to UI LTD. Defendants also transmitted subscription agreements modified to remove language requiring that investors be accredited. Examples of falsified SAFT's and/or subscription agreements are as follows:

- A document titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens", dated February 28, 2023, DocuSign Envelope ID: 8993ACC4-A393-4089-8AA7-493339854444 purported to grant Brett Anthony Teel, an Arizona resident, tokens via a forged SAFT in exchange for his payment of $50,000. UI never received those funds.

- Blockchain Funding, Inc. issued "Investor Summary Page" documents that purported to modify the SAFTs, without any authorization to do so or, on information and belief, legal review. One such document purported to sell two thirds of a million tokens to The Dream Weaver Trust on February 25, 2023, DocuSign Envelope ID: 31206058-4218-4BBB-AC0E-65077D32F7A0. The "Purchase Amount" was listed as $100,000, but UI never received any of those funds.We note that Ronald S. Ripps, Trustee of The Dream Weaver Trust, also appears among the third parties on UI's capitalization table who received shares without payment.

- An "Investor Summary Page" purported to sell 166,667 tokens to the CJS Family Trust, signed by John Shoecraft, for a "Purchase Amount" of $25,000.00. UI never received those funds. The fraudulent document itself appears to have been altered. The first page shows a Docusign header and a February 25, 2023 date (DocuSign Envelope ID: 31206058-4218-4BBB-AC0E-65077D32F7A0); the second page does not bear a Docusign header CJS Family Trust also appears among the third parties on UI's capitalization table who received shares without payment..

- A document titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens" and dated March 8, 2023, DocuSign Envelope ID: 9DAAC502-CEE3-4C9A-B791-8D9DB90FA286, purported to grant Marcos Esquivel, an Arizona resident, tokens via a forged SAFT in exchange for his payment of $2,500. UI never received those funds.

- A document titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens," together with an attached Investor Summary Page dated January 29, 2024, DocuSign Envelope ID: AEF3A30D-E98D-47CF-8823-405865C8008C, purported to grant Frantisek Karczag tokens via a forged SAFT in exchange for his payment of $24,000.00. UI never received those funds.

- A document titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens," together with an attached Investor Summary Page, DocuSign Envelope ID: BE70E344-221B-4954-A190-C3F155B10E06, purported to grant Patrik Nemeth tokens via a forged SAFT in exchange for his payment of $12,000.00. UI never received those funds.

- A document titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens," together with an attached Investor Summary Page dated January 29, 2024, DocuSign Envelope ID: 5A1DCA17-2643-49AD-A5BB-070E210FE3C1, purported to grant Attila Vajzer tokens via a forged SAFT in exchange for his payment of $43,500.00. UI never received those funds.

- As a further example, an "Investor Summary Page" purported to grant tokens to Jason Avakian in exchange for a "Purchase Amount" of $50,000.00, dated February 21, 2023. UI never received those funds. The document bears DocuSign Envelope ID: 85A45F6D-BD2A-4E20-856C-1575B920F575 Jason Avakian also appears among the third parties on UI's capitalization table who received shares without payment..

- Four separate documents titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens," each purporting to grant tokens to Jozsef Kiraly, were executed on four separate dates: $20,000.00 on January 23, 2024 (DocuSign Envelope ID: 3AC0D145-1697-468F-8B5B-EF5A3998AEE0); $10,000.00 on December 10, 2023 (Envelope ID: F862895F-1F3B-4251-BB14-03D7CC86F65B); $10,000.00 on December 15, 2023 (Envelope ID: B9AE371A-5D42-42EF-97E0-5A3291DF35F7); and $6,500.00 on December 20, 2023 (Envelope ID: EB06D95D-D86E-431A-8FDE-06B946F56A51), for a total of $46,500.00. UI never received any of those funds.

- Three separate documents titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens," each purporting to grant tokens to Tamas Bek in exchange for a "Purchase Amount" of $5,000.00, were executed on three separate dates: January 23, 2024 (DocuSign Envelope ID: 4321B433-4CB2-47CF-9FC0-17E02F7C2BAD); December 15, 2023 (Envelope ID: D82D23F3-9949-42DA-AC49-F7BB717CF438); and December 20, 2023 (Envelope ID: 6ECDA39C-C2CB-4638-BC2E-5F0B8748BBFD). UI never received any of those funds.

- A document titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens," together with an attached Investor Summary Page, DocuSign Envelope ID: D36E1949-808C-433D-87DE-8C13ACE457B5, purported to grant Janos Kemler tokens via a forged SAFT in exchange for his payment of $10,000.00, dated on or about April 11, 2024. UI never received those funds.

- A document titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens," together with an attached Investor Summary Page dated December 15, 2023, DocuSign Envelope ID: 9E98A907-E721-427C-A2F2-594F9894DDC7, purported to grant Zsolt Kiss tokens via a forged SAFT in exchange for his payment of $5,000.00. UI never received those funds.

- A document titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens" and dated December 15, 2023, DocuSign Envelope ID: 715212F3-C48E-47DA-AD08-675A01D1DC57, purported to grant Peter Nagy tokens via a forged SAFT in exchange for his payment of $2,000.00. UI never received those funds.

- A document titled "BLOCKCHAIN FUNDING, INC. simple agreement for future tokens," together with an attached Investor Summary Page dated December 10, 2023, DocuSign Envelope ID: 763FAB2C-0E1E-4E14-8616-3620A83A0978, purported to grant Istvan Jozsef Pall tokens via a forged SAFT in exchange for his payment of $10,000.00. UI never received those funds.

43.    To date, Quinn and/or Denne have misappropriated at least $1,410,500.00 from numerous investors who signed doctored SAFTs expecting to receive tokens upon minting. Plaintiffs expect there to be substantially more victims involving even larger sums. In addition, on information and belief, Quinn and Denne sold UI stock to third parties whose names then appeared on UI's capitalization table ("Cap Table") but from whom UI received no investment funds, with Quinn, Denne, and the other Defendants pocketing in excess of $1 million from those stock sales.

**The Blockchain Alliance Membership Interest Purchase Agreement**

44.    Blockchain Alliance was formed on October 17, 2022, with Joshua Denne as organizer and Loretta Castle, 1020 Wendy Lane, Cheyenne, Wyoming, as registered agent — the address that is also Blockchain Funding's principal place of business and, per the Wyoming Secretary of State record, Masternode's principal office of record since February 25, 2022. In a further attempt to control UI, Denne convinced Shuster that UI should purchase an interest in Blockchain Alliance.

45.    On or about April 10, 2023, Denne, on behalf of Blockchain Alliance, and Shuster, on behalf of UI, executed a Membership Interest Purchase Agreement (the "Membership Agreement") under which UI acquired a twenty-five percent (25%) membership interest in Blockchain Alliance in exchange for 3,685,000 shares of UI Class A Common Stock ($0.001 par

value). The Membership Agreement stated that the membership units were unregistered, restricted securities; gave Denne an option to purchase up to 3 million UI Class A shares at $1.00 per share; and gave UI the option to purchase up to 100% of Blockchain Alliance in 25% increments.

46.     Blockchain Alliance was pitched to Shuster as a massive network-marketing company that would sell UI's digital assets — cryptocurrency, nonfungible tokens ("NFTs"), and membership packages — to its network members, with a substantial portion of the revenue going to UI as earned income to increase UI's earnings and make the IPO more successful. UI never received any income from Blockchain Alliance. On information and belief, Blockchain Alliance had no massive network of members and either never completed setting up to sell UI's digital assets or sold a portion of them and pocketed the money; in breach of its fiduciary duty, it sold UI stock it had no authority to sell to investors who then appeared on UI's Cap Table, with UI receiving none of their money; and Denne and/or Blockchain Alliance resold the restricted UI shares received under the Membership Agreement to other investors and pocketed the funds. Shuster and UI relied on Denne's written representation in the Membership Agreement that Blockchain Alliance was validly existing and in good standing under Wyoming law.

47.     Although in good standing in April 2023, Blockchain Alliance was administratively dissolved on December 9, 2023; it was reinstated on April 24, 2025 — the same day the amended counterclaim was filed in this action, with its delinquent 2023 and 2024 annual reports filed that same day — and was dissolved again on December 9, 2025.

**The Disruptive Technology Binding Letter**

48.     Another aspect of the fraud was Quinn's and Denne's practice of touting prospective purchasers of UI or UDI stock as wealthy and eager, arranging meetings with Shuster at which the prospects often professed strong interest — after which, with few exceptions, the prospects simply evaporated, with Quinn and Denne telling Shuster they had "lost interest."

49.     One such investor was Disruptive Technology, an Estonian private limited company that executed a Binding Letter of Intent — an instrument bearing a date of August 8, 2022 on its face but, per the transmission record pled in below, negotiated August 22–23, 2022 and signed on or about August 25, 2022 (the "Binding Letter") with UDI, Shuster, and Shuster's brother Gary

(collectively, "Sellers"). On information and belief, Roma has an ownership interest in and controlled Disruptive Technology; at minimum, Roma facilitated communications between Quinn and Denne and Disruptive Technology.

50.    In exchange for fifteen percent (15%) of UDI's outstanding shares, 300 million UTHER tokens, and other consideration, Disruptive Technology agreed to distribute $30 million to Sellers: $2.5 million in September 2022, $2 million in October 2022, $2.5 million in November 2022, and the $23 million balance in April 2023. Apart from a $66 test payment, none of the $30 million was ever paid.

51.    Right before the first payment was due, Quinn, Denne, and Roma met. Shortly thereafter, Quinn told Shuster that a disgruntled former UDI associate had contacted Disruptive Technology, called Shuster a fraud, and threatened suit, causing Disruptive Technology to withdraw. On information and belief, no such communication occurred; the story was fabricated by Quinn, Denne, and Roma to keep UDI financially weak while they continued diverting funds, and the Disruptive Technology deal was a sham within the scheme. Quinn, Denne, and Roma had actual knowledge of the Binding Letter, having negotiated its terms and facilitated its execution, and as a direct result of their conduct the monies due UDI were never transferred. On information and belief, Disruptive Technology and other investors transferred cash or cryptocurrency to Quinn, Denne, or other Defendants (e.g., Blockchain Funding, Masternode), who gave the investors forged documents and false assurances that they were now investors.

**The Handpicked CEO**

52.    Defendants also falsely represented that preparing UI for an IPO required installing a new CEO, Robert Hackett, handpicked by Quinn and Denne. Defendants used Hackett to further the scheme by instructing him to compartmentalize and withhold information from Shuster, alter UI's Cap Table, and otherwise manipulate UI to Defendants' benefit.

**Attempts to Entrap Shuster and UI**

53.    Defendants attempted to compromise Shuster directly — and thereby render him unable to manage UI — by presenting unaccredited investors with actual funds while falsely representing that they were accredited. Quinn represented that non-party Jennifer Chen ("Chen")

was a wealthy real-estate broker for the rich and famous, an accredited investor so liquid that a $100,000 check was inconsequential. Quinn was given UI's proper Subscription Agreement for Chen to sign, which would have confirmed her accreditation; instead, Chen's $100,000 check arrived in January 2023 with a different agreement — on information and belief, modified by Quinn to eliminate the accreditation representation and passed off as UI's. Shuster noticed the substitution and refused the payment, even under Quinn's pressure to deposit the check first. On April 4, 2023, Chen signed the correct Subscription Agreement, affirming she is an accredited investor.

54.    In conjunction with the $1,350,000 NIYA loan, Quinn also attempted to have UI pay commissions to unlicensed brokers. Although no commission had been discussed or agreed, on April 13, 2022 Quinn invoiced Shuster to send "mark and Frankie commission $67,500," with wiring instructions to Luxury Asset Lending LLC — an entity owned not by "mark" or "Frankie" but listing Quinn as Chief Executive Officer, Owner, Member, and Managing Member. On information and belief, this was an attempt to defraud Utherverse of $67,500 and to entrap Shuster and UI into paying unlicensed brokers. Shuster did pay Quinn $67,500, but for expenses related to social-media marketing and not for commissions.

**Concealment, Extortion, and the September 2024 Minting**

55.    On information and belief, Defendants intended to mask their scheme by bankrupting UI, so that the defrauded putative investors would believe the stock "sold" to them was worthless and never discover they held nothing. Defendants pursued an analogous plan for the tokens — causing UI to fail before any tokens were minted — and, when bankruptcy might not arrive in time, resorted to extorting Shuster not to mint the tokens they pretended to have sold.

56.    In or about May 2023, after more than a year and a half of being strung along, Shuster notified Quinn that the failure to obtain investments risked UDI layoffs, UDI having overextended by hiring at Quinn's and Denne's insistence. Shuster proposed minting the tokens, believing minting could generate tens of millions of dollars. But minting would prompt the investors whose money Defendants had pocketed to ask UI for their tokens, exposing the conspiracy. Quinn therefore insisted that hasty, early minting would fail to produce revenue; in reliance, UI delayed minting — and with it, discovery of the fraud.

57.    Having extracted the maximum in fraudulent stock investments, Defendants shifted to the tokens. On or about May 2, 2024, Quinn told Shuster: "we don't care about any of the stock . . . The point is that as you know, between Josh [Denne] and I, we have all those tokens . . . It's really none of your business of who we gave tokens to." No tokens had been minted; Defendants refused to identify the putative transferees; Defendants had failed to meet their contractual requirements and had no right to any tokens; and Quinn and Denne refused Shuster's repeated requests for documentation of the stock and token transactions.

58.    Denne and Quinn then attempted to negotiate an exit with substantial, unearned compensation. The negotiations failed because their demands required cash UI lacked as a result of Defendants' own fraud. Quinn became combative, telling Shuster he had close friends at the SEC (presumably the ones that civilly prosecuted him in Massachusetts, resulting in the order banning Quinn from trading stock such as UI's) and would ensure Shuster was bankrupted and imprisoned if he minted the tokens, and telling Peter Gantner of Nexus that he would destroy UI, take UI shares to zero, and have Shuster prosecuted. The extortion failed; Shuster, guilty of no wrongdoing, was not dissuaded. When Shuster questioned Quinn's and Denne's motives, they threatened to bring bogus legal action against Shuster and his companies in a further attempt to extort money — and Denne and other Defendants carried out that threat by causing the filing of *Denne, et al. v. Shuster, et al.*, Superior Court of California, County of Orange, No. 30-2024-01438251-CU-FR-NJC (the"Orange County Action"), on November 6, 2024, as alleged in Section IV.B below.

59.    The tokens were minted on or about September 28, 2024. Shortly thereafter, investors began contacting Plaintiffs asking when they would receive their tokens. Only then did it become clear that Quinn, Denne, and the other Defendants had diverted the SAFT and stock proceeds to their own bank accounts and cryptocurrency wallets, and that the promises of huge investments, token minting, and an IPO were an elaborate scheme to enrich Defendants at Plaintiffs' expense.

60.    In executing the scheme, Defendants transmitted hundreds, if not thousands, of interstate and foreign wire communications; diverted Plaintiffs' money by interstate wire transfer to Defendants' bank accounts and cryptocurrency wallets; and transmitted forged documents — including falsified SAFTs and subscription agreements altered to delete investor-qualification

language and falsely stating that the SAFT agreements provided a means of purchasing tokens from Defendants — to defraud Shuster, UI, UDI, and third parties. The millions of investment dollars diverted from UI, UDI, and Shuster, together with the other acts described above, injured the business and property of UI, UDI, and Shuster in an amount to be proven at trial.

**C.**     **The Unauthorized-Litigation Scheme (2024 – 2026)**

61.     In or about July 2024, months before the first of the litigation and lien filings alleged below, Quinn declared his plan in writing. In text messages to George Hawatmeh, a business associate whose mid-2022 warnings about the venture Quinn had dismissed as "negativity," Quinn wrote that "Nima's owed 1.5m"; that Shuster "owes so many investors money"; that Quinn was "trying figure how get all the investors their money back"; that "luckily I have everything papered and can ruin him in 2 phone calls"; that he planned "to try throw a Hail Mary"; and, in closing: "Just keep low key until I can pull it off !" The litigation and lien filings alleged in this section and in the section below were the execution of that declared plan.

62.     On November 6, 2024, The Daily Law Group filed the Orange County Action, purportedly on behalf of Denne, Momayez, Blockchain Funding, Masternode, and Blockchain Alliance, seeking over $2.9 billion. On information and belief, Quinn and Denne procured and directed that filing, including the unauthorized naming of Momayez (and later Niya Holdings) as plaintiffs, who never retained or authorized The Daily Law Group to file the Action. The Orange County Action was voluntarily dismissed without prejudice on April 2, 2025.

63.     Two of the purported plaintiffs were defunct: Masternode joined that action, and later the counterclaims in this action, while administratively dissolved under Wyoming law (dissolved April 14, 2024; never reinstated; archived by the Wyoming Secretary of State on April 15, 2026 upon expiration of the two-year reinstatement window), and Blockchain Alliance joined while administratively dissolved (dissolved December 9, 2023) and was reinstated on April 24, 2025, the same day the amended counterclaim was filed in this action, with its delinquent 2023 and 2024 annual reports filed that day, before being allowed to dissolve again on December 9, 2025. The enterprise revived or ignored its Wyoming shells precisely as its litigation needs dictated. Neither entity was registered as a foreign entity with the California Secretary of State at the time of the

Orange County filing, in violation of California Law (California Corporations Code § 17708.07(a)).

64. On February 28 and April 24, 2025, an answer and counterclaims, and amended counterclaims (ECF Nos. 30, 48) were filed in this action by Brownstein Hyatt Farber Schreck, LLP purportedly on behalf of Momayez and Niya Holdings, among others, and on May 23, 2025, an acceptance of service was executed in their names (ECF No. 55). On information and belief, Momayez and Niya Holdings never retained or authorized that firm and were unaware of the counterclaims when they were filed. On January 26, 2026, this Court dismissed the amended counterclaim in its entirety (ECF No. 73).

**D.      The Fabricated Lien Filings (January – August 2025)**

65. On January 10, 2025, at 1:27 p.m., a UCC-1 lien financing statement, California Secretary of State Filing No. U250102092622 ("CA UCC-1 Lien"), was filed naming Brian Shuster and UDI as debtors and Niya Holdings, LLC as secured party. On information and belief, neither Momayez nor Niya Holdings authorized that filing. On information and belief, this lien was filed by the same parties filing the USPTO documents described below, but the filing improperly left all identifying information about the party making the filing blank. A copy of the CA UCC-1 Lien is attached hereto as Exhibit A.

66. On May 23, 2025, a UCC-1 financing statement, Nevada Secretary of State Initial Filing No. 2025476203-7 ("NV UCC-1 Lien") naming UDI as debtor and Niya Holdings, LLC as secured party was filed by "Naz Namazi" (filmmakernaz@gmail.com; (949) 295-4233; 29726 Felton Drive, Laguna Niguel, CA), listing forty-four U.S. patents as collateral — including patents owned of record by Brian Shuster and Gary Shuster as individuals, and patents assigned to third parties many years prior to the filing — not merely assets of UDI. A copy of the NV UCC-1 Lien is attached hereto as Exhibit B.

67. On May 30, 2025, Namazi electronically transmitted to the USPTO's Electronic Patent Assignment System (EPAS) in Alexandria, Virginia, submission 509214520 (Assignment ID PATI1052014), recorded at Reel/Frame 071469/0405, designating a "LIEN" in favor of Niya Holdings against the same 44 patents ("USPTO Lien"). The cover sheet named UDI and "Mr. Brian Shuster" as conveying parties with a purported April 11, 2022 execution date; listed correspondence

emails filmmakernaz@gmail.com and brianquinn27@icloud.com — an email of Defendant Quinn; was signed "/Nazanin Namazi/" on May 30, 2025; and stated it "serves as an Oath/Declaration (37 CFR 1.63)." A copy of the USPTO Lien is attached hereto as Exhibit C.

68.    Neither Brian Shuster nor UDI executed or authorized a lien to Niya against those patents; the Niya Note secured only UDI assets (UDI owned two of the 44 patents); many listed patents were owned by non-parties to the Note; and neither Momayez nor Niya Holdings authorized the filings. On August 6, 2025, a reconveyance (Reel/Frame 071950/0423), mislabeled "SECURITY INTEREST," which omitted at least one patent (U.S. Patent No. 10,394,363) was filed with the USPTO. Neither the CA UCC-1 Lien nor NV UCC-1 Lien were terminated.

69.    At all relevant times, communications and payments between Plaintiffs and Niya Holdings ran through Quinn personally. In a July 6–9, 2022 email thread (subject "Wire"), it was Quinn who transmitted the wire instructions for UDI's interest payment on the Niya Note (forwarding them to Shuster "For Nima"), and it was Quinn who, on July 9, 2022, supplied the beneficiary's name and address — "NAMS HOLDINGS, LLC, 21 Redbird, Irvine, CA 92603" — after UI's controller flagged that the account name on the wire instructions did not match Niya Holdings. Quinn's proprietary treatment of the Niya relationship continued for years: on February 14, 2023, Quinn emailed Shuster describing the Niya lender as "Our guy that put in the 1,350,000 debt on a convertible", and in January and February 2024 text messages Quinn directed the timing of Plaintiffs' communications with Momayez ("Yah hold off till Monday Nima maybe we get a break somewhere"; Jan. 12, 2024) and proposed to satisfy Momayez ("outta my tokens"; Feb. 6, 2024).

70.    Each Electronic Patent Assignment System ("EPAS")/Secretary of State ("SOS") transmission was a ministerial recordation with a government registry transmitted by interstate wire (California to Virginia, to Nevada, or within California) for the purpose of executing the scheme, in violation of 18 U.S.C. § 1343.

**E.    The Enterprise**

71.    At all relevant times Quinn, Denne, Blockchain Funding, Blockchain Alliance, Masternode, Martin, Roma, and Namazi, with others, constituted an association-in-fact enterprise

under 18 U.S.C. § 1961(4) (the "Quinn-Denne Enterprise") with a common purpose, relationships among those associated with it, and longevity sufficient to pursue its purpose. Quinn and Denne organized and directed the enterprise; Namazi executed its filing operations; the remaining Defendants served as counterparties, signatories, and nominees. The enterprise's reliance on nominees was express: on December 7, 2023, Quinn texted an Utherverse consultant, Peter Gantner, "I have a a way [sic] you can make 1m plus easy I only need you as a placeholder. No capital or anything I trust you so let's chat Tomorrow." Each Defendant participated in the conduct of the enterprise's affairs — not merely their own — through the pattern alleged below.

### F.    Pattern of Racketeering Activity; Continuity

72.    The predicate acts span at least March 2022 through August 2025 (more than three years), are related in purpose, participants, victims, and methods, and constitute a pattern, on a closed-ended basis; in the alternative, the 2024–2025 fabricated-lien and unauthorized-litigation acts show a threat of continuing activity (open-ended continuity).

73.    In the alternative, a pattern of racketeering activity exists independent of any act that could be characterized as fraud in connection with the purchase or sale of securities: the concealment and lulling wires (e.g., the July 25, August 15, and August 24, 2022 transmissions), the funds-diversion and misdirection wires, the fabricated-lien recordations of January through August 2025, and the related acts of concealment, standing alone, establish the requisite pattern. Plaintiffs plead this alternative pattern pursuant to Fed. R. Civ. P. 8(d) and without conceding that any predicate act alleged herein is subject to the securities-fraud bar of 18 U.S.C. § 1964(c); the wires and recordations identified in this paragraph are neither misrepresentations made in connection with the purchase or sale of securities nor actionable as securities fraud.

### G.    Predicate Acts by Defendants

**Quinn, Denne, Blockchain Funding, Inc., and Blockchain Alliance, LLC**

74.    At all relevant times, Shuster resided in Vancouver, British Columbia, Canada, and managed UI (a Nevada corporation with its principal place of business in Carson City, Nevada), UDI, and UI LTD (a British Virgin Islands company) from Vancouver, sending and receiving email principally through the address brian99@ideaflood.com; Quinn resided in Orange County,

California, and used the email address brianquinn27@icloud.com; Denne resided in Paradise Valley, Arizona, and used the email address joshua@blockchainfunding.com (Denne also messaged on Whatsapp.  He messaged Shuster primarily on that app, and on behalf of Blockchain Alliance on that app.  He also utilized various group chats); and UI LTD's securities counsel, Ari Good of Good Attorneys at Law, P.A. (info@goodattorneysatlaw.com), maintained offices in Miami, Florida and in the nation of Colombia. Virtually every email between Quinn or Denne, on the one hand, and Shuster, on the other, crossed both state lines and the United States–Canada border, and every email among Quinn, Denne, and counsel crossed state or national borders. Innumerable text messages between the same parties took place during those dates, each comprising a wire communication in interstate or international commerce.

75.    No allegation in this Section is made against 'Defendants' as an undifferentiated group. Each predicate act identifies the sender, recipient(s), date, medium, and content of the wire to the extent presently known to Plaintiffs; where an element (such as an exact time or a receiving account) is not pled, that detail lies within records in Defendants' or third parties' exclusive possession and control, and Plaintiffs plead the surrounding circumstances with the particularity available to them.

76.    Blockchain Funding, Inc. could act only through natural persons. At all relevant times Denne owned and controlled Blockchain Funding and transacted its business through the address joshua@blockchainfunding.com, and Quinn acted as Blockchain Funding's agent and co-promoter in dealings with Plaintiffs. Blockchain Alliance, LLC could likewise act only through natural persons. At all relevant times Denne was its controlling member and executed documents on its behalf.   Thus, each such wire is an act of the entity and the individual who sent or caused it.

**Predicate Acts of Defendant Brian Quinn**

76.    <u>March 20 and April 1, 2022 — Transmittal of the NIYA Loan Instruments.</u>  On March 20, 2022, at 8:41 p.m. Pacific time, Quinn sent Shuster (in Vancouver, British Columbia) an email attaching "Convertible Promissory Note - Final.docx," the instrument that became the $1.35 million NIYA Note executed on or about April 11, 2022. On April 1, 2022, at 7:56 p.m. Pacific time, Quinn forwarded to Shuster an email from Attorney Good attaching an "Updated Senior Secured

Promissory Note." These wires were foreign wire transmissions incident to an essential part of the scheme. On information and belief, Quinn transmitted the loan instruments intending that the resulting NIYA debt be used as a means to force UI/UDI toward insolvency.

77.    April–July 2022 — The "Imminent Funding" Lulling Wires. For the purpose of keeping UI/UDI dependent on him while investor funds were being diverted, Quinn transmitted to Shuster in Vancouver, British Columbia each of the electronic messages below. Each wire furthered the scheme by inducing Shuster to keep expanding UDI's staff and operations, to refrain from pursuing other financing, and to continue entrusting fundraising to Quinn and Denne while they diverted investor money. Each was a foreign wire in furtherance of the scheme, and each is a separate predicate act.

- On April 14, 2022, by iMessage text message, Quinn represented that he had assembled a blockchain entertainment consortium ("BEC") — "Crypto.Com passed me a massive opportunity to bring together the blockchain entertainment consortium BEC" — such that "Worst case, you have 8 - 10 metaverse clients who will license your ip/use your token" and "Best case we find a way to combine forces and go big for more like 150 mil [$150 million] raise and staff each other's weaknesses..." On information and belief, the statement that eight to ten metaverse clients were committed to license UI's IP or use its token was false when sent: no such clients existed or had made any commitment, and Quinn knew it.

- On April 16, 2022, beginning at 4:17 p.m., Quinn transmitted to Shuster by iMessage his contact's proposal — "I can present Utherverse to Naver, which runs the portal service in competition against Google, and has its own metaverse, Zepeto, with 300 million members" — and represented of that contact (Tong Soo Chung): "He'll do for free He can grab all the Asia money he has." On information and belief, Quinn had no such portal relationship and no basis for the represented access to Asian investment capital.

- On June 17, 2022, at 5:40 p.m., by iMessage text message, Quinn told Shuster: "Wow I've 50billion at the table no joke. This is real business not the dream hotel" — implying committed investor interest in UI. On information and belief, no person at any such dinner had committed or intended to invest in UI, and Quinn knew it.

- On June 17, 2022, at 10:42 p.m. and again at 10:51 p.m. Pacific time, Quinn emailed Shuster from brianquinn27@icloud.com, subject "When.": "I have more connections than anytime [sic: anyone] knows. If I'm in they are. I'm St[i]cking with you B stick with me Watch." These two wires were lulling transmissions in furtherance of the scheme, sent to induce continued reliance on Quinn as UI's funding source; the representation that Quinn's "connections" were committed to UI ("If I'm in they are") was, on information and belief, false when sent.

- On July 7, 2022, at 8:14 p.m., by iMessage text message, Quinn told Shuster the persons he was courting were worth "Maybe 18b" — adding "Just you wait partner. We're not doing this for drinking money. Just you wait and see." — when, on information and belief, Quinn knew those persons would transfer no funds to UI.

- On July 12, 2022, at 4:57 p.m., by iMessage text message, Quinn wrote: "Josh and I just off ! Got the whole advisor , partnership , exchanges , new deck etc deal inked !!!" and "Oh yah and tokens for the 3 us in Reveal !" — representing as existing fact that a deal had been executed under which Denne, Quinn, and UI would receive cryptographic tokens in another company. On information and belief, no such deal had been "inked" when the message was sent, and no such tokens were ever delivered.

- On July 16, 2022, at 8:52 p.m., by iMessage text message (iMessage export at 194 of 994), Quinn texted Shuster: "FYI I fucking knocked it down it [sic] with Koreans for public company ! Discuss tomorrow." — representing that his "Koreans" would take the company public. On information and belief, no such transaction or counterparty existed, and Quinn knew it.

78.    July 25, 2022 — the "I will bail us out" text messages that induced the $350,000 Blockchain Funding Note. On July 25, 2022, in a 10:46 a.m. (Pacific) iMessage exchange, eight days after the UTHER presale went live on July 17, 2022, Shuster texted Quinn: "But we will need some funds here in pretty short order or I will need to change the business. I can't keep hiring and growing or I'll risk running out of runway." Quinn replied, by iMessage text message transmitted to Shuster in Vancouver, British Columbia: "As I always told you I have a lot of money and I have a fund we will never go short of money just stick to the plan I promise you if we ever get in a tight spa [sic: spot] I will bail us out it's all happening and I just don't like that negativity And you could always talk straight with me or if we're ever in a bind I will be able us out [sic] but it's all happening," adding moments later: "Remember we also have a lot of hard cash in this and tons of time and relationships. We will win and this is happening I can assure you. . . . I'm working on big big sh__ for us that is all going to come to fruition in a big money way this isn't my first rodeo I know what the f___ I'm doing." Each statement of existing fact was false when made: Quinn did not have "a fund," did not have money committed for UI, and never "bailed out" UI or UDI. In reliance on these wires, Shuster, on behalf of UDI, agreed on or about August 12, 2022 to a $350,000 promissory note in favor of Blockchain Funding (the "Blockchain Note," 5% per annum, due August 12, 2025) . The wires furthered the scheme because they caused UDI to accept repayable, interest-bearing debt in place of the equity investment and launch funding that Quinn and Blockchain Funding had promised, layering onto a cash-starved company an obligation the conspirators could later call.

79.    August 15, 2022 — presale-period concealment wire ("SAFT Tally"). After the July 17, 2022 presale launch, and while the presale receiving wallet had been secretly changed so that investor payments bypassed UI, Quinn transmitted a wire designed to conceal the diversion by

25
FIRST AMENDED COMPLAINT

asserting personal control over the accounting of presale/SAFT proceeds. On August 15, 2022, at 5:23 p.m. Pacific time, in the thread "Re: SAFT Tally" copying Attorney Good, Quinn emailed Shuster from brianquinn27@icloud.com: "These were the ones prior to Platform token as we need minus from totals." Later that evening, at 9:04 p.m., Shuster wrote in the same thread — that UI had received only "approx. $24,400 in our wallet from deposits ranging from a few dollars to a few thousand dollars" and needed "a list of the buyers so that we can enter them into our accounting books" — a list that would have exposed the diversion. This foreign wire was a concealment and lulling transmission in furtherance of the scheme: Quinn injected himself as gatekeeper of the SAFT accounting; his substantive answer came only in the August 24, 2022 "I have a spreadsheet" wire, pled below; and beyond the August 15, 2022 tally of SAFT purchasers processed through counsel, no complete buyer list or accounting of presale proceeds was ever provided.

80.    August 24, 2022 — Quinn's "I have a spreadsheet" concealment wire. On August 24, 2022, at 9:13 p.m. Pacific time, replying in the same "Re: SAFT Tally" thread to Shuster's request for a list of the token buyers, Quinn emailed Shuster (Vancouver, British Columbia) from brianquinn27@icloud.com, copying Attorney Good and peter@kulabrands.com: "Yea Brian and I have most all accounting for all also ! I have a spreadsheet ! Let's all discuss next week !!!!!!" This foreign wire was a lulling and concealment transmission in furtherance of the scheme: Quinn claimed to hold "most all accounting" and "a spreadsheet" of the presale/SAFT buyers and deferred the subject to a discussion "next week"; no spreadsheet, buyer list, or accounting was ever provided, and the buyer list would have exposed the wallet diversion.

81.    August 10–18, 2022 — the "2 tranches 250" promise and the wires that became the $350,000 Blockchain Note. On August 10, 2022 (3:14 p.m. message block), Quinn texted Shuster by iMessage: "Yah good was gonna ask you. Probably gonna send 2 tranches 250. (Explain later ) should wire or crypto or one each ?" — a promise to send $500,000 in two $250,000 tranches. On August 12, 2022, at 2:36 p.m., Quinn texted: "2 wires my mistake on number 115k today 135 Monday Then the 250 next week wire or crypto we can discuss Let me know the first hit there as the other 135k is keyed up in system." On August 15, 2022, Shuster confirmed receipt of "a wire for $115,744.12," and at 7:02 p.m. that day Quinn texted a Bank of Nova Scotia transfer confirmation

reading "Transfer Amount: $134,255.88 USD," stating: "That was confirm for first 250k let me know hits brother." On August 17, 2022, Quinn texted "Look for another 100k wire today," and on August 18, 2022: "The wire was 100k sent confirm got it brother." The two receipted wires total exactly $250,000.00, and the three announced wires total exactly $350,000.00 — the precise principal amount of the Blockchain Note. The promised second $250,000 tranche was never completed and the funds that did arrive were not the promised bail-out support from Quinn's claimed "fund": they were recharacterized as an interest-bearing, repayable loan from Blockchain Funding, papered as the $350,000 Blockchain Note pled above. These wires furthered the scheme by inducing Shuster to keep UDI's expanded payroll and development spending in place and by converting the promised support into debt-based leverage that the conspirators and their assignees later sought to enforce against Plaintiffs.

82.    August 22, 2022 — Quinn supplies the "counter party" for the sham Disruptive Technology deal. On August 22, 2022, at 4:05 p.m. Pacific time, Quinn emailed Attorney Good (Florida) and Shuster (Vancouver, British Columbia) from brianquinn27@icloud.com, subject "Name": "Ari I will have the counter party name , address and signatory tonight." Attorney Good replied "Yes please" at 11:06 p.m. UTC the same day. It was Quinn,  not any independent investor, who thereafter supplied Disruptive Technology in which, on information and belief, Defendant Roma held an interest, as the counterparty to the Binding Letter of Intent. This wire furthered the scheme by seeding the sham $30 million transaction used to keep Shuster, UI, and UDI financially strung along.

83.    August 23, 2022 — Quinn's markup converting the Letter of Intent into the "Binding" Letter of Intent. In response to Attorney Good's August 22, 2022, 9:08 p.m. email circulating the draft Binding Letter of Intent ("Gentlemen - Please see attached...."), a reply email in the same thread transmitted deal terms, including: "1 c. can we say 20% of any funds received from any and all revenue from utherverse gaming including patent litigation settlements, licensing ,joint ventures, revenue sharing etc ....something like that? just a thought"; "2 c. change to April 10th 2023"; and "2 d. after via wire transfer or agreed upon crypto currency to the sellers digital wallet." This reply was sent by Quinn on August 23, 2022, at 9:12 a.m. Pacific time, from

brianquinn27@icloud.com, addressed to Attorney Good and copying Shuster. It was Quinn who directed that the instrument be made binding — "let's change the heading to BINDING LETTER OF INTENT" — consistent with his role as the participant who had undertaken to supply the counterparty and its deal terms. This wire furthered the scheme by shaping the sham Binding Letter's payment mechanics while, on information and belief, Quinn knew no payment would ever be made.

84.    August 23–25, 2022 — the sham "$30 million" confirmations. On or about August 23, 2022, Quinn represented to Shuster by iMessage text message on August 23, 2022, at 2:51 p.m. Pacific time that the investor (Disruptive Technology) had "Agreed to the 2.5m[illion] then 2m[illion] then 2.5m[illion]" — the first payments of what was to be a $30 million transaction. On August 25, 2022, Quinn told Shuster by electronic message that the Binding Letter had been signed, locking in the $30 million. Other than a $66 test payment, none of the $30 million was ever received; shortly before the first payment came due, on or about September 2, 2022, Quinn told Shuster by electronic message the fabricated story that a disgruntled former associate had caused Disruptive Technology to withdraw. Each of these transmissions to Shuster in Vancouver was a foreign wire in furtherance of the scheme, keeping UI/UDI financially weakened and dependent while diversions continued.

85.    February 17, 2023 — Quinn's unilateral direction to restructure the NIYA Note. On February 17, 2023, at 12:57 p.m., Quinn emailed Attorney Good (forwarding a message from Mark Gaeta, Momayez's representative): "see below...make an attachment or whatever stating that Niya wishes to convert (now not an option to convert) $675,000 of the note into 270,000 shares of Utherverse common shares @ $2.50 / share then make a note saying the levels he can convert the token are all cut in half." This interstate wire — sent by Quinn, who held no office at UI — was a transmission in furtherance of the scheme: it was an exercise of the conspirators' control over UI's debt and capitalization, dictating restructuring of the NIYA obligations in aid of the plan to load UI with obligations the conspirators could later call to force insolvency.

86.    May 2, 2024 — concealment of token and stock diversions. On or about May 2, 2024, Quinn stated to Shuster by electronic communication: "we don't care about any of the stock… The point is that as you know, between Josh [Denne] and I, we have all those tokens… It's really none

of your business of who we gave tokens to." At that time no tokens had been minted, Quinn and Denne had failed to meet the contractual conditions to receive any tokens, and they refused to identify the persons to whom they had purportedly sold or given tokens. This wire furthered the scheme by concealing the identities of the persons to whom tokens had purportedly been transferred and forestalling discovery of the diverted proceeds.

87. <u>May 30, 2025 — the fraudulent USPTO lien recordation directed by Quinn</u>. On May 30, 2025, a purported security interest against UI patent assets was recorded electronically with the United States Patent and Trademark Office, through the USPTO's Electronic Patent Assignment System ("EPAS"), at Reel/Frame 071469/0405. The recordation cover sheet lists Quinn's personal email address, brianquinn27@icloud.com, as the correspondence address, and on the basis of that fact Plaintiffs allege that Quinn directed and controlled the filing and caused the wire transmission to the USPTO. The recorded instrument was fabricated: UI never validly granted the security interest recorded, and the recordation was made to cloud title to UI's patent portfolio and impair UI's ability to finance or monetize its patents. This predicate act does not rest on any pleading, motion, or other filing in any court or adjudicative proceeding; it is the electronic recordation of a forged and fabricated instrument with a ministerial government registry, and it was an interstate wire transmission in furtherance of the scheme. Its date — after this action was commenced — demonstrates the open-ended continuity of Defendants' racketeering activity. A purported reconveyance was later recorded at Reel/Frame 071950/0423; it neither undoes the predicate act nor fully remedies the cloud and harm the fraudulent recordation caused.

**Predicate Acts of Defendant Joshua Denne**

88. <u>July 2022 — direction to divert the presale wallet, and lulling assurances that funds were "forthcoming."</u> On or about July 17, 2022, the initial presale of UTHER tokens went live, configured to sell to accredited investors with proceeds payable to a digital wallet for UI's benefit. On information and belief, before or shortly after launch, Denne instructed the developer of the presale software, by electronic communication, to change the digital wallet designated to receive investor funds, so that presale proceeds were diverted away from UI to a wallet or wallets that neither UI nor its developer controlled. On information and belief, that wallet was controlled by Denne, by

Quinn, or by an entity one of them controlled. Then, when Shuster (in Vancouver, British Columbia) questioned on or about July 25, 2022 why UI had received no presale funds, Denne assured him by electronic communication, in substance, that nothing was wrong, that the investor "accreditation process takes time," and that investments would be forthcoming. Denne's wallet-diversion instruction and his lulling assurances were each wire transmissions in furtherance of the scheme: the first effected the diversion, and the second concealed it.

89. <u>May 10, 2022 — Denne obtains the position of intermediary between UI LTD and its investors</u>. On May 10, 2022, at 21:44 UTC, Denne emailed prospective investor Mark Moskowitz from joshua@blockchainfunding.com, subject "Utherverse Token Offering," transmitting the "Prospective Investor Letter" prepared by UI LTD's counsel and a sample SAFT, and writing: "PLEASE NOTE that the values in the SAFT agreement will be filled in appropriately as it depends on when it is executed and at what round is open at the time of execution." This interstate wire was a transmission in furtherance of the scheme to defraud Plaintiffs: it installed Denne as the person who controlled the completion and transmission of UI LTD's own instruments — the position of access and trust he then exploited, by falsifying the counterparty on those instruments and converting to himself funds that belonged to UI LTD. The predicate is the wire's role in the scheme to steal Plaintiffs' property.

90. <u>The forged/substituted-counterparty SAFT transmittals — theft from UI LTD by forgery.</u> Beginning in or about mid-2022, Denne, with the full knowledge of Quinn, falsified the SAFT instrument that UI's securities counsel had prepared for UI LTD by inserting "Blockchain Funding, Inc." (and in other instances Masternode Partners, LLC) as the "Company"/counterparty in place of UI LTD, and transmitted the doctored instruments by email to counterparties for signature, directing that the resulting payments be sent to accounts and wallets Denne controlled. The scheme so executed was a scheme to obtain, by forgery and false pretenses, money and property belonging to UI LTD: funds totaling at least $1,410,500.00 from no fewer than sixteen (16) remitters, which were owed and destined to UI LTD as the true issuer and counterparty, were instead wired to bank accounts and/or cryptocurrency wallets controlled by Denne, Blockchain Funding, or Quinn. Each email transmittal of a doctored instrument by Denne, and each resulting incoming payment

wire that Denne caused, was a separate wire transmission in execution of the scheme to deprive UI LTD of that money and of its exclusive right to issue and be paid on its own instruments. Plaintiffs do not predicate this claim on any misrepresentation concerning the value or merits of any investment; the predicate conduct is Denne's forgery of UI LTD's instruments and conversion of funds belonging to UI LTD. Plaintiffs discovered the diversion only after the tokens were minted on or about September 28, 2024, when persons unknown to UI began demanding tokens.

91.    Denne's execution and return-transmission of the forged instruments. Denne also directed who would execute the doctored instruments in the "Company" signature block that rightfully belonged to UI LTD — causing himself or persons under his control to sign in UI LTD's place — and transmitted, or caused the transmission of, the fully executed forged instruments back to the counterparties by email, giving the forgeries the appearance of authorized company documents. Each such return transmission was a separate wire in furtherance of the theft from UI LTD.

92.    June 6–7, 2023 — Denne's electronic execution and transmittal of the Blockchain Funding note documents. Using the DocHub electronic-signature platform, Denne, as signer joshua@blockchainfunding.com, executed and caused the transmission of "Blockchain Funding - 2023 - Promissory Note - Utherverse Inc.pdf" — the amendment dated on or about June 5, 2023 extending the $350,000 Blockchain Note obligations to Utherverse, Inc. itself — which Denne completed June 7, 2023, at 7:07 p.m. EDT. Denne's DocHub signature events and the platform confirmation wires he thereby caused, transmitted among Arizona, British Columbia, and the DocHub servers, were interstate and foreign wires. These wires furthered the scheme by binding UI — the entity holding the patent and token assets — to the $350,000 debt that Quinn's false July 25, 2022 "bail us out" promise had induced, expanding the liability the conspirators could later use against UI.

93.    April 10, 2023 — the false pretense of Blockchain Alliance's corporate existence and good standing. On or about April 10, 2023, Denne, on behalf of Blockchain Alliance, executed and transmitted electronically to Shuster and UI the Membership Interest Purchase Agreement described below, in which Denne represented in writing that Blockchain Alliance was "a limited liability

company duly organized, validly existing and in good standing under the Laws of the State of Wyoming." Per its Wyoming SOS record, Blockchain Alliance was in good standing on that date; the false pretense pled here is not corporate status but operational substance: the transmission represented Blockchain Alliance to be an operating network-marketing enterprise with a massive member network capable of generating income for UI when, on information and belief, it had no operating network and generated nothing, so that the consideration UI received was illusory. The wire furthered the scheme because it was a false pretense as to the legal existence and status of the contracting party itself, used to obtain UI property for consideration Denne knew to be illusory.

### Predicate Acts of Defendant Blockchain Funding, Inc.

94.    May 10–24, 2022 — the Advisor SAFT and wiring-instruction transmittals. On or about May 10, 2022, Blockchain Funding, through Denne, executed and transmitted electronically the "Blockchain SAFT" with UI LTD, pre-purchasing 360 million UTHER tokens for $12,000.24 (at $0.000033334 per token) with no vesting or release schedule — terms atypical for a token presale and, on information and belief, included at Denne's insistence. On May 24, 2022, at 3:18 p.m. in consummation of that transaction, Attorney Ari Good (info@goodattorneysatlaw.com, Miami, Florida and Colombia South America offices) emailed Quinn (brianquinn27@icloud.com) and Shuster (brian99@ideaflood.com, Vancouver, British Columbia), copying Denne (joshua@blockchainfunding.com) and Lynne C. Martin (lynnecmartin@gmail.com), subject "Advisor investments": "The following are the funding amounts on the Advisor SAFTs. Blockchain Funding, Inc - $12,000.24[;] Masternode Partners, LLC - $5,000.01 … Total: $17,000.25[.] Attached are the wiring instructions." Blockchain Funding, through Denne and Quinn, caused these interstate and foreign wires within the meaning of 18 U.S.C. § 1343 — Attorney Good transmitted the May 24 wire as the foreseeable and intended consequence of the transaction Denne and Quinn set in motion — and Blockchain Funding thereafter wired its $12,000.24 payment. These wires were transmissions in furtherance of the scheme because they established Blockchain Funding as a nominal, immediately-unlocked counterparty of record — the vehicle whose name Denne would substitute for UI LTD in the forged instruments, and whose $12,000.24 "purchase price" was designed to ripen into a repayment obligation of UI LTD when, as Quinn and Denne knew, tokens

would not be minted by December 31, 2022.

95. <u>Receipt of funds belonging to UI LTD</u>. Blockchain Funding, through Denne, received into its bank accounts and/or cryptocurrency wallets funds — part of the at least $1,410,500.00 wired by no fewer than sixteen remitters described above — that belonged and were destined to UI LTD and were diverted to Blockchain Funding by means of the forged, substituted-counterparty instruments. Each incoming wire that Blockchain Funding solicited and received was a wire transmission in execution of the scheme to deprive UI LTD of its money and property, and Blockchain Funding retained and concealed those funds from UI.

96. <u>The $350,000 Blockchain Note wires.</u> Blockchain Funding, through Denne, executed and transmitted the June 2023 DocHub note and amendment wires described above, and, through Denne and/or Quinn, caused the electronic transmittal to Shuster (Vancouver, British Columbia) of the $350,000 Blockchain Note documentation in or about August 2022. These wires furthered the scheme by layering repayable debt onto UDI and then UI in place of the equity investment and $5 million of launch funding Blockchain Funding had promised under the April 16, 2022 Consulting Agreement — a loan induced by Quinn's false July 25, 2022 "I will bail us out" iMessage text messages.

97. <u>2023 — conversion of the token allocation</u>. In 2023, Blockchain Funding ceased paying the legal, public-relations, and management fees it had agreed to fund for the token launch, forcing Shuster to pay those costs personally; that cessation is pled as part of the scheme's background and damages, not as a predicate act. As predicate acts, Plaintiffs allege on information and belief that Blockchain Funding, through Denne, sold or transferred portions of its restricted token allocation and, by interstate wire, diverted the proceeds to accounts and wallets of Denne, Quinn, and/or Blockchain Funding rather than applying them for UI/UDI's benefit as the Consulting Agreement required, concealing those transfers from UI. Each such transfer and diversion wire was a wire transmission in furtherance of the scheme to deprive UI/UDI of money and property.

**Predicate Acts of Defendant Blockchain Alliance, LLC**

98. Each act in this subsection was performed for Blockchain Alliance by Denne, its controlling member, acting within the scope of his authority for the entity, and is an act of Blockchain

Alliance.

99. <u>March 23 – April 22, 2023 — the Membership Interest Purchase Agreement transmittals containing the false pretense of corporate existence and good standing.</u> To consummate the transaction by which UI issued 3,685,000 shares of its Class A Common Stock (par value $0.001) for a twenty-five percent membership interest in Blockchain Alliance, Denne and Blockchain Alliance caused a series of electronic transmissions through the DocHub e-signature platform to and from Shuster (Vancouver, British Columbia) and UI's then-CEO Robert Hackett, including without limitation:

- The March 25, 2023, 12:23 UTC transmission of "Utherverse Inc - 2023 - Agreements - Membership Interest Purchase - Blockchain Alliance - 032323 (1).docx" for review and signature;

- The April 8, 2023, 17:34 UTC transmission of "Utherverse Inc - 2023 - Resolutions - Approving Blockchain Alliance Membership Purchase Agreement - 040323.doc";

- The April 22, 2023, 00:03 UTC "FINALIZED" transmission of "Utherverse Inc - 2023 - Agreements - Membership Interest Purchase - Blockchain Alliance - 041023.pdf," confirming all-party execution of the Membership Agreement dated on or about April 10, 2023.

100. The executed Membership Agreement transmitted by these wires contained Denne's written representation, made on Blockchain Alliance's behalf, that Blockchain Alliance was "validly existing and in good standing under the Laws of the State of Wyoming," and represented Blockchain Alliance to be an operating network-marketing enterprise that would sell UI's digital assets and pay a substantial portion of revenue to UI. On information and belief, both pretenses were false when transmitted. Blockchain Alliance was in good standing on the transmission dates; the false pretense is the represented operating network-marketing business and income-generating capability, which, on information and belief, did not exist. The gravamen of this predicate is not any statement about the value or merits of a security; it is the false pretense of the contracting entity's own legal existence, status, and operations — akin to contracting in the name of a fictitious principal — by which Denne and Blockchain Alliance obtained UI property (the share block, which thereafter appeared on UI's capitalization table as held by Blockchain Alliance) for consideration Denne knew to be illusory. Each DocHub transmission was an interstate or foreign wire in furtherance of the scheme, whose object was to extract from UI a 10.7% block of its Class A stock by false pretenses.

101. <u>Conversion of UI shares and retention of proceeds belonging to UI.</u> On information and belief, Blockchain Alliance, through Denne, thereafter transferred to third parties UI shares it had no right to transfer — including the restricted shares it received under the Membership Agreement, which were legended and not permitted to be offered, sold, transferred, pledged, or hypothecated — and disposed of additional UI stock it had no authority to hold or convey, receiving payments by wire into accounts Denne controlled and remitting nothing to UI, while concealing the transfers from UI. Persons who received shares from Blockchain Alliance subsequently appeared on UI's capitalization table although UI received no funds from them, and UI never received any income from Blockchain Alliance. The predicate conduct is the conversion of UI's shares and of proceeds belonging to UI, and the concealment of that conversion from UI — not any representation made to the transferees — and each wire by which Blockchain Alliance transferred UI shares, received payment, or concealed the transfers from UI was a separate wire transmission in furtherance of the scheme.

102. The predicate acts alleged in this Section were related, sharing the same purposes (diverting funds belonging to UI/UI LTD, extracting UI stock and tokens without payment, and loading UI/UDI with debt to force insolvency and conceal the fraud), the same participants, the same victims, and the same methods of commission — and they extended continuously from at least March 2022 through at least May 30, 2025, including acts committed after this action was commenced. They therefore constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), (5).

**Predicate Acts of Nazanin Namazi**

103. On May 23, 2025, Namazi electronically filed Nevada UCC-1 No. 2025476203-7 with the Nevada Secretary of State (a California-to-Nevada interstate wire), as alleged in Section IV.C above.

104. On May 30, 2025, Namazi electronically transmitted EPAS submission 509214520, recorded at Reel/Frame 071469/0405, under a false 37 C.F.R. § 1.63 declaration (a California-to-Virginia interstate wire), as alleged in Section IV.C above.

105. On information and belief, the January 10, 2025 California UCC-1 alleged above was

filed by Namazi at Quinn's direction, but left the "Submitted Information" blank, an effort, on information and belief, to further conceal the persons behind the unlawful scheme and acts.

106.    On information and belief, Namazi's association with the enterprise long predated the 2025 filings. In an August 24, 2023 text exchange, Quinn identified "Naz" as his assistant, and the same day forwarded a ledger prepared by her tracking investor deposits routed across multiple Quinn-affiliated accounts.

**Predicate Acts of Lynne Martin and Masternode Partners, LLC**

107.    Plaintiffs allege the following wire-fraud predicate acts (18 U.S.C. § 1343) committed by, caused by, or reasonably foreseeable to and in furtherance of the scheme joined by Defendants Lynne Martin ("Martin") and Masternode Partners, LLC ("Masternode"). The scheme's object, as alleged, was to induce Utherverse International Ltd. ("UI Ltd.") to execute a Simple Agreement for Future Tokens ("SAFT") allocating 150,000,000 UTHER tokens to Masternode for the nominal sum of $5,000.01 (approximately $0.000033334 per token), to load Utherverse with a corresponding token/repurchase obligation running to a Denne/Quinn-affiliated entity, and to divert the resulting value to insiders including Martin.

108.    Masternode Partners, LLC could act only through natural persons. Masternode did not itself transmit the wires alleged in this Section. Masternode's own act was the execution of the Masternode SAFT, which Martin performed as the "Signor" that Quinn designated for the entity, as alleged below; that execution, and the written capacity-and-authority representation it embodied, are Masternode's acts through its designated signatory. The remaining wire communications alleged in this Section are attributed to Masternode as the named counterparty and intended recipient of the Masternode SAFT and its associated funding-and-wiring instructions, and, where expressly so stated, as acts of co-conspirators reasonably foreseeable within, and in furtherance of, the scheme that Masternode, through Martin, its official Secretary, designated signatory and a knowing participant, joined.

109.    The SAFT-Transmittal Wire to Martin (May 23–24, 2022) On May 23, 2022, at 6:28 p.m. Pacific Daylight Time, transactional counsel Ari Good (info@goodattorneysatlaw.com) sent an email addressed To Brian Shuster (brian99@ideaflood.com) and "Lynne C. Martin"

(lynnecmartin@gmail.com), with a copy to Brian Quinn (brianquinn27@icloud.com), bearing the subject line "SAFT for Masternode Partners, LLC" and attaching the executable "Combined Masternode Partners SAFT.pdf" (approximately 259 kB).

110.    The body of the wire stated, in pertinent part: "Hello Lynne, Brian — Would you please find attached the SAFT between Masternode Partners, LLC and Utherverse International Ltd. Please print, scan and return to me. I prefer manual signatures because the agreement was established on 10 May, and I don't want a DocuSign stamp after that."

111.    This was an interstate and foreign wire communication. The message was electronically transmitted through goodattorneysatlaw.com's relay infrastructure and delivered into the Google/Gmail mail system serving the named recipient Martin — who, on information and belief, resided in and accessed her account from California — and to named recipient Brian Shuster, who received it in Vancouver, British Columbia, Canada. The transmission therefore crossed state and national lines.

112.    This wire furthered the scheme by delivering the executable Masternode SAFT directly into the hands of Martin — the intended executing signatory for Masternode — for signature and return, thereby operationalizing the pre-purchase of 150,000,000 UTHER tokens for $5,000.01 and the creation of the corresponding obligation against UI Ltd. Counsel's express instruction to use "manual signatures" and to avoid a "DocuSign stamp" post-dating the "10 May" nominal execution date is alleged to reflect an intent to make a back-dated instrument appear regular.

113.    Martin is a named direct addressee of this wire. The executed instrument ("SAFT Masternode Partners.pdf") was returned to Attorney Good by Brian Shuster, not by Martin. Accordingly, no transmission wire by Martin herself is alleged; Martin is the named recipient of the wire and as the executing "Signor" of the instrument it transmitted.

114.    The "Advisor Investments" Funding/Wiring-Instruction Wire (May 24, 2022)  On May 24, 2022, at 3:18 p.m. Pacific Daylight Time (system time-stamp Tuesday, May 24, 2022, 22:18:42 +0000 UTC), Ari Good (info@goodattorneysatlaw.com) sent an email bearing the subject line "Advisor investments" To Brian Quinn (brianquinn27@icloud.com) and Brian Shuster (brian99@ideaflood.com), with copies to joshua@blockchainfunding.com and "Lynne C. Martin"

(lynnecmartin@gmail.com), attaching wiring instructions in the file "HSBC Wire Transfer UDI USD (legend) (2).docx."

115. The body of the wire stated, in pertinent part: "All — The following are the funding amounts on the Advisor SAFTs. Blockchain Funding, Inc — $12,000.24 / Masternode Partners, LLC — $5,000.01 / Total: $17,000.25. Attached are the wiring instructions," and further advised, "Please advise your assistant that the banks are clueless when it comes to using SWIFT codes. We have had a ton of problems at the retail level." The $5,000.01 figure is the exact consideration recited for Masternode's pre-purchase of 150,000,000 UTHER tokens.

116. This was an interstate and foreign wire communication. The email was electronically transmitted among recipients located in multiple states (California, and — as to co-schemers — elsewhere) and abroad, and the attached wiring legend specified an HSBC Bank Canada (Vancouver, British Columbia) USD wire, beneficiary Utherverse-affiliated entity, routed through a New York intermediary bank via the international SWIFT bank-messaging network. The transmission crossed both state and national lines.

117. This wire furthered the scheme by fixing the consideration for the Masternode token allocation and supplying the international-wire mechanics for the movement of funds relating to the Masternode and Blockchain Funding SAFTs, and by keeping Martin — the designated Masternode signatory — apprised of the funding and wire logistics for the entity on whose behalf she was to execute.

**Martin is a named recipient of this wire.**

118. The Quinn Signatory-Designation Wire (May 23, 2022) (on information and belief as reasonably foreseeable in furtherance of the scheme). On May 23, 2022, between 12:52 p.m. and 1:13 p.m. Pacific Daylight Time (after counsel's 12:52 p.m. PDT transmittal and quoted in full in counsel's reply time-stamped 20:13:01 UTC, i.e., 1:13 p.m. PDT), Brian Quinn (brianquinn27@icloud.com), writing "from my iPhone," sent an email to counsel Ari Good in the "Re: Advisor SAFTs" thread; the directive was thereafter quoted forward by Ari Good (info@goodattorneysatlaw.com) to Brian Quinn and Brian Shuster.

119. The operative content stated verbatim: "Ari make the Signor for block chain funding

Joshua Denne And MasterNode partners Lynne Martin." This directed counsel to designate Martin as the executing signatory ("Signor") for Masternode on the Masternode SAFT, immediately after counsel had circulated the Blockchain Funding and Masternode SAFTs for print, sign, and scan.

120.    This was an interstate and foreign wire communication, transmitted from an Apple/iCloud account through interstate email infrastructure to counsel, in furtherance of an instrument whose counterparty, UI Ltd., was located in Vancouver, British Columbia, Canada, and whose intended signatory, Martin, was located in Orange County, California.

121.    This wire furthered the scheme by installing Martin as the human signatory who would execute the Masternode SAFT on behalf of Masternode, thereby establishing the vehicle through which the 150,000,000-token allocation and the corresponding obligation against UI LTD. would be booked to a Denne/Quinn-affiliated entity.

122.    On information and belief, this wire is attributable to Martin and Masternode as a communication authored by Brian Quinn — Martin's co-schemer, and the business partner and co-principal of her son, Denne — in furtherance of, and reasonably foreseeable within, the common scheme that Martin knowingly joined (see Section 1962(d) allegations below). Plaintiffs plead this act as against Martin/Masternode on a Pinkerton/enterprise-foreseeability basis.

123.    Martin's Written Capacity/Authority Representation in the Executed Masternode SAFT. In the Masternode SAFT — nominally established May 10, 2022, transmitted to Martin for signature on May 23–24, 2022, and returned in executed form by wire on or about May 24, 2022, Martin, executing as the designated "Signor" on behalf of Masternode, represented in writing that Masternode possessed the full legal capacity and authority to enter into and perform the SAFT. This representation, and the executed instrument embodying it, was transmitted in interstate and foreign commerce by email between California and Vancouver, British Columbia, Canada, as set forth above.

124.    This representation furthered the scheme by inducing Shuster and UI LTD to execute the SAFT, to recognize the 150,000,000-token allocation, and to incur the corresponding repurchase obligation. As of May 2022, Masternode had received a tax delinquency notice sent on Feb. 2, 2022 that it knew (based on its history of an April 10, 2020 dissolution for tax delinquency that it cured

on April 28, 2021) would trigger a dissolution. If Masternode was unable to pay the taxes, it knew that it was falsely representing that it was an accredited investor in the SAFT. By contrast, if Masternode had the funds and intentionally failed to pay the taxes, it had intentionally taken a step toward being dissolved and therefore unable to meet its obligations.

125.    Unauthorized Token Sales with Retained Proceeds (on information and belief). On information and belief, on or after May 2022, Martin and/or Masternode by and through Martin or with the knowledge and consent of Martin sold UTHER token rights to third-party investors that Masternode was not authorized to sell, and retained the proceeds without remitting them to Utherverse, employing the same misappropriation method used by the Denne-affiliated Blockchain Funding, Inc. Such investor payments and token transfers, on information and belief, traveled by interstate or foreign wire or on-chain transfer, each constituting a candidate wire predicate under Section 1343.

126.    This conduct furthered the scheme by converting the 150,000,000-token allocation into cash retained by Martin and/or Masternode, diverting value from Utherverse to insiders.

127.    The foregoing establishes at least two particularized interstate/foreign wire communications connected to Martin and Masternode — the SAFT-transmittal and Advisor-Investments wires, of which Martin is a named recipient — together with the signatory-designation and capacity-representation wires on enterprise/foreseeability and execution theories. Plaintiffs' primary theory as to Martin and Masternode remains the § 1962(d) claim pleaded in the Second Count; § 1962(c) is pleaded in the alternative.

**Predicate Acts by Roma**

128.    On information and belief Roma held an ownership interest in and controlled Disruptive Technology, a defunct Estonian private limited company (registry code 16257698; €2,500 share capital; no employees, no VAT registration, no operations; virtual registered address at Mustamäe tee 6b, 10616 Tallinn, Estonia; struck from the Estonian registry on March 25, 2024), which was used as a sham "investor" and fronted by nominee management-board member Ilya Manin. Each wire described below, including those sent by co-Defendant Brian Quinn ("Quinn"), transmitted the identity, instrumentality, or payment terms of the Disruptive Technology shell that

Roma, on information and belief, owned and controlled, in furtherance of a scheme Roma knowingly joined. Each transmission crossed state and/or national lines and was made in furtherance of the scheme to defraud Plaintiffs as described above.

129.    August 23, 2022 wire transmitting the Disruptive/Manin counterparty identity used to paper the sham $30 million Letter of Intent. On August 23, 2022, at 8:35:55 a.m. Pacific Daylight Time (15:35:55 UTC), electronic mail was transmitted from an Apple iCloud account via an iPhone, bearing the subject line "Contract" from Brian Quinn (brianquinn27@icloud.com), which transmitted the Disruptive Technology counterparty identifying data that, on information and belief, originated from and was supplied and controlled by Roma as the undisclosed principal of Disruptive Technology.  The recipients were Ari Good (info@goodattorneysatlaw.com), transactional counsel, and Brian Shuster (brian99@ideaflood.com).

130.    The email transmitted the precise counterparty identifying data required to draft the binding Letter of Intent, stating verbatim: "Ari here is the name for counter party I'll be in my office in 15 and will look over contract and make any change !! Disruptive Technology OÜ Estonia, Tallinn, Mustamäe tee 6b, 10616 Signor Ilya Manin. Sent from my iPhone." This transmitted the exact Estonian shell entity, its registered virtual address, and the nominee signatory later used to execute the Letter of Intent.

131.    The transmission crossed at least one state and/or national boundary: it was sent to recipient Brian Shuster, who at all relevant times resided and worked in Vancouver, British Columbia, Canada, and transmitted the identifying data of a foreign entity (Disruptive Technology, Tallinn, Estonia) and its foreign-national signatory.

132.    By transmitting the fabricated "investor" identity, this wire supplied counsel with the entity name, address, and signatory needed to paper a facially binding $30 million Letter of Intent, giving the sham deal the appearance of a genuine, funded third-party investment. This induced Plaintiffs to continue believing bona fide financing was inbound, to continue operating and to increase operating expenditures, and kept Utherverse in a financially weakened position while the co-schemers diverted investor funds to themselves.

133.    August 23, 2022 wires drafting and circulating the "Binding Letter of Intent"

41
FIRST AMENDED COMPLAINT

memorializing the sham $30 million Disruptive deal. A drafting-and-transmittal sequence on August 23, 2022, comprising, among others: (a) 4:08:22 a.m. UTC—counsel Ari Good's transmittal of the draft "Letter of Intent" with the attached Word document "Letter of Intent.docx"; (b) 4:12:03 p.m. UTC (16:12:03)—Quinn's transmittal directing that the instrument be re-styled as a "BINDING LETTER OF INTENT" with wire-transfer payment terms; and (c) 6:43:58 p.m. UTC (18:43:58)—counsel's transmittal of the "Revised Binding Letter of Intent" was sent by electronic mail with an attached Microsoft Word document, under the subject lines "Letter of Intent," "Contract," and "Revised Binding Letter of Intent."

134.    The senders and recipients were (a) Ari Good (info@goodattorneysatlaw.com) to Brian Shuster (brian99@ideaflood.com) and Brian Quinn (brianquinn27@icloud.com); (b) Brian Quinn to Ari Good, copying Brian Shuster; (c) Ari Good to Brian Shuster and Brian Quinn. On information and belief, the Disruptive Technology counterparty for whom these documents were drafted was controlled by Roma.

135.    Counsel Ari Good circulated the draft stating: "Gentlemen - Please see attached . . . put together a proper agreement once this is signed . . . Is there any due diligence to be conducted?" Quinn then directed the operative fraudulent revisions, stating: "let's change the heading to BINDING LETTER OF INTENT . . . 2 d. after via wire transfer or agreed upon crypto currency to the sellers digital wallet." The resulting instrument—executed by Ilya Manin for Disruptive Technology on August 25, 2022—committed Disruptive Technology to pay $30,000,000 in staged installments ($2.5 million on or before September 1, 2022; $2.0 million on or before October 1, 2022; $2.5 million on or before November 30, 2022; and $23.0 million on or before April 10, 2023), payable "via wire transfer" or agreed cryptocurrency, in exchange for 15% of UDI's Class A shares, 300 million UTHER tokens, and 20% of Utherverse gaming operations receipts.

136.    The transmissions were directed to recipient Brian Shuster in Vancouver, British Columbia, Canada, and memorialized a transaction with a foreign counterparty (Disruptive Technology, Tallinn, Estonia) whose instrument expressly contemplated cross-border "wire transfer" of the $30 million consideration.

137.    These transmissions created and circulated the very instrument that gave the sham

deal binding legal form. The instrument's "binding" character and wire-transfer payment terms induced Plaintiffs to rely on incoming $30 million financing, to continue operating, and to increase operating costs, while the co-schemers diverted funds and kept Utherverse financially weak.

138.    The late-August–September 2022 wire transmitting the fabricated "disgruntled former associate" withdrawal narrative to cause Disruptive to abandon the $30 million deal. In or about late August through September 2022, shortly after a meeting among Quinn, Denne, and Roma, as the first $2.5 million installment came due (due on or before September 1, 2022), on information and belief, a wire communication via electronic message was sent by which Quinn relayed the fabricated withdrawal narrative to Shuster following the Quinn–Denne–Roma meeting. On information and belief, the fabricated story was jointly authored by Quinn, Denne, and Roma and relayed by Quinn to Brian Shuster in Vancouver, British Columbia, Canada. On information and belief, the "withdrawal" was effectuated through and on behalf of Disruptive Technology, which Roma controlled.

139.    Quinn told Shuster that a disgruntled former associate of UDI had contacted Disruptive Technology, told it that Shuster was a fraud, among other lies, and would soon be suing Shuster — causing Disruptive Technology to withdraw from the deal. On information and belief, the reported contact by any "former associate" never occurred, and the narrative was fabricated by Quinn, Denne, and Roma.

140.    On information and belief, the communication ran among Roma, Quinn, and Denne in the United States and recipient Brian Shuster in Vancouver, British Columbia, Canada, and concerned the withdrawal of a foreign counterparty (Disruptive Technology, Estonia), thereby crossing national lines.

141.    The fabricated withdrawal narrative supplied a false, non-Defendant scapegoat for the engineered collapse of the $30 million deal, concealed that the purported "investor" was a shell the schemers controlled, and kept Utherverse desperate for capital and financially weak so the co-schemers could continue diverting investor funds to themselves.

142.    Predicate Acts (corroborative of pattern and intent): The parallel Roma/Daisy $50 million sham "purchase." In further support of the pattern of racketeering activity and of Roma's

knowledge and intent, and on information and belief, Roma ran a second sham funding deal through the same playbook: a purported $50 million "purchase" to be paid to Plaintiffs by Roma's company, Daisy, in which a nominee's name was placed on Utherverse paperwork "in furtherance of the deceptions and fraud," which produced no funds and was quietly "cancelled." As recounted by Brian Shuster, "The only thing I can imagine is that it was put in front of me after we 'closed' the deal for $50 million to be paid to us by Jeremy Roma's company Daisy . . . Of course, we never got any money and I was told that the deal fell through but that Brian [Quinn] 'had taken care of it so that everything was cancelled.'" Furthermore, a "test" transfer of cryptocurrency in the amount of $66 was sent to Utherverse in conjunction with the sham agreements, on information and belief directed by Roma and Quinn with the intent of causing Shuster and UI to continue to believe that funds were incoming, and therefore to continue to act in reliance on the fraudulent representations.

**H.      Section 1962(d): Knowing Agreement and Awareness of the Enterprise's Scope**

**Martin and Masternode's Awareness of and Agreement to Further the Enterprise**

143.    Defendant Martin knew of the essential nature and scope of the Utherverse enterprise and agreed to further its aims. Martin is the biological mother of Joshua Denne, the principal schemer who, with Brian Quinn, directed the fraud. Martin's entry into the metaverse/crypto venture came solely through her son, and she operated no independent MLM or crypto business of her own. On March 18, 2022, Denne told Shuster in writing that he had described his new alignment with Shuster to his mother ("it's awesome that we can see 'eye to eye' . . . I told my mom the same thing"). On information and belief, Denne kept Martin informed of his Utherverse dealings in the weeks before the Masternode SAFT was executed. It was Quinn who, on May 23, 2022, designated Martin as Masternode's executing signatory ("Ari make the Signor . . . MasterNode partners Lynne Martin"), and Attorney Good who, on May 24, 2022, transmitted to Martin the Advisor-SAFT funding amounts and wiring instructions.  Martin accepted the nominee-signatory role those wires assigned her. Shortly thereafter, Martin executed the Masternode SAFT as its designated "Signor," warranting Masternode's capacity and authority and, on information and belief, Masternode sold UTHER token rights to outside investors and retained the proceeds, mirroring the enterprise's core method of pre-selling restricted tokens and pocketing investor funds. Masternode, Martin's vehicle — although

44
FIRST AMENDED COMPLAINT

administratively dissolved since April 14, 2024 and never reinstated and not registered to do business in California — was made a plaintiff pressing affirmative claims in the November 6, 2024 Orange County action, reflecting Martin's participation in the enterprise's coordinated litigation strategy. Martin knew she held signatory authority for Masternode and represented as much; after executing, she received email copies of the funding-and-wiring communications that made the enterprise's use of Masternode apparent, yet took no step to disavow the role or correct the record — knowing acquiescence from which her agreement to further the scheme may be inferred. These facts support the inference that Martin knew the enterprise's fraudulent aims and knowingly agreed to further them, satisfying 18 U.S.C. § 1962(d).

**Roma's Awareness of and Agreement to Further the Enterprise**

144.    Roma knew of and agreed to the essential nature and objectives of the enterprise's scheme to defraud investors and Plaintiffs, and knowingly agreed to facilitate it. First, Roma is a sophisticated, repeat architect of investment-fraud schemes. On information and belief he founded the Apex crypto-mining program (2019–2020), which the U.S. Securities and Exchange Commission determined to be an unregistered securities offering that raised approximately $21 million from more than 500 investors on false passive-return promises, and thereafter launched the Daisy/D.AI.SY Global crypto program (2020–2023), widely characterized as a Ponzi scheme and the subject of a British Columbia Securities Commission caution (November 20, 2023) and an Alberta Securities Commission caution (December 12, 2023) — establishing that Roma knew precisely how a scheme built on false investment promises, diverted funds, and unregistered token sales operates.

145.    On information and belief Roma owned and controlled the Disruptive Technology shell and supplied the sham "investor" instrumentality used to create false hope and string Plaintiffs along, a core overt act reflecting both his knowledge of the scheme's scope and his active furtherance of it.

146.    Roma is alleged to have collaborated with Quinn and Denne to fabricate the "disgruntled former associate" narrative that manufactured a pretext for Disruptive Technology to abandon the very deal his own shell had signed, just as the first installment came due, demonstrating

coordinated specific intent to keep Utherverse dependent and to conceal the diversion of funds 169.

147.    Additionally, Roma's relationship to the enterprise was continuous and multi-venture rather than incidental.  On information and belief he supplied his Daisy network as a source of credibility and investor access to the enterprise and continued partnering with Denne thereafter, including as a co-founder of BioLimitless in 2023–2024, rebutting any suggestion that his participation was that of an unwitting one-off actor.

148.    On information and belief Roma, together with Quinn and Denne, helped funnel monies raised through Disruptive Technology and diverted token pre-sale and stock-sale proceeds into the conspirators' own accounts—the enterprise's central financial objective.

149.    Contemporaneous communications corroborate Roma's integration into the enterprise: on June 4, 2022, Shuster texted Denne that he had "Just got off with Jeremy and Quinn," and Denne acknowledged the message — placing "Jeremy" on the venture's calls with Quinn; on July 8, 2022, Denne texted Shuster, "Jeremy Roma and I are putting final touches on an offer and would love your mind on it. This is About to EXPLODE," and, the same evening, "Walking to a quite [sic: quiet] area with Roma now. I'll FaceTime shortly"; and Quinn maintained a direct "Jeremy" channel during the same period — a March 20, 2022 email in which Quinn drafted the outreach message proposing a call among "myself, Brian, Josh and Craig".

150.    In an August 8, 2024 written email sent by defendants to Utherverse, defendants acknowledged Roma's involvement in the transactions at issue, stating "Through a longstanding relationship Mr. Joshua Denne had with a gentleman named Jeremy Roma, a capital raise of $25MM was agreed to. Then, just days prior to the wire, an Mr. Shuster's DISGRUNTAL ASSOCIATE GEORGE OR AN ASSOCIATE OF HIS placed a call to Mr. Roma and informed him that Brian Shuster was a fraud and that he and his associates were planning to file suit against Mr. Shuster and the company. Mr. Roma understandably reversed course."

151.    Taken together, these facts establish that Roma knowingly agreed that a member of the conspiracy would commit the predicate acts of wire fraud alleged above, in violation of 18 U.S.C. § 1962(d).

///

**FIRST COUNT**

**For Violation of 18 U.S.C. § 1962(c)**

**(Against Quinn, Denne, Blockchain Funding, Blockchain Alliance, and Namazi; and, in the Alternative, Martin, Masternode, and Roma)**

152.    Plaintiffs reallege and incorporate the allegations of Paragraphs 1 through 150 of this First Amended Complaint as though fully set forth herein. For the pattern of racketeering activity alleged in this Count, Plaintiffs rely in particular on the predicate acts pleaded above, defendant by defendant, in FACTS, Section G.

153.    Each Defendant is a "person" under 18 U.S.C. § 1961(3) distinct from the Quinn-Denne Enterprise, an association-in-fact enterprise engaged in and whose activities affect interstate and foreign commerce.

154.    Each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of multiple acts of wire fraud (18 U.S.C. § 1343) as alleged in the above FACTS, Section G. As to Defendants Martin, Masternode, and Roma, this Count is pleaded in the alternative, to the extent the predicate acts alleged in Section G are attributable to them under enterprise and co-conspirator principles.

155.    Plaintiffs were directly and proximately injured in their business and property.

156.    Plaintiffs are entitled to treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c).

**SECOND COUNT**

**For RICO Conspiracy, 18 U.S.C. § 1962(d)**

**(Against all Defendants)**

157.    Plaintiffs reallege and incorporate the allegations of Paragraphs 1 through 150 of this First Amended Complaint, and Count I, as though fully set forth herein. For each Defendant's knowing agreement to the scheme and awareness of the essential nature and scope of the enterprise, Plaintiffs rely in particular on FACTS, Section H.

158.    Each Defendant knowingly agreed and conspired to facilitate a scheme that, if completed, would constitute a violation of 18 U.S.C. § 1962(c), and was aware of the essential nature

and scope of the enterprise and intended to participate in it: Quinn and Denne organized and directed the scheme, including by procuring the unauthorized litigation alleged in FACTS, Section C and the fabricated lien filings alleged in Section FACTS, Section D; Namazi agreed to and did execute the fabricated filings; Martin and Masternode agreed to serve as nominee counterparty and signatory (FACTS, Section H); and Roma supplied and controlled the Disruptive Technology shell used to fabricate and then sabotage the $30 million transaction (FACTS, Section  H). The overt acts include each act alleged in FACTS, Sections B through G.

159.    As a direct and proximate result, Plaintiffs were injured in their business and property and are entitled to relief under 18 U.S.C. § 1964(c).

## THIRD COUNT

### For Fraud in the Inducement

### (Against Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance)

160.    Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 150 of this First Amended Complaint as though fully set forth herein.

161.    Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance, made false statements of material fact and engaged in deceptive conduct to induce Shuster, UI, and UDI to enter into a series of agreements that were instruments of Defendants' scheme and ultimately detrimental to Plaintiffs, including:

- The Niya Note — the $1,350,000 Senior Secured Convertible Promissory Note executed by Shuster on behalf of UDI on or about April 11, 2022 in favor of non-party Niya Holdings, LLC, bearing simple interest at 6% per annum with quarterly interest payments and a term expiring August 1, 2024;

- The Consulting Agreement between UDI and Blockchain Funding, executed on or about April 16, 2022, under which Blockchain Funding was to pay up to $5 million toward all expenses of the UTHER token launch and ongoing maintenance in exchange for 360 million (12%) of the 3 billion UTHER tokens to be minted;

- The Blockchain SAFT between Blockchain Funding and Utherverse International, Ltd., executed on or about May 10, 2022;

- The Masternode SAFT between Masternode and Utherverse International, Ltd., executed on or about May 10, 2022; and

- The Blockchain Note — the $350,000 promissory note executed by Shuster on behalf

of UDI in favor of Blockchain Funding on or about August 12, 2022; and the Membership Agreement between UI and Blockchain Alliance, executed on or about April 10, 2023, under which UI exchanged 3,685,000 shares of UI Class A Common Stock for a 25% membership interest in Blockchain Alliance.

162.    The false representations of material fact made to induce Plaintiffs to enter into the foregoing agreements included, among others, the following:

- Defendants Quinn, Denne, and Blockchain Funding represented that they would: (i) raise the money UI needed to reach profitability; (ii) take UI public on the NASDAQ; (iii) spend up to $5 million to prepare, market, and presell UDI's UTHER tokens; (iv) cause the UTHER tokens to be minted and used as in-world currency in UDI's virtual world environments; and (v) bring investors to UI to purchase shares prior to the initial public offering;

- Defendant Quinn represented, at the outset of the parties' relationship in or about early 2022, that he operated a billion-dollar investment fund and was interested in investing in UI, and that Denne was similarly situated with a consortium of investors sitting on a large amount of money earned via cryptocurrency;

- Defendants Quinn and Denne assured Shuster, before Shuster executed the Niya Note on behalf of UDI, that the Niya Note would be converted into UTHER tokens so that UDI would not have to come out of pocket to repay the loan in cash, and that the Note would not be called for immediate cash repayment;

- Defendant Quinn represented on or about July 25, 2022 — before Shuster executed the Blockchain Note on behalf of UDI — "As I always told you I have a lot of money and I have a fund we will never go short of money just stick to the plan I promise you if we ever get in a tight spa [sic] I will bail us out";

- Defendants Martin and Masternode represented in writing in the Masternode SAFT that Masternode had the full legal capacity and authority to execute the Masternode SAFT and to perform its obligations thereunder, not disclosing that Masternode had received a tax delinquency notice sent on Feb. 2, 2022 that it knew (based on its history of an April 10, 2020 dissolution for tax delinquency that it cured on April 28, 2021) would trigger a dissolution. If Masternode was unable to pay the taxes, it knew that it was falsely representing that it was an accredited investor in the SAFT. By contrast, if Masternode had the funds and intentionally failed to pay the taxes, it had intentionally taken a step toward being dissolved and therefore knew it would be unable to meet its obligations.

- Defendants Quinn, Denne, and Blockchain Alliance represented that Blockchain Alliance was validly existing and in good standing under the laws of the State of Wyoming and had the full legal capacity and authority to execute the Membership Agreement, and that Blockchain Alliance had a massive network of marketing members and would market and sell UI's digital assets — including cryptocurrency, non-fungible tokens, and membership packages — to those members with a substantial portion of the revenue going to UI as earned income, when in fact Blockchain Alliance did not have a massive network of members and never generated any income for UI (although in good standing when the Membership Agreement was executed in April 2023, Blockchain Alliance was administratively dissolved eight months later, on December 9, 2023).

163. Each of the foregoing representations was false when made. Quinn did not operate a billion-dollar investment fund; Quinn, Denne, and Blockchain Funding never intended to raise the money UI needed, take UI public, spend $5 million on the token launch, or bring bona fide investors to UI; Quinn and Denne intended that the Niya Note would be used to demand cash repayment and drive UI and UDI toward insolvency if their other acts of malfeasance did not suffice; and Blockchain Alliance had no massive marketing network and never sold UI's digital assets for UI's benefit.

164. The Defendants named in this Count knew the representations were false when they made them, or made them without any reasonable basis for believing them to be true.

165. The Defendants named in this Count made the representations with the intent to deceive Plaintiffs and to induce Plaintiffs to enter into the agreements described above in furtherance of Defendants' scheme to defraud Shuster and his companies, to divert investor funds to themselves, and to saddle UI and UDI with liabilities that could later be used to force UI and UDI into bankruptcy.

166. Plaintiffs justifiably relied on the representations and, in reliance thereon, entered into the agreements described above. Plaintiffs' reliance was justified, among other reasons, because Quinn and Denne cultivated Shuster's trust over months of electronic communications, presented themselves as honest family men, staged meetings with purportedly interested wealthy investors, and provided initial funding and initial performance sufficient to make their promises appear genuine.

167. The conduct of the Defendants named in this Count as alleged above was a substantial factor in causing harm to Plaintiffs. As a direct and proximate result of the fraudulently induced agreements, UI and UDI were burdened with the Niya Note and Blockchain Note liabilities; UI exchanged 3,685,000 shares of its Class A Common Stock for a worthless membership interest in an entity that, on information and belief, had no network-marketing operation, produced no income for UI, and was administratively dissolved eight months later; Blockchain Funding and Masternode obtained hundreds of millions of UTHER tokens with no vesting or release schedule, which were then sold without authorization; Shuster was forced to pay out of pocket for legal, public relations,

and management fees for the token launch that Blockchain Funding had agreed to fund; and at least $1,410,500 in investor funds from no fewer than sixteen investors, plus in excess of $1 million from unauthorized sales of UI stock, was diverted to Defendants rather than to UI.

168.    Plaintiffs are informed and believe, and thereon allege, that the conduct of the Defendants named in this Count was intentional, undertaken to deprive Plaintiffs of property and profits or otherwise cause injury to Plaintiffs, and constituted fraud, oppression, and malice, express or implied, in willful and conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages against said Defendants pursuant to NRS 42.005 and other applicable law.

169.    As a direct and proximate result of the conduct of the Defendants named in this Count, Plaintiffs have been damaged in an amount to be proven at trial. Plaintiffs are entitled, at their election, to a decree voiding and/or rescinding those of the agreements described above to which one or more of the Defendants named in this Count is a party — namely, the Consulting Agreement, the Blockchain SAFT, the Masternode SAFT, the Blockchain Note, and the Membership Agreement — or, in the alternative, to out-of-pocket damages according to proof. Under either election, Plaintiffs are further entitled to consequential damages according to proof and to punitive damages as alleged herein. No rescission of, or other relief with respect to, the Niya Note is sought in this Count as against non-party Niya Holdings, LLC.

## FOURTH COUNT

### For Fraud (Intentional Misrepresentation)

### (Against Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance)

170.    Plaintiffs reallege and incorporate the allegations of Paragraphs 1 through 150 of this First Amended Complaint as though fully set forth herein.

171.    Throughout the course of Plaintiffs' relationship with Defendants, beginning in or about January 2022 and continuing through July 2024, Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance made numerous intentional misrepresentations of fact to Shuster, UI, and UDI in furtherance of their scheme to defraud. As

detailed in the FACTS above, such misrepresentations include, but are not limited to, the following:

- That Quinn operated a billion-dollar investment fund and was interested in investing in UI;

- That Quinn and Denne would raise the money UI needed to reach profitability and would front up to $5 million to prepare, market, and presell UDI's UTHER tokens;

- That Quinn would take UI public on the NASDAQ, including his representation on or about July 17, 2022 that "Koreans" would take UI public;

- That Quinn and Denne had investors with large amounts of money who were interested in investing in UI;

- That the Niya Note would be converted into UTHER tokens rather than called for cash repayment — assurances Quinn and Denne gave Shuster before he executed the Note on UDI's behalf and repeated thereafter;

- That Masternode had the full legal capacity and authority to execute the Masternode SAFT

- That Blockchain Alliance was validly existing and in good standing with the State of Wyoming and had the capacity to sell a 25% membership interest to UI;

- That it was necessary, to prepare UI for an initial public offering, to install a new CEO, Robert Hackett, who was handpicked by Quinn and Denne and whom Defendants then used to compartmentalize and withhold information from Shuster and to alter UI's capitalization table;

- That, as Denne falsely assured Shuster on or about July 25, 2022, nothing was wrong with the live UTHER token presale and funds were merely delayed by the investor "accreditation process," when in fact Denne had instructed the presale software developer to change the digital wallet designated to receive presale funds so that the funds were diverted to Quinn and/or Denne instead of UI; and

- That a disgruntled former UDI associate had contacted Disruptive Technology and caused it to withdraw from the $30 million Binding Letter transaction, when on information and belief no such communication ever occurred and the story was fabricated.

172.    The representations of the Defendants named in this Count set forth above were false in the respects alleged in the FACTS and in this Count. The promised investors, the money for development of the metaverse and virtual world software, the money for the development and launch of the UTHER cryptocurrency, and the money for repayment of loans were never provided and were instead withheld or diverted by Defendants. The Niya Note was not converted as promised; instead it was called for immediate repayment in an effort to bankrupt UI and UDI.

173.    The Defendants named in this Count made the representations knowing them to be

false, or without any reasonable basis for believing them to be true, and with the intent to induce Plaintiffs to act in reliance on them.

174.    Acting in justifiable reliance on the misrepresentations, Plaintiffs, among other things, entered into the agreements described above; performed under those agreements, including making all quarterly interest payments on the Niya Note as they came due; substantially increased UDI's staff and operating costs in an effort to timely develop the metaverse and virtual world software; prepared for and paid money necessary to develop, launch, and maintain the UTHER cryptocurrency tokens, including legal, public relations, and management fees that Blockchain Funding had agreed to pay; installed Hackett as CEO; and delayed minting the UTHER tokens.

175.    The conduct of the Defendants named in this Count as alleged above was a substantial factor in causing harm to Plaintiffs.

176.    Plaintiffs are informed and believe, and thereon allege, that the conduct of the Defendants named in this Count was intentional, undertaken to deprive Plaintiffs of property and profits or otherwise cause injury to Plaintiffs, and constituted fraud, oppression, and malice, express or implied, in willful and conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages against said Defendants pursuant to NRS 42.005 and other applicable law.

177.    As a direct and proximate result of the conduct of the Defendants named in this Count, Plaintiffs have been damaged in an amount to be determined at trial.

## FIFTH COUNT

### Conversion

### (Against Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance)

178.    Plaintiffs reallege and incorporate the allegations of Paragraphs 1 through 150 as though fully set forth herein.

179.    At all relevant times, Plaintiffs owned and had the right to possess the personal property at issue in this Count. Defendants Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance possessed personal property belonging to Plaintiffs — including shares of

UI stock, UTHER tokens and contractual rights to UTHER tokens, and specific, identifiable investment funds due and owing to UI — that was to be held and used exclusively for the benefit of Plaintiffs, including the 360 million UTHER tokens allocated to Blockchain Funding under the Consulting Agreement (the majority of which were to be used for UDI's benefit), the 150 million UTHER tokens allocated to Masternode under the Masternode SAFT, and the restricted 3,685,000 shares of UI Class A Common Stock issued under the Membership Agreement.

180.    Plaintiffs are informed and believe, and thereon allege, that Quinn, Denne, Blockchain Funding, Masternode, Martin, and Blockchain Alliance, without authorization to do so, exerted wrongful dominion over Plaintiffs' property, sold UI stock and/or UTHER tokens (and purported rights to UTHER tokens) to investors, and took the money from those sales and used it for their own personal benefit, including without limitation:

- Selling UI stock and rights to UTHER tokens under SAFTs that Denne, with Quinn's full knowledge, had falsified to insert Blockchain Funding or Masternode as the issuing "Company," and diverting at least $1,410,500 from no fewer than sixteen investors;

- Selling UI stock to third parties whose names then appeared on UI's Cap Table but from whom UI received no investment funds, pocketing in excess of $1 million;

- Instructing the presale software developer to change the digital wallet designated to receive UTHER token presale funds, thereby diverting presale proceeds belonging to UI to Quinn's and/or Denne's accounts;

- Selling restricted tokens allocated under the Consulting Agreement that were not permitted to be offered, sold, transferred, pledged, or hypothecated, and diverting the proceeds to Denne's, Quinn's, and/or Blockchain Funding's bank accounts and cryptocurrency wallets; and

- As to Blockchain Alliance, obtaining 3,685,000 shares of UI Class A Common Stock through the fraudulently induced Membership Agreement and thereafter exercising continued dominion over those shares in denial of, and inconsistent with, UI's rights, including after Plaintiffs discovered the fraud and Blockchain Alliance's lack of good standing and failure of consideration.

181.    Plaintiffs are further informed and believe, and thereon allege, that Defendant Martin, as the owner, principal, and controlling person of Masternode, personally directed, authorized, ratified, and participated in Masternode's wrongful exertion of dominion over Plaintiffs' property alleged above, including Masternode's unauthorized sales of rights to UTHER tokens under falsified SAFTs and Masternode's receipt and retention of the proceeds thereof, and is therefore personally

liable for that conversion.

182.    Each of the foregoing acts constituted a distinct act of dominion wrongfully exerted over Plaintiffs' personal property in denial of, and inconsistent with, Plaintiffs' title and rights therein.

183.    The conduct of the Defendants named in this Count as alleged above was a substantial factor in causing harm to Plaintiffs.

184.    Plaintiffs are informed and believe, and thereon allege, that the conduct of the Defendants named in this Count was intentional, undertaken to deprive Plaintiffs of property and profits or otherwise cause injury to Plaintiffs, and constituted fraud, oppression, and malice, express or implied, in willful and conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages against said Defendants pursuant to NRS 42.005 and other applicable law.

185.    As a direct and proximate result of the conversion by the Defendants named in this Count, Plaintiffs have been damaged in an amount to be determined at trial, including the market value of the converted property at the time of conversion, damages for the loss of use of the property, interest on the value of the converted property from the date of conversion, and compensation for the time and money properly expended in pursuit of the converted property.

## SIXTH COUNT

### Breach of Fiduciary Duty

### (Against Defendant Blockchain Funding)

186.    Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 150 of this First Amended Complaint as though fully set forth herein.

187.    As a result of the Consulting Agreement, Blockchain Funding's relationship with Plaintiffs was one of special trust: Blockchain Funding knowingly agreed that it would act for the benefit of UI and UDI in the marketing and launch of the UTHER tokens and in the distribution of tokens to marketing groups, influencers, token exchanges, and similar market participants. Blockchain Funding received 360 million UTHER tokens — 12% of the 3 billion tokens to be minted — most of which were to be used for the benefit of UDI to promote, and to add value to, the token. At Denne's insistence, those tokens carried no vesting or release schedule and were immediately

unlocked, an atypical term that placed Plaintiffs' property and market goodwill entirely within Blockchain Funding's control and reposed special confidence in Blockchain Funding.

188.    By reason of its agreement to act with special trust on behalf of UI and UDI, Blockchain Funding owed Plaintiffs a fiduciary duty to act with the utmost care and loyalty with regard to UI and UDI.

189.    Blockchain Funding breached its fiduciary duty when, instead of distributing the tokens as provided for in the Consulting Agreement and for Plaintiffs' benefit, Blockchain Funding sold such tokens — restricted tokens not permitted to be offered, sold, or otherwise transferred, pledged, or hypothecated — without Plaintiffs' authorization, and received and retained the sale proceeds in its own bank accounts and/or cryptocurrency wallets for the personal benefit of Denne and Quinn. Blockchain Funding further breached its duty when, at Quinn's and Denne's instruction, it ceased in 2023 to pay the agreed legal, public relations, and management fees for the token launch — funding it had committed up to $5 million to provide — while retaining the 360 million tokens, forcing Shuster to pay those launch expenses out of pocket.

190.    Blockchain Funding's conduct as alleged above was a substantial factor in causing harm to Plaintiffs.

191.    Plaintiffs are informed and believe, and thereon allege, that Blockchain Funding's conduct was intentional, undertaken to deprive Plaintiffs of property and profits or otherwise cause injury to Plaintiffs, and constituted fraud, oppression, and malice, express or implied, in willful and conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages against Blockchain Funding pursuant to NRS 42.005 and other applicable law.

192.    As a direct and proximate result of Blockchain Funding's breaches of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial, and are further entitled to restitution and disgorgement of all tokens, funds, and proceeds Blockchain Funding obtained through its breaches.

///

///

**SEVENTH COUNT**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Against Defendants Quinn and Denne)**

193. Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 150 and 186 through 191 of this First Amended Complaint as though fully set forth herein.

194. Blockchain Funding stood in a fiduciary relationship of special trust to UI and UDI by reason of the Consulting Agreement and breached its fiduciary duties by, among other things, selling restricted UTHER tokens without authorization, retaining the proceeds for the personal benefit of Denne and Quinn, and abandoning its funding obligations for the token launch while retaining the tokens.

195. At all relevant times, Denne was actually and fully aware of Blockchain Funding's breaches of fiduciary duty because, at the time of such breaches, Denne was the sole owner of Blockchain Funding and was directing its activities. Quinn was also actually and fully aware of Blockchain Funding's breaches of fiduciary duty because Quinn and Denne were partners in the scheme to defraud Plaintiffs and Quinn was kept informed by Denne of the actions of Denne and Blockchain Funding.

196. Plaintiffs are informed and believe, and thereon allege, that Denne and Quinn knowingly provided substantial assistance and encouragement to Blockchain Funding's breaches of fiduciary duty: Denne directed all actions and activities of Blockchain Funding, including the unauthorized token sales and the cessation of launch funding, with Quinn's actual knowledge and endorsement; and Denne and Quinn were the principal, if not sole, beneficiaries of Blockchain Funding's breaches, receiving the diverted proceeds into their own bank accounts and cryptocurrency wallets.

197. Quinn's and Denne's conduct as alleged above was a substantial factor in causing harm to Plaintiffs.

198. Plaintiffs are informed and believe, and thereon allege, that Quinn's and Denne's conduct was intentional, undertaken to deprive Plaintiffs of property and profits or otherwise cause injury to Plaintiffs, and constituted fraud, oppression, and malice, express or implied, in willful and conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages

against Quinn and Denne pursuant to NRS 42.005 and other applicable law.

199. As a direct and proximate result of Quinn's and Denne's aiding and abetting of Blockchain Funding's breaches of fiduciary duty owed to Plaintiffs, Plaintiffs have been damaged in an amount to be proven at trial, and are further entitled to restitution and disgorgement of all funds and proceeds Quinn and Denne obtained through the breaches they aided and abetted.

## EIGHTH COUNT

### Tortious Interference with Contract — The Niya Note

### (Against Defendants Quinn and Denne)

200. Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 150 of this First Amended Complaint as though fully set forth herein.

201. A valid and existing contract — the Niya Note — existed between UDI, as borrower (executed by Shuster on UDI's behalf on or about April 11, 2022), and non-party Niya Holdings, LLC, as lender. Under the Niya Note, Niya Holdings loaned $1,350,000; interest accrued at 6% simple interest per annum on the unpaid principal balance; interest payments were due quarterly, and UDI made all interest payments as they became due; the Note was convertible to UTHER tokens; and the term of the Note expired on August 1, 2024. UDI entered into the Niya Note in good faith and with every intention, based on Quinn's and Denne's representations, of timely satisfying the Note through conversion or repayment.

202. Quinn and Denne are not parties to the Niya Note. Quinn and Denne had actual knowledge of the Niya Note because both Quinn and Denne assisted in negotiating its terms and facilitated its execution, including arranging the loan and assuring Shuster before execution that the Note would be converted rather than repaid in cash.

203. Quinn and Denne committed intentional acts intended and designed to disrupt the contractual relationship under the Niya Note. Among other things, Quinn and Denne diverted to their own bank accounts and cryptocurrency wallets millions of dollars in investments intended for UI and UDI — including SAFT proceeds, stock-sale proceeds, and token presale proceeds; intentionally failed to spend the promised $5 million to market and presell the UTHER tokens; intentionally failed to bring the promised investors to UI or to take UI public; fabricated the collapse

of the $30 million Disruptive Technology transaction; induced UI and UDI to expand staff and operating costs on false promises of funding; and threatened Shuster to delay the minting of the UTHER tokens — all for the purpose of keeping UI and UDI in a financially weakened position such that they would be unable to meet their financial obligations, including the obligation to repay the Niya Note, and could be driven into bankruptcy when the Note was called. Plaintiffs are further informed and believe, and thereon allege, that Quinn and Denne encouraged, procured, and facilitated the demand for immediate cash repayment of the Niya Note upon the expiration of its term — contrary to the parties' understanding that the Note would be converted into UTHER tokens — as a further intentional act designed to disrupt the contractual relationship.

204.    Quinn's and Denne's intentional conduct actually disrupted the contractual relationship: as a direct result, UI and UDI were unable to meet their obligations under the Niya Note when, following the expiration of the Note's term on August 1, 2024, immediate repayment in full was demanded — the very repayment demand Quinn and Denne had assured Shuster would never occur — resulting in default, collection pressure, and the assertion against Plaintiffs' assets of the purported lien instruments described in the FACTS, including the recordation at USPTO Reel/Frame 071469/0405 and Nevada UCC-1 Financing Statement No. 2025476203-7, which clouded title to Plaintiffs' core patent and other assets.

205.    This Count is asserted against Quinn and Denne only. Plaintiffs have resolved their claims against Nima Momayez and Niya Holdings, LLC pursuant to a June 2026 settlement agreement, and neither Momayez nor Niya Holdings is a defendant to this First Amended Complaint; no relief is sought against either of them herein. That settlement expressly preserves Plaintiffs' claims against persons who are not parties to it, including Quinn and Denne, whose interference with the Niya Note is independently actionable.

206.    Plaintiffs are informed and believe, and thereon allege, that Quinn's and Denne's conduct was intentional, undertaken to deprive Plaintiffs of profits or otherwise cause injury to Plaintiffs, and constituted fraud, oppression, and malice, express or implied, in willful and conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages against Quinn and Denne pursuant to NRS 42.005 and other applicable law.

207.    As a direct and proximate result of Quinn's and Denne's conduct, Plaintiffs have been damaged in an amount to be proven at trial, including consequential damages, lost profits, and the costs incurred in responding to the default on and collection efforts under the Niya Note.

**<u>NINTH COUNT</u>**

Tortious Interference With Contract — The Disruptive Technology Binding Letter

(Against Defendants Quinn, Denne, and Roma)

208.    Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 150 of this First Amended Complaint as though fully set forth herein.

209.    A valid and existing contract — the Binding Letter — existed between Disruptive Technology, on the one hand, and the Sellers (UDI, Shuster, and Gary Shuster), on the other hand. The Binding Letter — an instrument bearing a date of August 8, 2022 on its face — was signed on or about August 25, 2022, including by Ilya Manin for Disruptive Technology. In exchange for fifteen percent (15%) of the outstanding shares of UDI, 300 million UTHER tokens, and other consideration, Disruptive Technology agreed to distribute $30 million to the Sellers, of which $2.5 million was to be paid in September 2022, $2 million in October 2022, $2.5 million in November 2022, and the balance of $23 million in April 2023.

210.    Quinn, Denne, and Roma had actual knowledge of the Binding Letter because they assisted in negotiating its terms and facilitated its execution. On information and belief, Roma has an ownership interest in Disruptive Technology; at minimum, Roma was involved in facilitating communications between Quinn and Denne, on the one hand, and Disruptive Technology, on the other hand.

211.    None of Quinn, Denne, or Roma is a party to the Binding Letter. To the extent Roma holds any ownership interest in, or agency relationship with, Disruptive Technology, Plaintiffs are informed and believe, and thereon allege, that in committing the acts alleged in this Count Roma was not acting within the scope of any legitimate corporate role or in the interest of Disruptive Technology, but rather acted for his own personal benefit and in concert with Quinn and Denne to further their scheme to defraud Plaintiffs, and Roma is therefore a stranger to the contract for purposes of this Count and enjoys no privilege or immunity arising from any relationship with

Disruptive Technology.

212. Quinn, Denne, and Roma committed intentional acts intended and designed to disrupt the contractual relationship under the Binding Letter. Right before the first payment was to be made, Quinn, Denne, and Roma met, and shortly thereafter Quinn told Shuster that a disgruntled former associate of UDI had contacted Disruptive Technology, told Disruptive Technology that Shuster was a fraud among other lies, and indicated he would soon be suing Shuster — causing Disruptive Technology to pull out of the deal. On information and belief, no such communication from any former associate ever occurred; the story was fabricated by Quinn, Denne, and Roma to keep UDI in a weak financial position while Quinn and Denne continued to divert funds to themselves.

213. Quinn's, Denne's, and Roma's intentional conduct actually disrupted the contractual relationship: as a direct result, other than a $66 test payment, none of the $30 million to be paid under the Binding Letter was ever transferred to UDI or the other Sellers.

214. Quinn's, Denne's, and Roma's conduct as alleged above was a substantial factor in causing harm to Plaintiffs.

215. Plaintiffs are informed and believe, and thereon allege, that Quinn's, Denne's, and Roma's conduct was intentional, undertaken to deprive Plaintiffs of profits or otherwise cause injury to Plaintiffs, and constituted fraud, oppression, and malice, express or implied, in willful and conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages against Quinn, Denne, and Roma pursuant to NRS 42.005 and other applicable law.

216. As a direct and proximate result of Quinn's, Denne's, and Roma's conduct, Plaintiffs have been damaged in an amount to be proven at trial, including consequential damages and lost profits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against the Defendants named in each respective Count, as follows. No relief of any kind is sought in this First Amended Complaint against Nima Momayez or Niya Holdings, LLC, neither of whom is a party to this action.

///

## **ON THE FIRST AND SECOND COUNTS**

1.      For treble damages in a sum according to proof, pursuant to 18 U.S.C. § 1964(c);

2.      For an order enjoining Defendants from engaging in any additional unlawful acts, including but not limited to wire fraud;

3.      For declaratory relief pursuant to 28 U.S.C. §§ 2201–2202 that the recordings identified below are unauthorized and void, and for permanent injunctive and other equitable relief — pursuant to the Court's inherent equitable powers, applicable state law, and, to the extent available to a private plaintiff, 18 U.S.C. § 1964(a) — directing the release, termination, and expungement of the fabricated lien recordings procured in furtherance of the scheme alleged herein, including (a) the purported patent security-interest recordation at USPTO Reel/Frame 071469/0405, to the extent not fully released of record notwithstanding the reconveyance recorded at Reel/Frame 071950/0423, (b) Nevada UCC-1 Financing Statement No. 2025476203-7, and (c) California UCC-1 Financing Statement No. U250102092622 (filed January 10, 2025); declaring each such recording void ab initio and of no force or effect; directing Defendants, and all persons acting in concert or participation with them who receive actual notice of the order, to execute, file, and record all instruments — including UCC-3 termination statements with the Nevada Secretary of State and the California Secretary of State and corrective recordations with the United States Patent and Trademark Office — necessary to clear the affected titles and public records; and, to the extent any such instrument would require execution by a person not before the Court, authorizing Plaintiffs to file and record a certified copy of the Court's order with the Nevada Secretary of State, the California Secretary of State, and the United States Patent and Trademark Office in lieu thereof; and

4.      For attorneys' fees and costs of suit pursuant to 18 U.S.C. § 1964(c).

## ON THE THIRD COUNT

1.      At Plaintiffs' election, for an order voiding and/or rescinding the agreements described in Count III to which one or more of said Defendants is a party, or, in the alternative, for out-of-pocket damages in an amount according to proof;

2.      Under either election, for consequential damages according to proof; and

3.      Under either election, for punitive damages pursuant to NRS 42.005.

## ON THE FOURTH COUNT

62

FIRST AMENDED COMPLAINT

1. For compensatory damages according to proof; and

2. For punitive damages pursuant to NRS 42.005.

### ON THE FIFTH COUNT

1. For the market value of the converted property in a sum according to proof;

2. For damages resulting from the loss of use of the property in an amount according to proof at the time of trial;

3. For interest on the value of the converted property according to proof from the date of conversion;

4. For damages for the time and money properly expended in pursuit of the converted property in a sum according to proof; and

5. For punitive damages pursuant to NRS 42.005.

### ON THE SIXTH COUNT

1. For compensatory damages in a sum according to proof;

2. For punitive damages pursuant to NRS 42.005; and

3. For restitution and disgorgement.

### ON THE SEVENTH COUNT

1. For compensatory damages in a sum according to proof;

2. For punitive damages pursuant to NRS 42.005; and

3. For restitution and disgorgement.

### ON THE EIGHTH COUNT

1. For consequential damages in a sum according to proof;

2. For lost profits in an amount according to proof; and

3. For punitive damages pursuant to NRS 42.005.

### ON THE NINTH COUNT

1. For consequential damages in a sum according to proof;

2. For lost profits in an amount according to proof; and

3. For punitive damages pursuant to NRS 42.005.

### ON ALL COUNTS

1.     For costs of suit herein incurred, including attorneys' fees to the extent permitted by statute or contract;

2.     For pre-judgment and post-judgment interest at the maximum rate allowed by law; and

3.     For such other and further relief as the Court deems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to the Seventh Amendment to the United States Constitution, Fed. R. Civ. P. 38(b), and LR 38-1, Plaintiffs hereby demand a trial by jury in this action on all issues and matters so triable.

DATED: July 9, 2026                    COLEMAN & HOROWITT, LLP


By:  /s/ Sherrie M. Flynn
         Sherrie M. Flynn. Esq.
         Robert K. Ashley, Esq.
         499 West Shaw Avenue, Suite 116
         Fresno, California 93704
         Telephone: (559) 248- 4820
         Email: sflynn@ch-law.com

KEARNEY PUZEY DAMONTE LTD.

         James W. Puzey, Esq
         800 South Meadows Parkway, Suite 800
         Reno, Nevada 89521
         Telephone: (775) 851- 8700
         Email: jpuzey@nvlawfirm.com

         *Attorneys for Plaintiffs Utherverse, Inc. and Brian Shuster*

# EXHIBIT A



Case 3:25-cv-00020-MMC-CSD   Document 79-1   Filed 07/09/26   Page 72 of 93

U250102092622



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only

**-FILED-**

File No.: U250102092622

Date Filed: 1/10/2025

B3340-5892 01/10/2025 1:28 PM Received by California Secretary of State

Submitter Information:

Contact Name

Organization Name

Phone Number

Email Address

Address                                                    None

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| Utherverse Digital, Inc. | Canada<br>102-80A 6th Street<br>New Westminster, BC V3L 5B3 |
| Brian Shuster | Canada<br>102-80A 6th Street<br>Westminster, BC V3L 5B3 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| Niya Holdings, LLC | 187 Warm Springs Road<br>Suite B206<br>Las Vegas, NV 89119 |

Indicate how documentation of Collateral is provided:
    Attached in a File

Upload PDF as Collateral:
    Patent List.pdf

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
    Not Applicable

Select an alternate Financing Statement type:
    Not Applicable

Select an additional alternate Financing Statement type:
    Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:
    Not Applicable

Optional Filer Reference Information:

Miscellaneous Information:

Search to Reflect:

☐   Order a Search to Reflect

Collateral

| Patent | Description |
|---|---|
| 10,839,500 | Digital media enhancement system, method, and apparatus |
| 10,701,077 | System and methods of virtual world interaction |
| 10,464,482 | Immersive Display |
| 10,394,363 | Conditional balance management for non-issuer debit instruments |
| 10,394,363 | Device for physical interaction between remotely located users |
| 10,255,666 | Digital media enhancement system, method, and apparatus |
| 10,248,285 | Immersive Display |
| 10,198,154 | Translating user interfaces of applications |
| 10,102,661 | Time-dependent client inactivity indicia in a multi-user animation environment |
| 9,898,810 | Digital media enhancement system, method, and apparatus |
| 9,889,375 | Multi-instance, multi-user virtual reality spaces |
| 9,867,961 | Treatment of phantom limb syndrome and other sequelae of physical injury |
| 9,802,119 | Virtual environment for computer game |
| 9,786,082 | Avatar eye control in a multi-user animation environment |
| 9,724,605 | Method, System and Apparatus of Recording and Playing Back an Experience in a Virtual Worlds System |
| 9,705,838 | Mobile status update display |
| 9,595,136 | Creation and use of virtual places |
| 9,569,876 | Animation control method for multiple participants |
| 9,558,500 | Method and apparatus for providing internet advertising service |
| 9,508,180 | Avatar eye control in a multi-user animation environment |
| 9,452,360 | Multi-instance, multi-user virtual reality spaces |
| 9,418,462 | Digital media enhancement system, method, and apparatus |
| 9,348,666 | Translating user interfaces of applications |
| 9,329,743 | Computer simulation method with user-defined transportation and layout |
| 9,251,616 | Time-dependent client inactivity indicia in a multi-user animation environment |
| 9,208,598 | Avatar eye control in a multi-user animation environment |
| 9,123,157 | Multi-Instance, Multi-User Virtual Reality Spaces |
| 9,077,679 | Mobile status update display |
| 9,014,500 | Digital media enhancement system, method, and apparatus |
| 9,007,362 | Adaptable generation of virtual environment frames |
| 8,947,427 | Systems and methods of object processing in virtual worlds |
| 8,861,421 | Mobile status update display |
| 8,818,855 | System and method for aggregating information over a wide area network |
| 8,812,954 | Multi-Instance, Multi-User Virtual Reality Spaces |
| 8,775,396 | Method and system for searching a wide area network |
| 8,704,829 | Avatar eye control in a multi-user animation environment |
| 8,694,553 | Creation and use of virtual places |
| 8,683,386 | Virtual environment for computer game |
| 8,671,142 | Systems and methods of virtual worlds access |
| 8,621,368 | Systems and methods of virtual world interaction |

B3340-5893 01/10/2025 1:28 PM Received by California Secretary of State

Collateral

| Patent | Description |
| --- | --- |
| 8,589,792 | Multi-instance, multi-user virtual reality spaces |
| 8,572,207 | Dynamic serving of multidimensional content |
| 8,453,219 | Systems and methods of assessing permissions in virtual worlds |
| 8,390,630 | Avatar eye control in a multi-user animation environment |
| 8,276,071 | Multi-Instance, Multi-User Animation Platforms |

B3340-5894  01/10/2025 1:28 PM Received by California Secretary of State

# EXHIBIT B

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| **Naz Namazi 949-295-4233** |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| **filmmakernaz@gmail.com** |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

**29726 Felton Drive**
**Laguna Niguel, CA 92677, USA**

| Filed in the Office of | Initial Filing Number |
|---|---|
| *F H Aguilar* | **2025476203-7** |
| | Filed On |
| | **May 23, 2025 03:22 PM** |
| Secretary of State | Number of Pages |
| State Of Nevada | **6** |

---

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **UTHERVERSE DIGITAL, INC.** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **102-80A 6TH STREET** | **NEW WESTMINSTER** | **BC** | **V3L 5B3** | **CAN** |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **SHUSTER** | **BRIAN** | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **102-80A 6TH STREET** | **NEW WESTMINSTER** | **BC** | **V3L 5B3** | **CAN** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **NIYA HOLDINGS, LLC** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **187 WARM SPRINGS ROAD** | **LAS VEGAS** | **NV** | **89119** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**10,839,500 DIGITAL MEDIA ENHANCEMENT SYSTEM, METHOD, AND APPARATUS**
**10,701,077 SYSTEM AND METHODS OF VIRTUAL WORLD INTERACTION**
**10,464,482 IMMERSIVE DISPLAY**
**10,394,363 CONDITIONAL BALANCE MANAGEMENT FOR NON-ISSUER DEBIT INSTRUMENTS**
**10,394,363 DEVICE FOR PHYSICAL INTERACTION BETWEEN REMOTELY LOCATED USERS**
**10,255,666 DIGITAL MEDIA ENHANCEMENT SYSTEM, METHOD, AND APPARATUS**
**10,248,285 IMMERSIVE DISPLAY**
**10,198,154 TRANSLATING USER INTERFACES OF APPLICATIONS**
**10,102,661 TIME-DEPENDENT CLIENT INACTIVITY INDICIA IN A MULTI-USER ANIMATION ENVIRONMENT**
**9,898,810 DIGITAL MEDIA ENHANCEMENT SYSTEM, METHOD, AND**

---

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

---

**FILING OFFICE COPY —** UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

**APPARATUS**
**9,889,375 MULTI-INSTANCE, MULTI-USER VIRTUAL REALITY SPACES**
**9,867,961 TREATMENT OF PHANTOM LIMB SYNDROME AND OTHER SEQUELAE OF PHYSICAL INJURY**
**9,802,119 VIRTUAL ENVIRONMENT FOR COMPUTER GAME**
**9,786,082 AVATAR EYE CONTROL IN A MULTI-USER ANIMATION ENVIRONMENT**
**9,724,605 METHOD, SYSTEM AND APPARATUS OF RECORDING AND PLAYING BACK AN EXPERIENCE IN A VIRTUAL WORLDS SYSTEM**
**9,705,838 MOBILE STATUS UPDATE DISPLAY**
**9,595,136 CREATION AND USE OF VIRTUAL PLACES**
**9,569,876 ANIMATION CONTROL METHOD FOR MULTIPLE PARTICIPANTS**
**9,558,500 METHOD AND APPARATUS FOR PROVIDING INTERNET ADVERTISING SERVICE**
**9,508,180 AVATAR EYE CONTROL IN A MULTI-USER ANIMATION ENVIRONMENT**
**9,452,360 MULTI-INSTANCE, MULTI-USER VIRTUAL REALITY SPACES**
**9,418,462 DIGITAL MEDIA ENHANCEMENT SYSTEM, METHOD, AND APPARATUS**
**9,348,666 TRANSLATING USER INTERFACES OF APPLICATIONS**
**9,329,743 COMPUTER SIMULATION METHOD WITH USER-DEFINED TRANSPORTATION AND LAYOUT**
**9,251,616 TIME-DEPENDENT CLIENT INACTIVITY INDICIA IN A MULTI-USER ANIMATION ENVIRONMENT**
**9,208,598 AVATAR EYE**

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

17. MISCELLANEOUS:

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
   because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME | | |
|---|---|---|
| | | |

OR

| 9b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

OR

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

OR

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

**CONTROL IN A MULTI-USER ANIMATION ENVIRONMENT**
**9,123,157 MULTI-INSTANCE, MULTI-USER VIRTUAL REALITY SPACES**
**9,077,679 MOBILE STATUS UPDATE DISPLAY**
**9,014,500 DIGITAL MEDIA ENHANCEMENT SYSTEM, METHOD, AND APPARATUS**
**9,007,362 ADAPTABLE GENERATION OF VIRTUAL ENVIRONMENT FRAMES**
**8,947,427 SYSTEMS AND METHODS OF OBJECT PROCESSING IN VIRTUAL WORLDS**
**8,861,421 MOBILE STATUS UPDATE DISPLAY**
**8,818,855 SYSTEM AND METHOD FOR AGGREGATING INFORMATION OVER A WIDE AREA NETWORK**
**8,812,954 MULTI-INSTANCE, MULTI-USER VIRTUAL REALITY SPACES**
**8,775,396 METHOD AND SYSTEM FOR SEARCHING A WIDE AREA NETWORK**
**8,704,829 AVATAR EYE CONTROL IN A MULTI-USER ANIMATION ENVIRONMENT**
**8,694,553 CREATION AND USE OF VIRTUAL PLACES**
**8,683,386 VIRTUAL ENVIRONMENT FOR COMPUTER GAME**
**8,671,142 SYSTEMS AND METHODS OF VIRTUAL WORLDS ACCESS**
**8,621,368 SYSTEMS AND METHODS OF VIRTUAL WORLD INTERACTION**
**8,589,792 MULTI-INSTANCE, MULTI-USER VIRTUAL REALITY SPACES**
**8,572,207 DYNAMIC SERVING OF MULTIDIMENSIONAL CONTENT**
**8,453,219 SYSTEMS AND METHODS OF ASSESSING PERMISSIONS IN**

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

17. MISCELLANEOUS:

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |

OR

| 9b. INDIVIDUAL'S SURNAME | |
|---|---|
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
**VIRTUAL WORLDS**
**8,390,630 AVATAR EYE CONTROL IN A MULTI-USER ANIMATION ENVIRONMENT**
**8,276,071 MULTI-INSTANCE, MULTI-USER ANIMATION PLATFORMS**

| | |
|---|---|
| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# EXHIBIT C

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

Assignment ID: PATI1052014

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | LIEN |

## CONVEYING PARTY DATA

| Name | Execution Date |
|---|---|
| Utherverse Digital, Inc. | 04/11/2022 |
| Mr. Brian Shuster | 04/11/2022 |

## RECEIVING PARTY DATA

| | |
|---|---|
| Company Name: | Niya Holdings, LLC |
| Street Address: | 187 Warm Springs Road |
| City: | Las Vegas |
| State/Country: | NEVADA |
| Postal Code: | 89119 |

## PROPERTY NUMBERS Total: 44

| Property Type | Number |
|---|---|
| Patent Number: | 10839500 |
| Patent Number: | 10701077 |
| Patent Number: | 10464482 |
| Patent Number: | 10394363 |
| Patent Number: | 10255666 |
| Patent Number: | 10248285 |
| Patent Number: | 10102661 |
| Patent Number: | 9898810 |
| Patent Number: | 9889375 |
| Patent Number: | 9867961 |
| Patent Number: | 9802119 |
| Patent Number: | 9786082 |
| Patent Number: | 9724605 |
| Patent Number: | 9705838 |
| Patent Number: | 9595136 |
| Patent Number: | 9569876 |
| Patent Number: | 9558500 |
| Patent Number: | 9508180 |
| Patent Number: | 9452360 |

| Property Type | Number |
|---|---|
| Patent Number: | 9418462 |
| Patent Number: | 9348666 |
| Patent Number: | 9329743 |
| Patent Number: | 9251616 |
| Patent Number: | 9208598 |
| Patent Number: | 9123157 |
| Patent Number: | 9077679 |
| Patent Number: | 9014500 |
| Patent Number: | 9007362 |
| Patent Number: | 8947427 |
| Patent Number: | 8861421 |
| Patent Number: | 8818855 |
| Patent Number: | 8812954 |
| Patent Number: | 8775396 |
| Patent Number: | 8704829 |
| Patent Number: | 8694553 |
| Patent Number: | 8683386 |
| Patent Number: | 8671142 |
| Patent Number: | 8621368 |
| Patent Number: | 8589792 |
| Patent Number: | 8572207 |
| Patent Number: | 8453219 |
| Patent Number: | 8390630 |
| Patent Number: | 8276071 |
| Patent Number: | 10198154 |

**CORRESPONDENCE DATA**

**Fax Number:**

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| **Phone:** | (949)2954233 |
| **Email:** | filmmakernaz@gmail.com,brianquinn27@icloud.com |
| **Correspondent Name:** | Naz Namazi |
| **Address Line 1:** | 29726 Felton Drive |
| **Address Line 2:** | |
| **Address Line 4:** | Laguna Niguel, CALIFORNIA 92677 |

| **NAME OF SUBMITTER:** | Nazanin Namazi |
|---|---|
| **SIGNATURE:** | /Nazanin Namazi/ |
| **DATE SIGNED:** | 05/30/2025 |

This document serves as an Oath/Declaration (37 CFR 1.63).

**Total Attachments: 7**

source=Patent List#page1.tiff

source=Patent List#page2.tiff

source=UDI_Niya - Sen Sec Conv Note - FULLY EXECUTED - 2022.04.11 (3)#page1.tiff

source=UDI_Niya - Sen Sec Conv Note - FULLY EXECUTED - 2022.04.11 (3)#page2.tiff

source=UDI_Niya - Sen Sec Conv Note - FULLY EXECUTED - 2022.04.11 (3)#page3.tiff

source=UDI_Niya - Sen Sec Conv Note - FULLY EXECUTED - 2022.04.11 (3)#page4.tiff

source=UDI_Niya - Sen Sec Conv Note - FULLY EXECUTED - 2022.04.11 (3)#page5.tiff

**Exhibit A**

Collateral

| Patent | Description |
|---|---|
| 10,839,500 | Digital media enhancement system, method, and apparatus |
| 10,701,077 | System and methods of virtual world interaction |
| 10,464,482 | Immersive Display |
| 10,394,363 | Conditional balance management for non-issuer debit instruments |
| 10,394,363 | Device for physical interaction between remotely located users |
| 10,255,666 | Digital media enhancement system, method, and apparatus |
| 10,248,285 | Immersive Display |
| 10,198,154 | Translating user interfaces of applications |
| 10,102,661 | Time-dependent client inactivity indicia in a multi-user animation environment |
| 9,898,810 | Digital media enhancement system, method, and apparatus |
| 9,889,375 | Multi-instance, multi-user virtual reality spaces |
| 9,867,961 | Treatment of phantom limb syndrome and other sequelae of physical injury |
| 9,802,119 | Virtual environment for computer game |
| 9,786,082 | Avatar eye control in a multi-user animation environment |
| 9,724,605 | Method, System and Apparatus of Recording and Playing Back an Experience in a Virtual Worlds System |
| 9,705,838 | Mobile status update display |
| 9,595,136 | Creation and use of virtual places |
| 9,569,876 | Animation control method for multiple participants |
| 9,558,500 | Method and apparatus for providing internet advertising service |
| 9,508,180 | Avatar eye control in a multi-user animation environment |
| 9,452,360 | Multi-instance, multi-user virtual reality spaces |
| 9,418,462 | Digital media enhancement system, method, and apparatus |
| 9,348,666 | Translating user interfaces of applications |
| 9,329,743 | Computer simulation method with user-defined transportation and layout |
| 9,251,616 | Time-dependent client inactivity indicia in a multi-user animation environment |
| 9,208,598 | Avatar eye control in a multi-user animation environment |
| 9,123,157 | Multi-Instance, Multi-User Virtual Reality Spaces |
| 9,077,679 | Mobile status update display |
| 9,014,500 | Digital media enhancement system, method, and apparatus |
| 9,007,362 | Adaptable generation of virtual environment frames |
| 8,947,427 | Systems and methods of object processing in virtual worlds |
| 8,861,421 | Mobile status update display |
| 8,818,855 | System and method for aggregating information over a wide area network |
| 8,812,954 | Multi-Instance, Multi-User Virtual Reality Spaces |
| 8,775,396 | Method and system for searching a wide area network |
| 8,704,829 | Avatar eye control in a multi-user animation environment |
| 8,694,553 | Creation and use of virtual places |
| 8,683,386 | Virtual environment for computer game |
| 8,671,142 | Systems and methods of virtual worlds access |
| 8,621,368 | Systems and methods of virtual world interaction |

1 of 2

Collateral

| Patent | Description |
|---|---|
| 8,589,792 | Multi-instance, multi-user virtual reality spaces |
| 8,572,207 | Dynamic serving of multidimensional content |
| 8,453,219 | Systems and methods of assessing permissions in virtual worlds |
| 8,390,630 | Avatar eye control in a multi-user animation environment |
| 8,276,071 | Multi-Instance, Multi-User Animation Platforms |

## SENIOR SECURED CONVERTIBLE PROMISSORY NOTE

**THIS CONVERTIBLE PROMISSORY NOTE AND ANY SECURITIES ISSUABLE UPON CONVERSION OF THIS PROMISSORY NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, TRANSFERRED, OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND STATUTES, UNLESS OFFERED, SOLD, PLEDGED, HYPOTHECATED OR TRANSFERRED PURSUANT TO AN AVAILABLE EXEMPTION FROM OR IN A TRANSACTION NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF THOSE LAWS. THE COMPANY SHALL BE ENTITLED TO REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.**

This Convertible Promissory Note (the "Note") is made on this 11th of April, 2022, by and between Utherverse Digital, Inc., a corporation duly organized and existing under the laws of the Province of British Columbia, Canada, with a principal place of business at 102-80A 6th Street, New Westminster, British Columbia V3L 5B3, (the "Corporation"), and Niya Holdings, LLC, a Nevada Limited Liability Company with a principal place of business at 187 Warm Springs Road, Suite B206, Las Vegas, NV 89119, (the "Note Holder").

WHEREAS, Note Holder is willing to lend Corporation the aggregate sum of One Million Three Hundred Fifty Thousand and 00/100 United States Dollars ($1,350,000.00) (the "Loan"), on the terms and conditions set forth herein;

WHEREAS, the Corporation has developed a unique digital Coin to function in the Utherverse "Uther Coin" with a maximum supply of Three Billion (3,000,000,000) Uther Coins to be created;

WHEREAS, the Note Holder is vested by the terms and conditions of this Agreement with the right, but not the obligation, to convert the proceeds of the Loan into Uther Coins, as described herein;

WHEREAS the parties agree that the obligations set forth in this Note shall be secured by the tangible and intangible property of the Corporation;

NOW THEREFORE, for and in consideration of the mutual covenants contained in this Note, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1.     Promise to Repay**

A.     For full, fair, and adequate value received, Corporation hereby unconditionally promises to pay Note Holder all amounts borrowed, in lawful money of the United States of America, the principal amount being One Million Three Hundred Fifty Thousand and 00/100 US Dollars ($1,350,000.00 US) as well as the accrued interest on the unpaid principal amount thereof at the rate of six percent (6%) simple interest per annum, within Twenty-Four (24) months of the date of the Loan.

Payment(s) shall be made quarterly in equal installments to Note Holder at an address as Note Holder may designate. If any payment is not paid when due or Corporation is in default as set forth in this Note, interest shall then accrue from the date of default forward at the default rate of ten percent (10%) per annum until all amounts due and owing under this Note are paid in full.

For the purposes of calculating interest for any period for which the interest shall be payable, such interest shall be calculated on the basis of a thirty (30) day month and a 365-day year. The Corporation will promptly and punctually pay to Note Holder or their nominee the interest on the Note held by Note Holder without the need for presentment. In the event the Corporation defaults on any installment of interest or principal, then any Note

1

Holder may, at its option, without notice, declare the entire principal and the interest accrued thereon immediately due and payable and may proceed to enforce the collection thereof.

B.    The Corporation shall create Uther Coins, which shall be available to Note Holder for conversion, in the manner and at the prices specified herein. Uther Coins shall not constitute nor be the equivalent of stock of or in the Corporation, but rather, intangible property of the Corporation. Nothing in this Note shall be deemed to limit or control the issuance, number or composition of said Coins, the design and functionality of which shall at all times be within the Corporation's sole discretion.

C.    Presentment, notice of dishonor, and protest are hereby waived by all makers, sureties, guarantors, and endorsers hereof. This Note shall be the joint and several obligations of all makers, sureties, guarantors, and endorsers, and shall be binding upon them and their guarantors and endorsers, successors, agents, and assigns.

## 2.    Representations and Warranties by the Corporation

A.    The Corporation is a duly organized corporation existing in good standing under the laws of the Province of British Columbia, Canada, and has the corporate power to own its own property and to carry on in the business as it is now being conducted.

B.    There is no action or proceeding pending or threatened against the Corporation before any court or administrative agency, the determination of which might result in and material adverse change in the business of the Corporation.

C.    The Corporation has title to the respective properties and assets which are the subject of this Note, which assets and properties are subject to no liens, mortgages, encumbrances, or charges.

D.    The Corporation is not a party to any contract or Note or subject to any restriction which materially and adversely affects its business, property, assets, or financial condition, and neither the execution nor delivery of this Note, nor the confirmation of the transactions contemplated herein, nor the fulfillment of the terms hereof, nor the compliance with the terms and provisions hereof and of the Notes, will conflict with or result in the breach of the terms, conditions or provisions or constitute a default, under the Articles of Incorporation or of any Note or instrument to which the Corporation is now a party.

E.    There are no outstanding options or rights to purchase the Uther Coins that are the subject of this Note, nor any other outstanding contracts or Notes with the right of conversion to the same.

F.    Corporation owns or possesses adequate licenses or other rights to use, all patents, trademarks, trade names, trade secrets, and copyrights used in its business. No one has asserted to the Corporation that its operations infringe on the patents, trademarks, trade secrets or other rights utilized in the operation of its business.

G.    Neither the Corporation nor any agent or employee acting on its behalf has offered the Note or the Uther Coins or any portion thereof for sale to, or solicited in any offer to buy the same, from anyone other than the Note Holder. Neither the Corporation nor any agent or employee acting in its behalf will sell or offer for sale the Note to anyone so as to bring the issuance or sale thereof within the provisions of Section 5 of the Securities Act of 1933.

H.    The Corporation's repayment obligations under the terms of this Note shall be secured, in favor of Note Holder, by all of the tangible and intangible property of the Corporation. Said obligation shall be senior to any competing claim of any kind on said property up until Note Holder exercises its conversion rights hereunder, or the obligation is satisfied in full.

2

**3.      The Note Holder represents and warrants that:**

A.      The Note Holder is hereby issuing funds for the subject Note for its own investment purposes and not for the further sale thereof, and it has no intent to sell, give or otherwise transfer the Uther Coins that are the subject of this Note to any third party.

B.      The Note Holder states that it is a resident of the State of Nevada.

C.      The Note Holder understands that this Note represents a highly speculative investment, and that it has the requisite sophistication to fully understand all of the risks of said investment, including the speculative nature of the Uther Coins which the Note holder may choose to acquire hereunder.  The Note Holder hereby warrants that is has had the ability to review this Note with competent legal or other counsel.

D.      The principal(s) of the Note Holder, as individual(s) represent and warrant that they have a net worth in excess of one million United States dollars ($1,000,000.00), exclusive of their principal residences, and that they are sophisticated investors who are knowledgeable about digital assets and the business of the Corporation.

4.  **Prepayment of the Note** – Corporation shall have the right, at a time no earlier than twelve (12) months after the date of the initial generation and offering of the Uther Coins, to make prepayments on the whole or any part of the principal of this Note, plus all accrued interest, by giving thirty (30) days written notice ("Prepayment Notice") to the Note Holder of its intent to may a prepayment on the whole or any part of the principal of this Note. Note Holder shall have the opportunity to convert the outstanding principal balance of this Note to Uther Coins according to the terms of this Note by giving written notice to Corporation within fifteen (15) days of the Prepayment Notice.

**5.      Conversion**

The Note Holder, at any time up to 24 months from the Uther Coin being minted, but not thereafter, may, but shall not be required to, convert the Note in whole or in part into Uther Coins according to the following schedule:

| Amount of Principal Eligible For Conversion | Coin Purchase Price (in USD) |
|---|---|
| Three Hundred  Thirty-Seven Thousand Five Hundred United States Dollars ($337,500.00) | $0.12 |
| Three Hundred  Thirty-Seven Thousand Five Hundred United States Dollars ($337,500.00) | $0.15 |
| Three Hundred Thirty-Seven  Thousand Five Hundred United States Dollars ($337,500.00) | $0.18 |
| Three Hundred Thirty-Seven Thousand Five Hundred United States Dollars ($337,500.00) | $0.20 |

3

The Note Holder may exercise its right convert any amount of the Loan set forth in the Note into Uther Coins in the amount and at the strike prices set forth above by contacting both Brian Shuster and Ari Good by email at the email addresses set below. The Note Holder shall provide the amount of Uther Coins and strike price it wishes to convert in its email communication. Corporation shall furnish Note Holder with the Uther Coins requested within ten (10) business days of Note Holder exercising its option to convert any part of the Loan or Note.

## 6.     Covenants

A.     The Corporation covenants that, so long as the Note is outstanding, it will permit the Note Holder to visit and inspect, at the Note Holder's expense and with reasonable notice, any of the property of the Corporation, including its books and records, and to discuss affairs, finances, and accounts with its officers.

B.     Corporation covenants that, without the written consent of the Note Holder, it will not:

1.     Create or suffer to exist any mortgage, pledge, encumbrance, lien or charge of any kind on any of its properties or assets, whether now owned or hereafter acquired except for (i) mortgages, encumbrances, liens or charges which are now in existence; (ii) mortgages, liens, charges and encumbrances (a) for taxes, assessments or governmental charges or levies on property of the Corporation if the same shall not be due or delinquent or thereafter can be paid without penalty, or being contested in good faith and by appropriate proceedings; (b) of mechanics and material men for sums not yet due or being contested in good faith and by appropriate proceedings; or (c) in connection with workers' compensation, unemployment insurance and other state employment legislation.

2.     Make any loan or advance to any person, firm, or corporation.

3.     Assume, guarantee, endorse or otherwise become liable in connection with the obligations, stock or dividends of any person, firm, or corporation except in the ordinary course of business by endorsement of a negotiable instrument in the course of collection.

4.     Merge or consolidate with any other corporation or sell, lease or transfer or otherwise dispose of all or a substantial part of its assets to any person, firm, or corporation.

## 7.     Event of Default

A.     The breach of any of the events or conditions set forth in this Section 7 of the Note shall constitute an event of default under this Note. The Note Holder may give written notice of such breach and if the Corporation shall within thirty (30) days after receipt of such written notice have failed to correct such occurrence or condition, then the Holder of any one of the Notes may, at its option and without notice, declare the entire principal and interest accrued thereon immediately due and payable and may proceed with collection.

B.     If the Corporation has made a material misrepresentation in connection with this Note or with the transactions contemplated by this Note, or if the Corporation makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for the Corporation; or if any proceeding involving the Corporation is commenced under any bankruptcy, reorganization, arrangement, insolvency, statute or law, such event shall be deemed a default which will immediately entitled Holder of the Notes, at their option and without notice, to declare the entire amount of interest accrued thereon immediately due and payable and proceed to enforce the collection thereof.

C.     In case of default in the payment of any installment or principal, the Holder of the Note may, at their option and without notice, declare the entire principal and the interest accrued thereof immediately due and payable and may proceed to enforce the collection thereof.

4

**8.      Miscellaneous**

A.      Notice - Any and all notices, approvals or other communications to be sent to the parties shall be deemed validly and properly given if made in writing and delivered by hand or by registered or certified mail, return receipt requested, and addressed to the Corporation at its principal office or to the Holder of the Notes at the addresses given to the Corporation by such Note Holder.  Routine communications shall be made to: ▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮info@goodattorneysatlaw.com if to the Corporation, and to ▮▮▮▮▮▮▮▮▮▮ if to the Note Holder.

B.      This Note may not be modified, amended, or terminated except by written Note executed by all the parties hereto.

C.      The waiver of any breach or default hereunder shall not be considered valid unless in writing and signed by the party giving such notice and no waiver shall be deemed a waiver of any subsequent breach or default of same.

D.      The paragraph headings contained herein are for the purpose of convenience only and are not intended to define or limit the contents of such.

E.      The validity, construction, interpretation and enforceability of this Note and the Notes executed pursuant to this Note shall be determined and governed by the laws of the Province of British Columbia, Canada.

F.      This Note shall be binding upon and inure to the benefit of the Corporation and its successors and assigns.

G.      This Note may be executed in one or more counterparts, each of which shall be deemed an original.

H.      The parties to this Note have all necessary authority to make all representations and carry out all their obligations herein, and to bind each respective party.

WITNESS our signatures as of **April 11th, 2022**:

For the Note Bearer:

Signed
By:
Brian Shuster, CEO - Utherverse Digital, Inc.
Brian Shuster, Individual

For the Note Holder:

Signed
By:
Nima Momayez, Member - Niya Holdings, LLC
Nima Momayez, Individual